**2015-1235**

# United States Court of Appeals
# for the Federal Circuit

HIGH POINT SARL,

*Plaintiff-Appellant,*

v.

T-MOBILE USA, INC.,  ERICSSON, INC.
and NOKIA SOLUTIONS AND NETWORKS US LLC,

*Defendants-Appellees.*

*Appeal From The United States District Court For The District Of New Jersey In Case No. 12-Cv-01453, Judge Joseph E. Irenas*

## NON-CONFIDENTIAL OPENING BRIEF
## FOR PLAINTIFF-APPELLANT HIGH POINT SARL

MARTIN J. BLACK
ROBERT D. RHOAD
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
*Counsel for Plaintiffs-Appellants*

March 23, 2015

## CERTIFICATE OF INTEREST

Counsel for the appellant, High Point SARL, certifies the following:

1.  The full name of every party or amicus represented by me is:

    High Point SARL

2.  The name of the real party in interest (if the real party named in the caption is not the real party in interest) represented by me is:

    High Point SARL

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    InPro, Limited is a parent corporation of High Point
    SARL.  RIT Capital Partners, PLC (publicly held) owns
    10 percent or more of High Point SARL.

4.  The names of all law firms and the partners or associates that appeared for the party or  amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Martin J. Black, Robert D. Rhoad, Jeffrey S. Edwards,
    Bryan Jin, James D. Ragon, Derek J. Brader, all of
    Dechert LLP and Thomas P. Lihan formerly of Dechert
    LLP.

Date: March 23, 2015

/s/ *Robert D. Rhoad*
Robert D. Rhoad
DECHERT LLP
*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

Certificate of Interest ................................................................................i

Table of Authorities ..................................................................................v

I.     Statement of Related Cases .............................................................1

II.    Jurisdictional Statement...................................................................1

III.   Statement of the Issues ....................................................................1

IV.    Introduction......................................................................................2

V.     Statement of the Case ......................................................................4

VI.    Statement of the Facts .....................................................................6

       A.     The Patented Technology.......................................................6

       B.     The Accused T-Mobile Network............................................10

       C.     T-Mobile, NSN-US, and Ericsson-US Motions for Partial
              Summary Judgment...............................................................14

              1.     Nokia, NSN-BV, and NSN-US....................................14

                     (a)    Nokia sales to T-Mobile were not authorized. ..............14

                     (b)    NSN-US sales to T-Mobile were not authorized...........15

                     (c)    The ATT-Siemens license ............................................16

              2.     LME and Ericsson-US .................................................18

                     (a)    2006–2011 Ericsson-US Purchases...............................18

                     (b)    The Lucent-LME License.............................................18

                     (c)    The "nunc pro tunc" sublicense.....................................20

              3.     Alcatel-Lucent.............................................................20

       D.     The District Court's Opinion.............................................22

VII.   Summary of Argument ....................................................................23

VIII.  Argument .........................................................................................26

       A.     Standard of Review ...............................................................26

       B.     The Defense of Patent Exhaustion ......................................26

C.    The District Court Erred in Finding that Sales to T-Mobile were
      Authorized ........................................................................27

      1.    Sales by Nokia-US were Not Authorized ...............................27

      2.    Sales by NSN-US were Not Authorized ...................................27

            (a)    The district court misinterpreted the "separately
                   identifiable" limitation of the Divestment Rider ..........27

            (b)    NSN never operated Siemens' divested business as
                   a "separately identifiable" business ...............................29

            (c)    NSN is not the "divested business" ...............................29

            (d)    NSN sold no Siemens divested products to T-
                   Mobile ........................................................................30

            (e)    NSN failed to meet the products limitation of the
                   underlying 1988 AT&T-Siemens Agreement ...............31

            (f)    NSN BV had no authority to sublicense NSN-US ........31

      3.    Sales by Ericsson were Not Authorized ...................................32

            (a)    There is no such thing as retroactive exhaustion...........32

            (b)    Ericsson's purported "nunc pro tunc" sublicense is
                   an illegitimate release ...................................................34

            (c)    The district court erred in crediting Ericsson's
                   unevidenced "holding company" submissions..............36

            (d)    Ericsson effectively concedes that its summary
                   judgment position is untenable ....................................37

      4.    Sales by Alcatel-Lucent were Not Authorized ........................38

            (a)    Alcatel's 1996 license does not cover the MGW
                   products it acquired from Spatial Wireless in 2004 ......38

            (b)    Alcatel's 1996 license does not cover the Spatial
                   Wireless MGW business, which Alcatel did not
                   "operate" until 2004....................................................41

            (c)    The district court misinterpreted and misapplied
                   Rembrandt II................................................................41

D.     The District Court Erred in Finding that the Articles Sold Under
       the Purported Licenses Substantially Embody all of the
       Claimed Inventions............................................................................44

       1.     No Substantial Embodiment of High Point's Inventions ........44

              (a)     The district court failed to analyze T-Mobile's
                      equipment vis-a-vis the claims .....................................44

              (b)     The district court misinterpreted and misapplied
                      dicta in Keurig ............................................................46

              (c)     The district court failed to take account of the role
                      of unlicensed equipment...............................................49

       2.     Portions of the Network Incorporating Any Equipment
              from an Unlicensed Vendor are Infringing.............................51

E.     T-Mobile Uses Unlicensed Equipment Combinations in Its
       Network ..............................................................................................53

IX.   Conclusion ...................................................................................................54

**CONFIENTIAL MATERIAL OMITTED**

The material omitted on pages 16 and 17 describes confidential terms of the 1988 AT&T-Siemens License.  The material omitted from the second paragraph on page 21 describes the financial relationship of Alcatel and Lucent in their 2006 merger.  The material omitted from the third paragraph on page 22 describes confidential terms of the 1996 AT&T-Alcatel Agreement.  The material omitted on pages 28 and 31 describes confidential terms of the 1988 AT&T-Siemens License. The material omitted on page 39 describes confidential terms of the 1996 AT&T-Alcatel Agreement.  The material omitted on pages 53 and 54 describes confidential terms of the 1988 AT&T-Siemens License.

# TABLE OF AUTHORITIES

## Cases

*Aleynikov v. Goldman Sachs Grp., Inc.*,
  765 F.3d 350 (3d Cir. 2014) ........................................................ 26, 37

*Cascades Computer Innovation, LLC v. Samsung Elecs. Co.*,
  Civ. Nos. 11-4574, 11-6235, 2014 WL 4553226, 2014 U.S. Dist. LEXIS 128300
  (N.D. Ill. Sep. 14, 2014) ................................................................ 35

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) ................................................... 24, 34

*Helferich Patent Licensing, LLC v. New York Times Co.*,
  Nos. 2014-1196 et al., 2015 WL 527851, 2015 U.S. App. LEXIS 2047 (Fed. Cir.
  Feb. 10, 2015) ....................................................... 4, 26, 47, 48

*High Point SARL v. Sprint Nextel Corp.*,
  No. 15-1298 (Fed. Cir.) ................................................................. 1

*Honeywell International, Inc. v. United States*,
  609 F.3d 1292 (Fed. Cir. 2010) ............................................ 24, 33, 34

*Jazz Photo Corp. v. United States*,
  439 F.3d 1344 (Fed. Cir. 2006) ..................................................... 26

*Keurig, Inc. v. Sturm Foods, Inc.*,
  732 F.3d 1370 (Fed. Cir. 2013) ................................................ passim

*Memorylink Corp. v. Motorola Sol'ns, Inc.*,
  773 F.3d 1266 (Fed. Cir. 2014) ..................................................... 26

*Orson, Inc. v. Miramax Film Corp.*,
  79 F.3d 1358 (3d Cir. 1996) ........................................................... 37

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) ................................................................ passim

*Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*,
  489 F.2d 974 (7th Cir. 1973) ........................................................ 35

*Rembrandt Data Techs., LP v. AOL, LLC* (*Rembrandt II*),
  641 F.3d 1331 (Fed. Cir. 2011) ................................................ passim

*Rembrandt Data Techs., LP v. AOL, LLC*,
  673 F. Supp. 2d 420 (E.D. Va. 2009) ............................................. 42

*Schering Corp. v. Roussel-Uclaf Sa*,
   104 F.3d 341 (Fed. Cir. 1997) ...............................................................34

*STC.UNM v. Intel Corp.*,
   754 F.3d 940 (Fed. Cir. 2014) ...............................................................34

*Toshiba Corp. v. Imation Corp.*, Civ. 09-305, 2013 WL 1248633, 2013 U.S. Dist.
   LEXIS 42662 (W.D. Wisc. Mar. 26, 2013) .........................................44

**Statutes**

28 U.S.C. § 1295 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

28 U.S.C. § 1338 ..........................................................................................1

35 U.S.C. § 121 ..........................................................................................48

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) .........................................28

MPEP § 803.01 ..........................................................................................48

## I.    STATEMENT OF RELATED CASES

No other appeal in or from the underlying civil action was previously before this or any other appellate court.  Currently pending before this Court is High Point SARL's appeal in *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298 (Fed. Cir.), which involves the same patents-in-suit as the instant appeal.  On February 24, 2015, this Court listed these cases as companion cases for oral argument.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  The district court entered final judgment on December 10, 2014.  Plaintiff-appellant High Point SARL appealed on December 23, 2014.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## III.    STATEMENT OF THE ISSUES

1.    Whether the district court erred in granting summary judgment of exhaustion based on its finding that sales from NSN-US to T-Mobile were authorized by a purported sublicense from Siemens AG, a non-controlling shareholder of NSN-US's parent company.

2.    Whether the district court erred in granting summary judgment of exhaustion based on its finding that sales from Ericsson-US to T-Mobile were retroactively authorized by a purported "*nunc pro tunc*" sublicense made after the patents-in-suit had expired.

3.     Whether the district court erred in granting summary judgment based on its finding sales from ALU-US to T-Mobile were authorized under a prior agreement with High Point's predecessor, Lucent, even though the equipment fell outside the license averred.

4.     Whether the district court erred in granting summary judgment based on exhaustion without having examined whether the supposedly-licensed equipment substantially embodied all the asserted claims of the patents-in-suit.

5.     Whether the district court erred in granting summary judgment based on finding that an authorized sale of one claimed invention triggers exhaustion of other claims to separate inventions of the same or related patents.

## IV.    INTRODUCTION

The patents-in-suit claim several inventions relating to the transmission of packetized cell phone traffic within the terrestrial portion of a wireless telecommunications network.  The inventions were developed by AT&T Bell Labs, and ultimately acquired by the Plaintiff-appellant High Point SARL ("High Point").  Defendant-appellee T-Mobile USA, Inc. ("T-Mobile") uses the patented transmission technology to transfer voice packets within its network, and High Point brought infringement proceedings against T-Mobile in the United States District Court in New Jersey.

T-Mobile's network is complex and includes equipment from several suppliers in multiple configurations. Two of T-Mobile's suppliers, Ericsson Inc. ("Ericsson-US") and Nokia Siemens Networks US LLC ("NSN-US"), intervened in High Point's action, asserting that they held licenses to the patents-in-suit from High Point's predecessors, AT&T and Lucent Technologies Inc. ("Lucent"). T-Mobile and the intervening suppliers sought summary judgment on the basis that most of the components in T-Mobile's network were bought from licensed suppliers, and that High Point's claims for infringement against the entirety of T-Mobile's network were thereby exhausted.

The district court was obligated in ruling on the exhaustion defense to follow a two step process: (1) interpret the suppliers' license agreements to determine whether the sales to T-Mobile were authorized, and (2) examine the patent claims to determine whether any of the equipment purchased pursuant to an authorized sale substantially embodied the claimed inventions. *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008) . The district court erred grievously in the first step and then failed to apply the second step altogether. The district court ruled that Nokia's phone business obtained a license to the patents-in-suit when it formed a joint venture with Siemens, even though the applicable license agreement precluded that result. The court ruled that a "*nunc pro tunc*" license agreement formed between Ericsson-US and its parent in 2013, after the patents-in-suit had

3

expired and High Point had commenced this litigation, somehow wiped out High Point's accrued infringement claims.  And with respect to a third supplier, Alcatel-Lucent USA, Inc. ("ALU-US"), the district court erroneously held that T-Mobile purchased licensed "MGW"s when that was not a category of licensed products under the agreement in question.

Having erroneously concluded that all three suppliers were licensed, the district court failed to determine whether equipment from these suppliers substantially embodied the asserted claims.  Indeed, it could not do so on the record evidence.  Instead, the district court misapplied *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370 (Fed. Cir. 2013), and dismissed all of High Point's claims on the ground that supposed exhaustion of three asserted base station-only claims further exhausted all asserted claims of the '090 Patent.  The district court applied a similar approach to the other patents-in-suit.  This summary approach to exhaustion was recently rejected in *Helferich Patent Licensing, LLC v. New York Times Co.*, Nos. 2014-1196 et al., 2015 WL 527851, 2015 U.S. App. LEXIS 2047 (Fed. Cir. Feb. 10, 2015).

## V.    STATEMENT OF THE CASE

Plaintiff-Appellant High Point SARL filed this case on March 8, 2012, against Defendant-Appellee T-Mobile USA Inc., asserting claims for infringement of United States Patent Nos. 5,195,090; 5,305,308; 5,184,347; and 5,195,091.

A72–79; A81–353.  T-Mobile asserted counterclaims for declaratory judgments of non-infringement and invalidity in its Amended Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial.  A880–92.

In May 2013, the district court allowed NSN-US[1] and Ericsson-US to intervene as defendants.  A451–56.  Ericsson-US asserted counterclaims for declaratory judgments of invalidity, non-infringement, license, estoppel, breach of contract, and promissory estoppel in its Amended Answer, Affirmative Defenses, Counterclaims in Intervention, and Demand for Trial by Jury.  A693–709. NSN-US filed an answer, but did not assert counterclaims.  A711–22  T-Mobile filed a motion to join ALU-US as a defendant, but the district court administratively terminated this motion without prejudice.  A3 n.3.

On February 24, 2014, T-Mobile and NSN-US filed a motion for partial summary judgment on T-Mobile's affirmative defense of patent exhaustion, asserting that certain of High Point's claims were barred by the doctrine of exhaustion.  A2720–69.  T-Mobile sought to show that each of its major suppliers, Ericsson-US, NSN-US, and ALU-US were licensed, and that by extension High Point's claims against T-Mobile, at least with respect to calls serviced by equipment from these manufacturers, were exhausted.

---

[1] Nokia Solutions and Networks US LLC was formerly known as Nokia Siemens Networks US LLC.  A1095–96.

Ericsson-US filed its own motion seeking "partial summary judgment that Defendant T-Mobile USA Inc. ('T-Mobile') has not infringed the patents asserted by Plaintiff High Point SARL ('High Point') in connection with the components supplied to T-Mobile by Ericsson."  A1176–1212.

After a short period of discovery, briefing, and oral argument, the district court granted both motions for summary judgment in an Opinion and Order dated October 15, 2014.  A1–33.  Because this ruling disposed of all but a small portion of T-Mobile's infringement, the Parties stipulated to the entry of final judgment on all claims and counterclaims.  A34–38.

## VI.    STATEMENT OF THE FACTS

The patents-in-suit cover a series of system-level inventions which are of immense value to a wireless telecommunications carrier.  T-Mobile uses those inventions in the network it constructed using building blocks from third parties.

### A.    THE PATENTED TECHNOLOGY

The patents-in-suit relate to phone calls made through cellular telephone networks.  A wireless network consists of two parts: (1) the air interface which handles communications over the airwaves between a wireless base station (or "cell") and a mobile phone, and (2) the terrestrial infrastructure which transfers traffic to and from the base stations and a larger network.  A6288.  Specifically, when a customer speaks into a mobile phone, the phone converts the sound waves

6

into digitized voice samples which are then sent over the air to a base station.
A6288–89; A6293.  For calls which must be connected to traditional landlines,
known as the PSTN, the network needs to send the traffic to the PSTN without
timing delays or glitches.  A6296–97.

As described in the '090 Patent, the prior art involved using "circuit
switching" technology which dedicated a single circuit to each call regardless
whether there was voice traffic on the line at any given time.  A84; A116–17;
A6289; A6292–94.  With the advent of CDMA, which greatly expanded the traffic
handled by each base station, there was a need for a much more robust mechanism
to transfer traffic over the terrestrial infrastructure.  A116 at 2:19 – A117 at 3:12;
A116–17; A6290–92.  Broadly speaking, the patents-in-suit discuss different
aspects of the use of "statistical multiplexing" and packet-switching techniques to
drive these efficiencies.  *See* A6292–97.

Although there are four patents-in-suit with many claims and vastly different
subject matter, the district court lumped all of the patents-in-suit and all of the
claims together.  In fact, there are significant differences between the scope of the
claims in the four patents-in-suit.

There are many system claims that are similar to claim 6 of the '090 Patent
and claim an entire communications system:

> 6. *A radio-telephone communications system*
> comprising:

7

a ***plurality of cells*** each providing radio-telephone call services to radio telephones located in a zone served by the cell;

a ***plurality of communications links*** connected to the plurality of cells, at least one link connected to each cell;

***at least one switching system*** connected to the plurality of links for conveying radio-telephone call traffic to and from the cells over the links;

***each cell including first means*** responsive to radio reception of incoming voice call traffic from radio telephones, for transmitting packets carrying the incoming traffic of individual calls on the connected at least one link in statistically-multiplexed form, and further for receiving packets carrying outgoing voice call traffic of the individual calls on the connected at least one link in statistically-multiplexed form for radio transmission of the outgoing traffic to the radio telephones; and

***each switching system including second means*** responsive to receipt of outgoing voice call traffic destined for radio telephones served by a cell, for transmitting packets carrying the outgoing traffic of the individual calls in statistically-multiplexed form on the at least one link connected to the cell, and further for receiving packets carrying incoming voice call traffic of the individual calls in statistically-multiplexed form on the at least one line connected to the cell for transmission of the incoming traffic to destinations of the incoming traffic,

***the second means including***

***means for controlling time instants of switching system transmission*** from the switching system of the packets carrying the outgoing traffic to ensure receipt of the transmitted packets, at a cell serving a user terminal for

8

which the transmitted packets are destined, within predetermined windows of time, and

***means for controlling time instants of switching system transmission*** from the switching system of the incoming traffic to ensure that the packets carrying the incoming traffic will have been received at the switching system within predetermined windows of time prior to the time instants of their transmission from the switching system.

A139–40 (emphasis added).

The elements of the claim include cells, a communications medium, switching systems, and various means used to communicate traffic between the devices and handle timing problems that might arise.  Other claims in the '090 Patent claim only the cell or base station alone (claims 28 and 31).  A148–49. While the district court did not examine the claims, the asserted claims cover the following distinct inventions:

9

| Invention | Asserted Claims |
|---|---|
| 1. Radio-telephone communications system and methods of using same | '090 Patent claims 6, 8, 10. 11, 12, 15, 18, 22, 39, 40, 42, 47, 53, 54. A139–56. |
| 2. Cell | '090 Patent claims 28, 31. A148–49. |
| 3. Cell interconnect module | '308 Patent claim 1. A217. |
| 4. Switching system | '308 Patent claim 4. A218. |
| 5. Radio-telephone call processing apparatus | '308 Patent claims 13, 17, 28. A220–21; A225. |
| 6. A method of maintaining synchronization despite drift of the system's clocks | '347 Patent claims 24, 26, 29, 31, 32. A286–88. |
| 7. A method of maintaining synchronization despite the presence of a communications medium having a fluctuating transmission delay. | '091 Patent claims 22, 24, 25. A350–51. |

### B.    THE ACCUSED T-MOBILE NETWORK

High Point contends that T-Mobile's assembly and use of its 3G/UMTS cellular wireless network infringes each of the patents-in-suit.[2]  That network is comprised principally of components known as Node Bs (also referred to as cells or base stations), Radio Network Controllers (RNCs), Media Gateways (MGWs),

---

[2] "3G" is short for "Third Generation," meaning the third generation of mobile telecommunications technology, and is generally used to refer to mobile devices and networks that comply with certain sets of industry specifications established by the International Telecommunication Union.  One such set of standards is the Universal Mobile Telecommunications System, or "UMTS." A6297 n.2.

switches, transmission media (*i.e.*, lines, cables, etc. that convey digital signals), and other interconnect equipment, including "Routers." A6297–304. The following is a high level schematic of how these pieces fit together in a typical configuration of the accused network:



*See* A6301–04.

T-Mobile's key vendors have been Nokia Inc. ("Nokia-US"), succeeded by NSN-US, Ericsson-US, and Alcatel USA Marketing Inc. ("ALU Marketing"), a subsidiary of ALU-US. A6299; A6381–84. T-Mobile also purchased Routers and Interconnect Equipment from various vendors, including Cisco, Tellabs, and Alcatel. A6379–80. The relationship between the various pieces of the network is complex, but the key elements are discussed below. *See* A6273–80; A6298–99; A6371–85; A5849–57.

Node Bs:  "Node Bs," are cells and base stations, include radios, antennas, and digital signal processing equipment, and are used to convey digital traffic "over the air" to and from mobile users in a geographic area near the Node B. A6298.

RNCs:  Each Node B is connected to and communicates with a Radio Network Controller ("RNC") via T1 lines or other transmission media, and interconnect equipment.  Each RNC can be connected to scores (sometimes hundreds) of Node Bs.  Among other things, each RNC processes and controls the voice call traffic received from and destined for the Node Bs to which it is connected, and performs, for example, the required selection and distribution functions during "soft handoffs," as occurs in CDMA networks when a phone moves from one cell to another.  Typically, the combination of an RNC and the Node Bs to which it is connected are referred to as a radio access network ("RAN").  A6298; A7125–26.

MGWs:  Media gateways ("MGWs") are connected to the RAN via transmission media and interconnect equipment.  The MGWs are further connected to the PSTN and sometimes to other MGWs, and convey communications between the RNCs and the PSTN or other telecommunications networks.  The MGWs, along with Mobile Switching Centers ("MSCs") oftentimes collocated with them, are sometimes referred to as the "Core Network."  A6298; A7125–26.

Transmission Media and Interconnect Equipment:  The above components are inter-connected with one another by a variety of transmission media (*i.e.*, lines, cables, etc. that convey digital signals between them) and interconnect equipment that, among other things, perform various routing and switching functions with respect to communications being conveyed among the above components over the transmission media.  The transmission media include, for example, T1 lines, DS-3 lines, and OC-3 optical fibers.  The interconnect equipment includes, for example, Local Exchange Carrier ("LEC") equipment; Interexchange Carrier ("IXC") equipment; MSO Aggregation Devices ("MADs"); Alternative Access Vendor ("AAV") equipment; Routers co-located with the Node Bs; digital cross-connect systems ("DACS"), routing switch platforms ("RSP") and other Routers co-located with the RNCs; and other Routers located between RNCs and Node Bs (collectively, the "Interconnect Equipment").  A6298; A7125–26.

T-Mobile uses different equipment configurations in different geographic locations, so that depending on where a caller calls from and to, his or her call will traverse different types of equipment.  A6377–80.  The parties agree that the bulk of the infringement in the case involves four general configurations, each of which must be considered separately.

13

| Configuration | Node B vendor | Routers and Interconnect Equipment | RNC Vendor | MGW Vendor |
|---|---|---|---|---|
| 1) NSN-ALU | NSN or Nokia | Various | NSN | ALU |
| 2) NSN-Ericsson | NSN or Nokia | Various | NSN | Ericsson |
| 3) Ericsson-ALU | Ericsson | Various | Ericsson | ALU |
| 4) Ericsson-Ericsson | Ericsson | Various | Ericsson | Ericsson |

*See* A2736; A6380–84.

### C.    T-MOBILE, NSN-US, AND ERICSSON-US MOTIONS FOR PARTIAL SUMMARY JUDGMENT

T-Mobile, NSN-US, and Ericsson-US moved for summary judgment on T-Mobile's affirmative defense of patent exhaustion.  These motions rest on two false premises: (1) that T-Mobile purchased nearly all its equipment from authorized licensees, thereby satisfying the "authorized sale" requirement; and (2) that these purportedly authorized sales exhausted High Point's claims against T-Mobile.  The facts relevant to the vendors' purported authority for the sales are as follows.

#### 1.    Nokia, NSN-BV, and NSN-US

##### (a)    *Nokia sales to T-Mobile were not authorized.*

Nokia Inc. ("Nokia-US") is a supplier of telecommunications equipment. Prior to 2007, T-Mobile purchased Node Bs and RNCs from Nokia-US under a supply contract.  A6406 (Deposition of Gerwin Zott); A6422–23 (Nov. 8, 2006 letter agreement assigning Nokia-US agreement to NSN-US); A6425–26 (sales

14

excerpts prior to creation of NSN-BV); A6441–43 (recitals to 9th amendment to supply agreement); A6019–21; A6039–41.  It is undisputed that the sales of these Nokia products were not authorized.  *See* A5 n.6.

### (b)    *NSN-US sales to T-Mobile were not authorized*

In 2007, Nokia Corporation ("Nokia"), and Siemens AG ("Siemens") created a joint venture, whose corporate form was a Dutch corporation named Nokia Siemens Networks B.V.  ("NSN BV").  A6231 ¶ 93; A6428–39.  NSN BV is the combined wireless telephone infrastructure businesses of the Nokia and Siemens organizations under one roof.  The equity was split 50/50, but control rested with Nokia, which consolidated NSN BV's operations into its own financial statements and had board control of the company and daily operations.  A6391–94; A6433–34.

After formation of NSN BV, Nokia-US assigned its contract with T-Mobile to NSN BV's U.S. subsidiary, NSN-US, after which NSN-US continued to sell to T-Mobile the same Nokia Node Bs and RNCs previously sold by Nokia-US itself.  A6019–21; A6039–41; A6406; A6422–23; A6441–43.  Siemens never sold any Node Bs or RNCs to T-Mobile.  A6405.  There is no evidence in the record that T-Mobile purchased a single piece of equipment designed by Siemens or which came from the original Siemens product line.  *See* A6406:5–17.

*Confidential Material Redacted*

### (c)    The ATT-Siemens license

Before the creation of NSN, Siemens and AT&T had entered into a cross-license agreement in 1988 (the "1988 AT&T-Siemens Agreement").  A4865–76.  There were important restrictions on the license rights granted under that agreement.

The license rights extended only to 

A4866 § 1.01(a).  Moreover, License rights could have been extended by Siemens only to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  A4866 § 1.01(b).  NSN BV is not and never was a ▆▆▆▆▆▆▆▆▆▆▆▆.  A6393–94, A6418.

In 1995, the 1988 AT&T-Siemens Agreement was supplemented by a letter signed by AT&T on November 3, 1995 and countersigned by Siemens on November 30, 1995 (the "Divestment Rider").  A4881–82.  The Divestment Rider provided that if Siemens would thereafter divest a portion of its business, Siemens may sublicense its rights under the 1988 AT&T-Siemens Agreement to the divested business but "[1] only while the future divested business operates as a separately identifiable business and [2] only to the extent applicable to products and services sold by the future divested business prior to its divestiture."  A4881.  After Siemens divested its wireless telephone infrastructure business to NSN BV,

### *Confidential Material Redacted*

that divested business was fully integrated with the corresponding wireless telephone infrastructure business of Nokia. It was never operated or identified separately. A6397, 6419. In fact, NSN BV shut down the relevant Siemens business and migrated its Siemens-based customers to Nokia-based equipment. A6232–33; A6398:15–6399:16, 6400:17–21, 6401:7–6402:9, 6403:9–16; 6649–65.

Even NSN-US's own witness admitted that the divested Siemens carrier division was not separately identifiable once integrated into NSN-BV. A6419. Moreover, T-Mobile simply continued to buy the same Nokia equipment the day after the formation of the joint venture as it had the day before. A6039–41; A6406; A6422–23; A6441–43.

The original 1988 AT&T-Siemens Agreement never covered ████████

█████████████████████████████████████████████████████████

Under § 4.02 of the 1988 AT&T-Siemens Agreement, ████████████

█████████████████████████████████████████████████████████

█████████████████████    A4868. In this case, T-Mobile acknowledges that the NSN components it purchased were used in combination with Alcatel and Ericsson MGWs as well as Routers and other Interconnection Equipment from others. A2735–36; A6380–84.

### 2.    LME and Ericsson-US

#### (a)    *2006–2011 Ericsson-US Purchases*

Between 2006 and July 2011, when the patents-in-suit expired, T-Mobile purchased equipment at issue in this case from Ericsson-US.  It is undisputed that during that time period, Ericsson-US had no license to the patents-in-suit and that T-Mobile used that equipment to service numerous calls prior to the expiration of the patents-in-suit.

#### (b)    *The Lucent-LME License*

High Point's predecessor, Lucent, entered into a cross-license agreement with L.M. Ericsson Telefonaktiebolaget ("LME"), effective as of January 1, 1996 (the "1996 Lucent-LME License").  A4782–99; A1217 ¶ 12.  The term of the licenses to each patent covered by the agreement extended only through the unexpired term of the patent:

> 1.02 Duration and Extent
>
> All licenses granted herein under any patent shall, notwithstanding the expiration of the LIMTIED PERIOD, continue for the entire unexpired term of such patent.

A4785; A1219 ¶ 21; A1186 (Ericsson opening brief, noting the Lucent-LME license "continued . . . until the patents expired").  The patents-in-suit expired on July 9, 2011.  A1216–17 ¶¶ 2, 4, 6, 8.  Accordingly, LME's license to the patents-in-suit expired on that date as well.

18

Although LME was licensed to the patents-in-suit through patent expiration, its subsidiaries were not licensed. By the express terms of the 1996 Lucent-LME License, the licenses thereunder did not automatically cover subsidiaries, but LME had a right "to grant sublicenses within the scope of such license to a party's RELATED COMPANIES." A1220 ¶ 23; A4785 § 1.03(c).

Thus any sublicense of a subsidiary was not automatic and would be on a specific, ad hoc basis. The agreement does not state the reason for this requirement of specific sublicensing, and there is no extrinsic evidence in the record about the parties' concerns with global filing requirements, tax planning, license controls, or other reasons. In any event, it is clear that sublicenses require specific action to be effective.

LME did not execute any sublicense to Ericsson-US during the entire period of its license to the patents-in-suit. Years after the patents and its license had expired, LME purported to execute a sublicense to Ericsson-US "*nunc pro tunc*," as described below.

In any event, under § 1.03(a)(1) of the 1996 Lucent-LME License, High Point's predecessor reserved its right to assert the patents-in-suit against customers who use LME's products in combination with other products not licensed under the agreement or for the use of methods which employed such combinations. A4785. T-Mobile acknowledges that it uses the Ericsson-US products in its

19

network in combination with the equipment of others, which is disqualifying.

A2735–36; A6380–84.

### (c)    The "nunc pro tunc" sublicense

On or about January 10, 2013, LME and Ericsson-US executed a document

entitled "Sublicense Agreement."  A1797–99.  The agreement stated:

> Effective, *nunc pro tunc*, as of the Effective Date, LME
> hereby grants to EUS and its Subsidiaries, and EUS
> hereby accepts on behalf of itself and its Subsidiaries, a
> worldwide, non-exclusive, paid-up, royalty-free,
> sublicense to all of LME's rights relating to U.S. Patents
> 5,184,347, 5,195,090, 5,195,091, and 5,305,308, and to
> all non-U.S. counterpart patents of each of the foregoing,
> pursuant to the AT&T Agreement and to the Lucent
> Agreement.

A1797.

The identified patents are the patents-in-suit.  The sublicense was executed

years after High Point's claims for infringement damages had accrued, two years

after expiration of the patent, and 17 years after the purported "Effective Date."

The purported sublicensee is Ericsson-US.  No license was granted to T-Mobile.

### 3.    Alcatel-Lucent

T-Mobile purchased MGWs from Alcatel USA Marketing, Inc. ("Alcatel-

US") and ALU-US, and T-Mobile claims that these purchases were authorized

under a 1996 agreement between AT&T and Alcatel (the "1996 AT&T-Alcatel

Agreement").  A5394–410.

The products covered under the 1996 AT&T-Alcatel Agreement are limited to "the kinds which are furnished . . . on the effective date of this Agreement." A5395 § 1.01(a).  T-Mobile provided no evidence of exactly what Alcatel "furnished" as of the effective date.[3]  T-Mobile provided no evidence, expert or otherwise, to show that the MGWs at issue in this case bear any relation to any 1996 Alcatel equipment in particular.

To the contrary, there is evidence that the equipment purchased by T-Mobile is not of the same "kind" as Alcatel furnished on the effective date of the 1996 AT&T-Alcatel Agreement.  The MGWs T-Mobile purchased are not original Alcatel products.  Alcatel came to the MGW business by acquiring a third party, Spatial Communications Technologies Inc. of Richardson, Texas (known as "Spatial Wireless").  A6445–46.  Alcatel bought Spatial Wireless to fill a hole in its product offering in December 2004, eight years *after* the product-defining date in the 1996 AT&T-Alcatel Agreement.  A6246–49.[4]  In fact, T-Mobile already had

---

[3] The only evidence T-Mobile offered of the "kinds" of equipment Alcatel furnished on the agreement's effective date was that Alcatel annual reports referred to "switching systems based on a number of worldwide standards" and "radio base stations based on the GSM standard."  *See* A22; A6245–46 ¶ 124; A5428; A5435–37.

[4] A6445–46 (Alcatel Sept. 17, 2004, press release, "Alcatel to Acquire Spatial," including Spatial Atrium "flagship product," to allow Alcatel to "leapfrog traditional mobile switching technologies"); A6448 (Alcatel webpage for 7540 MGW stating it was "formerly the 5020 WMG, part of the Spatial Atrium Distributed Mobile Switching Center").

*Confidential Material Redacted*

a supply agreement in place with Spatial Wireless before Alcatel bought it. A5679–82; A5724; A5793–94.  The MGWs T-Mobile bought are not licensed products.

Moreover, there are and were numerous Alcatel and Lucent entities, with different ownership structures at different times.  In 2006, Alcatel and Lucent merged to form a new company ██████████████████████████████████ A6272 ¶ 3; A6466–73.  The position was even further consolidated by another merger in 2008.  A6580–81.  It is T-Mobile's burden to explain where it purchased each piece of equipment installed in the network and under what theory it is allegedly licensed.  T-Mobile has not undertaken that analysis, and brushes aside the corporate complexities.  *See* A6246–49.

The 1996 AT&T-Alcatel Agreement also ██████████████████████████ ███████████████████████████  Under § 4.02(c) of the agreement, ███ ██████████████████████  A5400–01.  According to T-Mobile, the ALU MGWs are always combined with equipment from other vendors.  A2735–36; A6380–84.

### D.    THE DISTRICT COURT'S OPINION

In an Opinion and Order dated October 15, 2014, the district court granted Defendant and Intervenors' summary judgment motions on patent exhaustion "in their entirety."  A4.  The Court concluded there was not even a triable issue over

(1) whether each vendor possessed a valid license at the time of the sales at issue, or (2) whether the articles sold under those purported licenses substantially embodied all the claimed inventions, sufficient to trigger exhaustion.

The district court did not consider the particulars of any of the claims of High Point's patents.  Nor did the district court undertake a material inquiry into whether the components in T-Mobile's accused network substantially embodied the claims asserted.  Instead, the district court found that the (supposedly licensed) Node Bs in T-Mobile's network exhausted claims 28, 29, and 31 of the '090 Patent; and thereby exhausted all of the other asserted claims *ipso facto* per dicta in *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  A27–28. The district court also found, without evidentiary support, that the combination of (supposedly licensed) Node Bs, RNCs, and MGWs supplied by NSN, Ericsson-US, and ALU-US "substantially embod[ies] the patents-in-suit."  A30.

## VII.  SUMMARY OF ARGUMENT

A.    The district court's license findings are erroneous generally, and unsupported by the record of undisputed facts in particular.  At the core:

(1)    The license under the 1988 AT&T-Siemens Agreement could not pass to NSN because NSN did not operate the divested wireless carrier business of Siemens as a "separately identifiable business" after divestment, but instead merged it into the Nokia wireless carrier business.  The district

court's finding that "the divested business need only operate separately from Siemens" (A25) strips the "separately identifiable" provision of meaning, and ignores altogether the further express condition that the ex-Siemens carrier business continue going forward, but NSN ceased selling the Siemens carrier equipment in favor of the Nokia line of products.

(2)     The license under the Lucent-LME Agreement could not pass to Ericsson-US under the purported "*nunc pro tunc*" sublicense because LME's entitlement to grant sublicenses lapsed when the patents in question expired two years earlier; and in any event, a *nunc pro tunc* instrument could not bestow the required authority at the critical moment per *Honeywell International, Inc. v. United States*, 609 F.3d 1292 (Fed. Cir. 2010).  The district court's bare finding that "the [LME] Cross-License Agreement places no limits on when retroactive sublicenses may be granted" (A17), fails to give due regard to the law and the evidentiary paucity of the factual record, which falls far short of the summary judgment minimum.  In particular, the district court's decision fails to abide the distinction between releases (for past infringement) and licenses (for future infringement), which is fundamental in the law and explicit in the Lucent-LME Agreement.  *See, e.g.*, *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998).

(3)    The MGWs T-Mobile purchased from Alcatel-US and ALU-US were Spatial Wireless MGWs that were not licensed under the 1996 AT&T-Alcatel Agreement. There is no evidence or expert testimony to establish otherwise. The district court's bare conclusion to the contrary ("Alcatel sold 'switching systems' in 1996, and . . . MGWs are a type of switching system" (A22)) is unsupported; and the district court's reliance on *Rembrandt Data Technologies, LP v. AOL, LLC* ("*Rembrandt II*") is misplaced. 641 F.3d 1331 (Fed. Cir. 2011).

B.    The basic premise of the district court's conclusion is that *all* of the Node Bs, RNCs and MGWs in T-Mobile's accused network are individually licensed. If any one set of components from at least one of the major suppliers is not licensed as supposed, the basic premise fails and the entire case must be remanded to the district court for trial.

C.    Exhaustion also requires that the authorized sales of articles must substantially embody the claimed invention. *Quanta Computer Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). In addition to its errors on authorization, the district court failed to carry out a sufficient examination of the actual claims of the patents-in-suit based on a misapprehension of *Quanta*, *Keurig*, and *Rembrandt II*. Even if the equipment sales in dispute were correctly found by the district court to have been authorized, most of the claims of the patents-in-suit would not be

25

exhausted because their inventions were not substantially embodied in the

equipment supplied.  The district court's casual approach to the exhaustion

analysis was recently rejected in *Helferich Patent Licensing, LLC v. New York

Times Co.*  Nos. 2014-1196 et al., 2015 WL 527851, 2015 U.S. App. LEXIS 2047

(Fed. Cir. Feb. 10, 2015).

## VIII.  ARGUMENT

### A.    STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment "de novo,

and thus appl[ies] the same standard as that used by the district court."  *Aleynikov

v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 357 (3d Cir. 2014); *see Memorylink

Corp. v. Motorola Sol'ns, Inc.*, 773 F.3d 1266, 1270 (Fed. Cir. 2014) ("We review

the district court's grant of summary judgment under the law of the regional

circuit . . . .").  The record is viewed in the light most favorable to High Point, and

all reasonable inferences must be drawn in High Point's favor.  *Aleynikov*, 765

F.3d at 357.

### B.    THE DEFENSE OF PATENT EXHAUSTION

Exhaustion is an affirmative defense on which the defendant bears the

burden of proof.  *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir.

2006).  To show exhaustion with respect to a particular article, T-Mobile must

show (1) an authorized first sale of that article, and (2) that the article substantially

embodies the patented invention.  Q*uanta Computer, Inc. v. LG Elecs., Inc.*, 553

U.S. 617, 638 (2008).  The district court erred in finding each of these elements.

### C. THE DISTRICT COURT ERRED IN FINDING THAT SALES TO T-MOBILE WERE AUTHORIZED

#### 1. Sales by Nokia-US were Not Authorized

As an initial matter, it is undisputed that Nokia-US was not licensed, and

that sales from Nokia-US to T-Mobile were not authorized.  *See* A5 n.6; A35 ¶ 5;

A7112.

#### 2. Sales by NSN-US were Not Authorized

##### (a) *The district court misinterpreted the "separately identifiable" limitation of the Divestment Rider*

The district court misinterpreted the "separately identifiable" limitation of

the Divestment Rider.  The relevant portion of the Divestment Rider provides:

> [I]n the future, if SIEMENS or any of the three [AT&T]
> entities divests a portion of its present business, the
> licenses and rights granted in the subject agreement may
> be sublicensed to the divested business by the divesting
> company.  Such sublicenses may be granted and retained
> *only while the future divested business operates as a
> separately identifiable business* and only to the extent
> applicable to products and services sold by the future
> divested business prior to its divestiture.

A4881 (emphasis added).  The district court found that "[t]he plain language of the

rider indicates that the divested business need only operate separately from

Siemens," and that it was of no moment that Siemens' divested carrier business

was merged into and seamlessly integrated with the Nokia portion of NSN-BV,

*Confidential Material Redacted*

and then ceased to exist at all after that integration.  A25.  That is, the district court found that a divested business need only be "separately identifiable" from the seller, not that it be operated in a "separately identifiable" manner by the acquirer.

The district court's interpretation renders the "separately identifiable" provision completely meaningless.  A divestment always means that the divested business will operate separately from the seller—that is what a divestment is.  *See* BLACK'S LAW DICTIONARY (10th ed. 2014), divest ("3. (Of a company, investor, etc.) to sell (assets, investments, etc.) <the pressure on companies in the 1970s to divest apartheid-related investments>").  The whole point of the "separately identifiable" limitation was to prevent what occurred here—integrating the divested business into a similar, unlicensed business operated by another, thus expanding the intended scope of the original license.  There is no room for ambiguity about the meaning of "separately identifiable" in the Divestment Rider; and even if there were any, there is no extrinsic evidence whatsoever to justify this improbable construction.  To the contrary, § 4.03 of the 1988 AT&T-Siemens Agreement clearly provides:



A4865.  Nokia is not a party to the agreement, and extending a license to its

wireless network equipment business was never contemplated by the parties to the

Agreement or by the Divestment Rider.

### (b)    NSN never operated Siemens' divested business as a "separately identifiable" business

The Divestment Rider provided that any sublicense to a divested business

may be "granted and retained only while the future divested business operates as a

separately identifiable business."  A4881.  After Siemens divested its carrier

business to NSN BV in 2007, it was "fully integrated" into the corresponding

business of Nokia.  A6397:21.  It was never operated or identified separately by

NSN.  A6390, 6397, 6419.  To the contrary, NSN BV discontinued the relevant

Siemens equipment and migrated its Siemens-based customers to Nokia-based

equipment.  A6232–33; A6398:15–6399:16, 6400:17–21, 6401:7–6402:9, 6403:9–

16; 6649–65.  Even NSN-US's own witness admitted that the divested Siemens

carrier division was not separately identifiable once integrated into NSN BV.

A6419:16–25.  Accordingly, by the express terms of the Divestment Rider, no

sublicense could be "granted" to or "retained" by NSN BV.

### (c)    NSN is not the "divested business"

Under the Divestment Rider, license rights "may be sublicensed *to the*

*divested business*."  A4881 (emphasis added).  The "divested business" was the

Siemens carrier division.  A24; A6231 ¶ 92, 6234¶ 97; A6391, 6419.  Only that

"divested business" may be sublicensed.  NSN BV is not the "divested business."

There has never been any suggestion that Siemens ever owned a controlling

interest in NSN BV, or was in any respect the same as NSN BV.  NSN BV could

not be the subject of any purported sublicense.

### (d)    NSN sold no Siemens divested products to T-Mobile

The district court also failed to apply the Divestment Rider's explicit

"products and services" limitation.  The Divestment Rider provided that any

sublicense may be granted and retained "only to the extent applicable to products

and services sold by the future divested business prior to its divestiture."  A4881.

It is undisputed, however, that T-Mobile never bought Siemens equipment, and

simply kept buying Nokia equipment after the formation of the NSN BV.  A6405–

06.  T-Mobile and NSN-US have failed to show that the equipment T-Mobile

bought from NSN-US was the same "products and services sold by [the Siemens

carrier division] prior to its [2007] divestiture."  *See* A4881.  The district court

erroneously ignored the facts.[5]

---

[5] The district court was content simply to assume that the limitation was met
"[s]o long as the equipment coming from NSN was wireless infrastructure
equipment."  A26 n.13.  It "[did] not matter whether [the products in question]
originated with Siemens or Nokia."  A26 n.13.  Neither the language of the
limitation in the Divestment Rider, nor the context in which it appears, supports
so sweeping and unreasoned an interpretation, and there is no extrinsic
evidence in the record to this effect either.  At the very least, this is an issue for
trial; and the district court's grant of summary judgment on it is unsustainable.

### (e)    NSN failed to meet the products limitation of the underlying 1988 AT&T-Siemens Agreement

T-Mobile and NSN-US also failed to show that the advanced Nokia 3G equipment sold to T-Mobile was ███████████████████████ when the 1988 AT&T-Siemens Agreement became effective.  *See* A4866 § 1.01(a).  To the contrary, NSN's corporate representative testified that in 1988, Siemens had only a first-generation analog product in Germany (A6407–08) while the Nokia 3G equipment that NSN-US sold to T-Mobile years later was significantly more complex digital equipment.  T-Mobile offers no explanation of any supposedly identical features of Siemens' analog products and Nokia's digital products sold 15 years later.  The factual void itself mandates reversal and remand.[6]

### (f)    NSN BV had no authority to sublicense NSN-US

T-Mobile purchased equipment from NSN-US, and NSN-US is in any event unlicensed.  NSN-US is not a ████████████████████, and therefore could not have been licensed under the 1988 AT&T-Siemens Agreement.  A4866 § 1.01(b), A4873–74 (████████████████████████████████ ████████████████); A6391–94, A6393–94, A6418 (NSN BV not a ███████ ████████████); A6433–34 (same).  Nor does the Divestment Rider alter

---

[6] The district court may have been led into error by misconstruing *Rembrandt Data Technologies, LP v. AOL, LLC* ("*Rembrandt II*"), 641 F.3d 1331 ("*Rembrandt II*") (Fed. Cir. 2011).  The district court's erroneous reliance on *Rembrandt II* is fully discussed below in relation to ALU-US.

the position. The Divestment Rider contemplates a sublicense only to "the divested [Siemens] business." A4881. There is no evidence that NSN-US ever had anything whatsoever to do with Siemens or any Siemens products, and still less that NSN-US is a Siemens "divested business." The district court's failure to require T-Mobile and NSN-US to show that NSN-US was licensed is error. T-Mobile and NSN-US could not have met this essential requirement.

### 3.    Sales by Ericsson were Not Authorized

The district court erred in granting summary judgment that Ericsson-US's sales to T-Mobile were authorized. The patents-in-suit expired in July 2011. A1216–17. As of that date, LME had not granted any sublicense to Ericsson-US. Thus, it is undisputed that, during the entire time period that Ericsson-US sold the infringing equipment to T-Mobile, it was not licensed and the sales were not authorized. Indeed, T-Mobile was on notice of the infringement claim for years, yet took no steps to obtain a license for itself or for Ericsson-US. A75 ¶ 13.

### *(a)    There is no such thing as retroactive exhaustion*

The district court erred in finding Ericsson-US's sales to T-Mobile were authorized because there is no dispute that the sales were *not* authorized at the time they were made. Ericsson-US has pointed to no case in which a "retroactive license" was accepted as the basis for exhaustion. Here, the sales were completed, T-Mobile's infringement was completed, LME's license had expired, and High

Point's damages had accrued, all long before any purported sublicense to Ericsson-US was executed. What the district court found is a legal impossibility.

The cases do not recognize retroactive exhaustion, and instead reflect the view that *nunc pro tunc* legal instruments undermine commercial certainty and should be treated with caution. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365–67 (Fed. Cir. 2010) (*nunc pro tunc* assignment could not retroactively cure standing defect). Thus, in *Honeywell International, Inc. v. United States*, the Federal Circuit held that infringing sales could not be authorized retroactively. 609 F.3d 1292 (Fed. Cir. 2010). Honeywell sold products to the United States. AlliedSignal alleged that the government's use of these products infringed its patents. After the sale and use of the infringing items, Honeywell and AlliedSignal merged to become "Honeywell International Inc." Honeywell International then sued the U.S. for infringing the AlliedSignal patents it had acquired through the merger. The government defended on grounds similar to those of Ericsson-US and T-Mobile in this case—that the product sales in question were ultimately authorized, and the patentee's rights were thereby exhausted. The Federal Circuit disagreed:

> Honeywell Inc.'s sale of infringing CMFDs ***was not authorized because, at the time of the sale, Honeywell Inc. had no rights under the '914 patent***, which AlliedSignal owned. The fact that Honeywell now owns the patent does not retroactively authorize the earlier sale. As such, the first sale doctrine does not preclude

33

> Honeywell from recovering damages against the
> government for use of infringing CMFDs and NVGs in
> the F-16 aircraft.

*Id.* at 1304 (emphasis added).

Here, LME had no rights in the patents at the time of the purported

sublicense.

### (b)    *Ericsson's purported "nunc pro tunc" sublicense is an illegitimate release*

What LME has attempted to do is not to extend a *sublicense* to Ericsson-US,

but rather to effect a *release* of a third party, T-Mobile, for damages that had

already accrued.  The effect of a release is distinct from the effect of a license:

licenses operate only prospectively, to protect against *future* infringement, while

releases operate retrospectively, inoculating infringement damages that have

already accrued.  *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467

(Fed. Cir. 1998) ("[A] license to a third party only operates prospectively.  Absent

agreement to the contrary, a co-owner cannot grant a release of another co-owner's

right to accrued damages."); *Schering Corp. v. Roussel-Uclaf Sa*, 104 F.3d 341,

345 (Fed. Cir. 1997); *see also STC.UNM v. Intel Corp.*, 754 F.3d 940, 945 (Fed.

Cir. 2014) (reaffirming distinction between license and release).

This fundamental distinction between release and license is also reflected in

the Lucent-LME Agreement.  LME and its Related Companies are *released* in

§ 4.09, A4794 ("LUCENT, for itself and for its present RELATED

COMPANIES, hereby *releases* ERICSSON, its present RELATED

COMPANIES and all customers (purchasers and users) of products of the

kinds herein licensed as of the effective date hereof to ERICSSON . . . .")

(emphasis added); but LME is entitled only to "to grant sub*licenses* within the

scope of [LME's] *license*" in § 1.03(c), A4785 (emphasis added).  LME has no

right to grant sub-*releases*.  *See Cascades Computer Innovation, LLC v. Samsung*

*Elecs. Co.*, Civ. Nos. 11-4574, 11-6235, 2014 WL 4553226, 2014 U.S. Dist.

LEXIS 128300, at *17 (N.D. Ill. Sep. 14, 2014) ("Patent exhaustion is a rule that

looks forward . . . A release, by contrast, looks backward and takes an alleged

infringer off the hook for something it has already done or is alleged to have

done.") (citing *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d

974, 977 (7th Cir. 1973)).[7]

---

[7] *Cascades* also held that although exhaustion might enable third party
customers (such as T-Mobile in this case) to benefit from their suppliers'
licenses, the benefit would *not* extend to their suppliers' releases:  "[T]he
release and covenant not to sue in this case were expressly limited to Google
and its affiliated entities.  As indicated earlier, when a patent holder sells
or grants a license on a patented item or method, the patent holder surrenders
its rights to enforce the patent against not only the buyer or licensee but also
those who acquire the product or method from the buyer or licensee. A
release, however, works differently.  Specifically, a release given to one
tortfeasor does not release others and does not, unlike a sale or a license,
surrender the releasor's rights."  *Cascades*, 2014 U.S. Dist. LEXIS 128300, at
**17–18 (citations omitted).

It is true that the second sentence of § 1.03(c) refers to an LME right to sublicense "retroactively" (A4785) but this language does not permit LME to grant releases from infringement damages that have already accrued, particularly releases to third parties such as T-Mobile, and particularly after the underlying license term elapsed.  Ericsson-US offered no extrinsic evidence to this effect, and the district court could not properly grant summary judgment on so thin a record.  To the contrary, the retroactivity provision of § 1.03(c), read in the context of the agreement as a whole, cannot be construed to allow LME to release third parties from infringement damages that have accrued from the use of unlicensed equipment combinations.  *See* A4785 § 1.03(a)(1).  In any event, this is not an issue for summary judgment in this case with no record evidence whatsoever on the point.

### (c)    *The district court erred in crediting Ericsson's unevidenced "holding company" submissions*

At oral argument before the district court, counsel for Ericsson-US said that "LME is a holding company" and that it "was always understood between these parties that the operating company, whether it be Ericsson[-US] or some other of the 150 some odd affiliates that LME has, would be selling stuff." A7656:1–4.  He then concluded, without any evidentiary support, that "[n]o one ever thought LME was going to sell [equipment]." A7661:19.  The conclusion seems to have found favor with the district court, which found "it may be inferred that . . . Lucent

36

contemplated that sales would be accomplished through a sublicense." *See* A16 n.9. Yet this conclusion was bare lawyer argument, and represents an improper inference in Defendants' favor.[8] *See Aleynikov*, 765 F.3d at 357 (court must "draw all reasonable inferences" in non-movant's favor); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d Cir. 1996) ("[L]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.") (internal quotations omitted). The district court's grant of summary judgment on this basis usurps the function of a trial and is manifest error.

### *(d)    Ericsson effectively concedes that its summary judgment position is untenable*

Ericsson-US specifically recognized in its brief the "potential unfairness that may arise from an assignee not being on notice of a prior . . . license" (A1193), the moreso with the purported *nunc pro tunc* sublicense, which did not even exist until after High Point filed this case. Ericsson nonetheless maintains that strict compliance with its putative *nunc pro tunc* sublicense entitlement is required.

---

[8] There is no evidence of Lucent's knowledge or intent in relation to these matters. Ericsson's witness testified, "I can just tell you from my time working at Ericsson that it is very, very common and typical for a license agreement to be entered into that is intended to cover all of the Ericsson companies." A7011 at 53:22–25. But that is not what happened in this case. LME subsidiaries were not automatically covered, and the only purported LME sublicense on the record (the *nunc pro tunc* one now in issue) does not "cover all of the Ericsson companies."

37

A1193.  The concession reveals the basic inadequacy of Ericsson-US's position on the extremely thin record evidence in this case.  Cross-license parties generally, and particularly sophisticated ones such as Lucent and LME, are well aware of patent ownership changes, and the licensing implications of them.  Indeed at the time the Lucent-LME Agreement was made, Lucent had itself recently succeeded to many AT&T patents, including the patents-in-suit.  Sophisticated parties are also aware that retroactivity in general may foster uncertainty, which diminishes future value and thereby involves current cost.  Forseeable difficulties such as the unfairness Ericsson-US notes would therefore have been avoided by the cross-licensing parties.  At the least, the matter raises a presumption that the unfair effect that Ericsson-US mentions must be confronted, explained, and shown by concrete extrinsic evidence to have been a consequence both parties intended when the agreement was made.  That is precisely what Ericsson-US has failed to do.

### 4.    Sales by Alcatel-Lucent were Not Authorized

The district court erred in granting summary judgment that sales from Alcatel-Lucent to T-Mobile were authorized.

### (a)    *Alcatel's 1996 license does not cover the MGW products it acquired from Spatial Wireless in 2004*

The 1996 AT&T-Alcatel Agreement is limited to products Alcatel was furnishing on the effective date of the agreement:

**Confidential Material Redacted**

> 1.01(a)    AT&T, ▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮ grants to ALCATEL, under the
> AT&T PARTIES' PATENTS, nonexclusive and
> nontransferable licenses to make, have made, use, lease,
> offer to sell, sell and Import any or all products and
> services ***of the kinds which are furnished or used by
> ALCATEL*** or any of its present RELATED
> COMPANIES in the operation of the business in which
> ALCATEL or any such RELATED COMPANY is
> engaged ***on the effective date of this Agreement*** . . . .

A5395 § 1.01(a) (emphasis added).

The district court misinterpreted this section of the 1996 AT&T-Alcatel

Agreement by trivializing the "of the kinds" language, without evidence or

justification.  The district court found that licensed products were not "limit[ed] . . .

to certain kinds of communications and transmission systems" (A21), but the

explicit "of the kinds" provision is a critical limitation the district court virtually

ignores.

To establish license rights with respect to any particular product, T-Mobile

needed to come forward with proof that the product is "of the kind" furnished or

used by Alcatel at the time of the agreement, *i.e.*, January 1, 1996.  It was

T-Mobile's burden to establish compliance with this provision, such that no

reasonable jury could conclude the products T-Mobile purchased were unlicensed.

The key items of equipment at issue are MGWs, specifically ALU Models

7540 and 7549.  A6371–72; A2808 ¶ 143.  T-Mobile has failed to meet its burden

of production, much less establish the right to judgment as a matter of law with

respect to these MGWs.  Defendants have stated, "As of January 1, 1996, Alcatel sold wireless network products such as MGWs."  A2804 ¶ 124.  The *evidence* they have cited on this point, however, includes only excerpts from certain 1996 Alcatel Annual Reports, and says nothing about MGWs.  A5423–28; A5431–37.  The Annual Reports simply say that Alcatel's Mobile Communications division produced "switching systems based on a number of worldwide standards," as well as "radio base stations based on the GSM standard."  A5428.  These vague statements are inadmissible hearsay, and do not even support the contention that Alcatel sold MGWs or other articles of the same "kinds" at the relevant time.  The record does not support the district court's conclusion on this point.

To the contrary, the record evidence shows that Alcatel did not sell the MGWs T-Mobile was buying until 2004.  The MGWs sold to T-Mobile were not original Alcatel products.  They were made by Spatial Communications Technologies Inc. (known as "Spatial Wireless").  Alcatel acquired Spatial Wireless to fill a hole in its product line in December 2004.  A6246–49.  That is eight years after the effective date of the AT&T-Alcatel agreement.  A5394.  Alcatel had no such products in 1996.  These new products were not covered by the license.  There is, at the very least, a genuine issue of material fact whether MGWs are of the same "kinds" as whatever equipment Alcatel may have been selling back in 1996.

40

**Confidential Material Redacted**

> **(b)    *Alcatel's 1996 license does not cover the Spatial Wireless MGW business, which Alcatel did not "operate" until 2004***

The district court also ignored the "business operation" limitation in the

AT&T-Alcatel Agreement:

> 1.01(a)        AT&T, on behalf of itself, █████
> ████████████ grants to ALCATEL, under the
> AT&T PARTIES' PATENTS, nonexclusive and
> nontransferable licenses to make, have made, use, lease,
> offer to sell, sell and Import any or all products and
> services of the kinds which are furnished or used by
> ALCATEL or any of its present RELATED
> COMPANIES *in the operation of the business in which
> ALCATEL or any such RELATED COMPANY is
> engaged on the effective date of this Agreement* . . . .

A5395 § 1.01(a) (emphasis added).

Alcatel did not operate Spatial Wireless in 1996, nor was it in the business of

selling MGWs in January 1996. *See* A6246–49.

> **(c)    *The district court misinterpreted and misapplied Rembrandt II***

The district court was led into error by misinterpreting and misapplying

*Rembrandt II.*  The district court appears to consider *Rembrandt II* as a mandate to

determine only that MGWs are "switching system products," whereupon the

limitations of § 1.01(a) of the AT&T-Alcatel Agreement are met *ipso facto.*  A20–

22.  *Rembrandt II*, however, mandates no such thing, and is in fact inapposite.  The

issue in *Rembrandt II* was whether V.34 protocol compliant modem chipsets sold

by Conexant were licensed.  Rockwell had sold modems under a license from

AT&T, including V.34 protocol compliant modem chipsets. *Rembrandt II*, 641 F.3d at 1334. Later, Rockwell divested its modem business to Conexant. *Id.* Conexant continued to sell V.34 protocol compliant modem chipsets thereafter under a sublicense from Rockwell, whose underlying license with AT&T permitted sublicenses to divested business products sold by Rockwell prior to its divestiture. *Id.* at 1335, 1337–38. The claim against Conexant was that its accused V.34 protocol compliant modem chipsets were newer models than Rockwell had sold and, as such, not sublicensed. *Id.* at 1338. This Court held Rockwell's right to a sublicense covered "modems generally, not specifically the exact types of modems in production at the time of the sublicense and/or divestiture." *Id.* Indeed, Rockwell was "the world leader in modems" before the divestiture. *Rembrandt Data Techs., LP v. AOL, LLC*, 673 F. Supp. 2d 420, 437 (E.D. Va. 2009). Accordingly, the products requirement was met, and the sublicense was valid.

The facts and circumstances are wholly different here. Far from being the "world leader" in MGWs in 1996, Alcatel did not sell any at all. T-Mobile contends that MGWs are within a general category of switching system equipment, but there is no evidence that MGWs were part of 1996 switching systems. *Rembrandt II* concerned different models of particular modems—not different products altogether.

42

"Switching system product" is not a defined term in the 1996 AT&T-Alcatel Agreement.  Nor is there any evidence to determine which, if any, switching products were sold by Alcatel in 1996 and, therefore, were licensed.  Still less is there any evidence that the Spatial Wireless MGWs bore any technical or contractually-relevant relationship to any products Alcatel actually did sell in 1996.  These evidentiary omissions are fatal.  An MGW is a device which is defined by the 3G standards.  *See* A1950–51; A5849–57; A6297.  T-Mobile produced no evidence that these standards predated 1996, and in fact they cannot do so because the standards defining this piece of equipment had not yet been written.  Unlike the Rockwell/Conexant modem chipsets that were all compatible with the V.34 standard, the MGWs in this case are designed to comply with an altogether new standard that did not exist in 1996.

In *Rembrandt II*, the Court carefully searched the record and concluded that the modems sold before and after the sale fell within the contract's express definition of "Licensed Products."  *Rembrandt II*, 641 F.3d at 1338.  Here, the moving parties have failed to provide the requisite evidence, and the district court's indifference to the void is error.

### D.    THE DISTRICT COURT ERRED IN FINDING THAT THE ARTICLES SOLD UNDER THE PURPORTED LICENSES SUBSTANTIALLY EMBODY ALL OF THE CLAIMED INVENTIONS

As demonstrated above, none of T-Mobile's suppliers were licensed, and on this basis alone, the district court's grant of summary judgment of exhaustion should be reversed.  But even if this Court were to conclude that one or more of T-Mobile's vendors was pertinently licensed, the district court also erred in finding that the supposedly licensed products substantially embody each and every invention claimed in the patents-in-suit.  The critical question is factual, and the record evidence does not support summary judgment.

### 1.    No Substantial Embodiment of High Point's Inventions

#### (a)    *The district court failed to analyze T-Mobile's equipment vis-a-vis the claims*

A patentee does not exhaust its patent rights unless it authorizes a sale of an article that *substantially embodies* the claimed invention.  *Quanta*, 553 U.S. at 625–38.  Thus in addition to proving that the equipment sold to T-Mobile was in fact authorized, T-Mobile must also prove that it embodies all of the "inventive aspects" of the claims, and has no "reasonable noninfringing use."  *Id.* at 638.  This is a fact-intensive inquiry that cannot be satisfied with mere "perfunctory argument."  *See, e.g.*, *Toshiba Corp. v. Imation Corp.*, Civ. No. 09-305, 2013 WL 1248633, 2013 U.S. Dist. LEXIS 42662, at *23 (W.D. Wis. Mar. 26, 2013)

(denying defendants' motion for summary judgment on its exhaustion defense). T-Mobile and its interveners made no such showing.

In *Quanta*, the patentee (LG) granted a license to Intel to make patented chipsets. The license did not reach chipset combinations covered by method claims of LG's patent. Intel sold licensed chipsets to Quanta, which Quanta combined with minor components in making final computer products. LG sued Quanta for infringing the reserved method claims. The Supreme Court held that the sale of the licensed computer chipset exhausted the method claims covering the combination of the chipset and minor variants, like configuring the chipset with stock items having no inventive content, because the chipset itself substantially embodied the invention in issue.

In High Point's case, by sharp contrast, the vast majority of claims asserted cover aggregations, no one of whose components substantially embody the invention claimed. *See, e.g.*, A5849–57; A5957–62; A6273–80; A6298–99; A6371–85. In that critical respect, the claims of LG and High Point are fundamentally distinguishable. The licensed component in *Quanta* substantially embodied the invention, while the licensed component in High Point did not. The district court simply refused to examine the claims, and ignored High Point's submissions about their scope, which the Defendants never rebutted. That is error.

45

*(b)    The district court misinterpreted and misapplied dicta in Keurig*

Instead of examining the claims, the district court misinterpreted and misapplied dicta in *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013). It held that if an authorized sale is made of a product that substantially embodies the invention of one claim, then all rights under all claims of that patent are exhausted, regardless of how many other distinct inventions are claimed, and regardless whether the licensed product substantially embodies any of them. A27–28. Thus the district court concluded that the authorized sale of just Node Bs exhausted all claims of the '090 patent directed to T-Mobile's accused network, and did not even attempt to examine the multitude of distinct claims in suit, or whether any of the equipment in T-Mobile's network substantially embodied them. Indeed, the district court did not even discuss the other three patents in suit.

In *Keurig*, all the claims at issue were directed to "brewers and the use of brewers." *Keurig*, 732 F.3d at 1374. The Federal Circuit held that the authorized sale of Keurig's brewers exhausted Keurig's rights in the claims to methods of using those brewers. The district court relied on one paragraph of dicta in *Keurig* in which the majority declined a claim-by-claim analysis. A28 (citing *Keurig*, 732 F.3d at 1374). The district court failed to note that in *Keurig*, there were no claims to distinct inventions at issue. Indeed, in a concurring opinion, Judge O'Malley noted that "[t]here could be instances where assessing exhaustion on a claim-by-

claim basis—the same way we conduct almost every analysis related to patent law—would be necessary and appropriate." *Keurig*, 723 F.3d at 1375 (O'Malley, J., concurring). *Keurig* is quite inapposite to *High Point*, where a multiplicity of distinct inventions is asserted.

Should there have been any room for doubt on this point, this Court recently removed it in *Helferich Patent Licensing, LLC v. New York Times Co.*, Nos. 2014-1196 et al., 2015 WL 527851, 2015 U.S. App. LEXIS 2047 (Fed. Cir. Feb. 10, 2015). Helferich asserted a family of patents that included both "handset claims" directed to mobile phone handsets, and "content claims" directed to systems and methods for storing, updating, and delivering information. *Helferich*, 2015 U.S. App. LEXIS 2047 at *4. Two of these patents included both handset and content claims together. *Id.* The district court in *Helferich* held that the sale of licensed handsets exhausted not only the handset claims, but the content claims as well. *Id.* at **11–12. This Court reversed. The district court had been guided by *Keurig*, but by sharp contrast Helferich's "cases raise an exhaustion question in the context of *multiple related and separately patentable inventions*." *Id.* at *20 (emphasis added). In these circumstances, this Court considered the claims in detail, and found that the distinct content claims were not exhausted.

*Helferich* is relevant to *High Point*, and *Keurig* is not. Here, the asserted claims of the patents-in-suit include claims of widely varying scope. For example,

some claims are directed to just a "cell" and are met by Node Bs (*e.g.*, '090 claim 28) (A5901–03), others are directed to a "radio-telephone-call processing apparatus" within a "switching system," and are met by the combination and interconnection of RNCs and MGWs (*e.g.*, '308 claim 13) (A5937–38), others are directed to a "cell interconnect module" and are met by interconnect equipment interposed between Node Bs and RNCs ('308 claim 1) (A5932–33), and still others are directed to the broader cellular network (*i.e.*, combinations of cells, a switching system, and communication links interconnecting the two) (*e.g.*, '090 claim 6) (A5849–70).  As is reflected on the face of the patents, the '347 and '091 patents are divisionals, "which tends to confirm the independence or distinctness" of their respective inventions.  *Helferich*, 2015 U.S. App. LEXIS 2047 at *46.  Even for different claims in the same patent, however, "an inference of lack of distinctiveness is not warranted."  *Id.* at *47.[9]

There is no legal or policy reason that the sale of, for example, a "cell" or Node B exhausts claims directed to entirely distinct inventions, to components

---

[9] *See also* 35 U.S.C. § 121 ("[T]he Director **may** require the application to be restricted" if there are "two or more independent and distinct inventions.") (emphasis added); *id.* ("The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention."); MPEP § 803.01 ("[R]equirements for restriction under 35 U.S.C. § 121 are discretionary with the Director.").

which work together but are claimed separately (such as a "switching system" and "cell interconnect module") or to claims directed to the broad cellular network.

### (c)     The district court failed to take account of the role of unlicensed equipment

The district court failed even to consider the exhaustion implications of the Routers and other Interconnect Equipment in T-Mobile's network, which are indisputably unlicensed. The role of Routers and other Interconnect Equipment in T-Mobile's network is a fact-intensive issue on which there is conflicting expert evidence. Even if all sales of NSN-US, Ericsson-US, and ALU equipment were authorized, which they were not, they would not exhaust High Point's rights to inventions that required such unlicensed equipment. Fact disputes on this issue preclude summary judgment.

As summarized above, the accused T-Mobile network includes not only the Node Bs, RNCs, and MGWs sold by Nokia-US, NSN-US, Ericsson-US, and ALU-US, but also (among other things) Routers and other Interconnect Equipment that perform various routing and switching functions with respect to communications being conveyed among the above components over the transmission media. *See, e.g.*, A6298–99. Defendants lumped all of that additional equipment into the category of "communication links," and argued that it cannot encompass any of the inventive features or functions of the claimed inventions. *See, e.g.*, A2760–62. Their analysis was limited, however, to the

49

transmission media in T-Mobile's network (T1 lines, optical fibers, etc.), and omitted essential Routers and other Interconnect Equipment.

High Point's expert explained that it is probable or at least reasonably possible that the Routers installed in T-Mobile's network are statistically multiplexing voice call traffic and transmitting that traffic in statistically multiplexed form between the Node Bs and RNCs—and thereby encompass inventive features and perform inventive functions that are critical to many of the asserted claims of the '090 patent. A6307–08 ¶¶ 51–53. This is true for each of the claims that requires transmitting or receiving voice call packets on the link between the recited cells and switching systems "in statistically multiplexed form"—that is, asserted claims 6, 8, 10–12, 15, 18, 22, 39, 40, 42, 47, 53, and 54 of the '090 patent.

Neither Defendants nor their expert, Dr. Acampora, analyzed the role that the Routers play in the accused T-Mobile network. Indeed, Dr. Acampora acknowledged at his deposition that he performed no analysis of any Routers actually installed in the accused T-Mobile network (*see* A6586:25–96:5), and further admitted that he did not know what a Cell Site Router is or whether any such Routers were installed in the T-Mobile network, even after being shown T-Mobile's interrogatory responses specifically stating that such Routers were, in fact, installed in the network (A6587:4–88:1). Similarly, he testified that with

respect to the other Routers installed in the T-Mobile network, he did not know what they were, where they were installed in the network, or what functions they performed.  A6588:11–24, 6589:7–24, 6590:7–15, 6591:2–16; A6308 ¶ 54–55. The Defendants made no showing that the Routers were "standard parts" whose role may be ignored per *Quanta.*

The district court erroneously took none of these deficiencies into account, and the effect of this was to allow T-Mobile to shift the burden of proof on the exhaustion defense to High Point.  The district court compounded this error by denying High Point the opportunity to conduct sufficient discovery respecting the design, operation, and use of the Routers in T-Mobile's network.  *See* A6713–17.

### 2.    Portions of the Network Incorporating Any Equipment from an Unlicensed Vendor are Infringing

For the reasons in Section VIII.C above, High Point submits that none of T-Mobile's vendors were licensed to sell the equipment in T-Mobile's accused network.  Even if the Court were to find that some but not all such equipment was authorized, all portions of the network incorporating equipment from unauthorized sales would still infringe most asserted claims.  For example, if ALU sales were authorized but NSN sales were not, the portions of the network comprising NSN Node Bs, NSN RNCs, and ALU MGWs would infringe.

Most asserted claims are directed to "switching systems" or other methods or apparatus for which the accused instrumentalities are combinations of either

RNCs and MGWs, or RNCs/MGWs together with Node Bs, in each instance also including the transmission media and interconnect equipment that connect them together.[10]  For each of these claims, it is undisputed that each Node B, RNC or MGW included as part of the combination encompasses critical inventive features and/or carries out critical inventive functions required by the claim, and no one piece of the combination (such as a Node B, RNC, or MGW on its own) performs all of the inventive features or functions of such claims.[11]  *See, e.g.*, A6310–11.  As Mr. Chandler points out, even Defendants' expert, Dr. Acampora, does not assert, nor could he, that the Node Bs, RNCs or MGWs in the accused T-Mobile network are "standard parts" or perform "common processes," or that any one of them individually substantially embodies any of the claimed inventions.  A6311 ¶ 59.

Thus High Point's rights are not exhausted with respect to any configuration in which either the Node Bs, RNCs *or* MGWs are supplied by an unlicensed

---

[10] These claims include '090 Patent claims 6, 8, 10–12, 15, 18, 22, 39, 40, 42, 47, 53, and 54, asserted '308 Patent claims 4, 13, 17, and 28, and all of the asserted claims of the '347 and '091 Patents.

[11] The only exceptions are '090 claims 28, 29 and 31, which are each directed only to "cells" and infringed only by Node Bs.  High Point acknowledges that the accused Node Bs substantially embody the inventions of those claims, such that the licensed sale of a Node B would exhaust High Point's rights with respect to those patent claims, and those patent claims only.  With respect to all of High Point's other asserted claims, High Point's rights are not exhausted even if this Court were to find that one or more of the vendors at issue had a valid license at the time it supplied Node Bs, RNCs or MGWs to T-Mobile.

*Confidential Material Redacted*

vendor. In that instance, each of the allegedly authorized sales would have been of only a part of the whole combination, and none of the sales by any vendor would have involved the sale of a product or products that substantially embodied the entirety of the claimed inventions.

Accordingly, if this Court finds error in the district court's license findings as to any one vendor, the judgment must be reversed.

### E.    T-MOBILE USES UNLICENSED EQUIPMENT COMBINATIONS IN ITS NETWORK

T-Mobile relies solely upon the defense of exhaustion because it cannot establish a defense of license. Even if any of the alleged NSN-US, Ericsson-US and ALU-US licenses validly covered the equipment sold to T-Mobile, all by their terms ███████████████████████████████████████████████████

████████ A4868 § 4.02 (Siemens); A4785 § 1.03(a) (LM Ericsson); A5401 § 4.02(c) (Alcatel). This is particularly important because T-Mobile assembled switching systems using multiple vendors' equipment, including combinations of RNCs and MGWs from Nokia/ALU, NSN/ALU and Ericsson/ALU (A2736), yet the right to determine overall system configuration may be the most valuable, and these ███████████████████████████████████████[12]

---

[12] T-Mobile also included unlicensed Routers and other Interconnect Equipment supplied by other vendors. *See, e.g.*, A6298–99; A6380–84.

*Confidential Material Redacted*

That ████████████████████████████████████████

████████████████████ is undisputed.  It is also undisputed that T-Mobile

combined equipment from different vendors.  The accused network thus is not

licensed, and T-Mobile proceeds solely on its defense of exhaustion.

## IX.    CONCLUSION

High Point respectfully urges this Court to reverse the district court's grant

of summary judgment of patent exhaustion, set aside the judgment in T-Mobile's

favor, and remand this case to the district court for further proceedings in

accordance with this Court's rulings.

Date: March 23, 2015                    Respectfully submitted,

                                        By: /s/ Martin J. Black
                                        Martin J. Black
                                        Robert D. Rhoad
                                        DECHERT LLP
                                        2929 Arch Street
                                        Philadelphia, PA 19104
                                        (215) 994-4000

                                        *Attorneys for Plaintiff-Appellant,*
                                        *High Point SARL*

# ADDENDUM

## <u>ADDENDUM TABLE OF CONTENTS</u>

| Date Filed | ECF No. | Description | Page(s) |
|------------|---------|-------------|---------|
| 10/15/2014 | 181 | Opinion | A1-30 |
| 10/15/2014 | 182 | Order | A31-33 |
| 12/10/2014 | 192 | Stipulated Order and Final Judgment | A34-38 |

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HIGH POINT SARL, | HONORABLE JOSEPH E. IRENAS |
|        Plaintiff, | Civil No. 12-1453 (JEI/AMD) |
|     v. | **OPINION** |
| T-MOBILE USA, INC., | |
|        Defendant, | |
|     and | |
| NOKIA SOLUTIONS AND NETWORKS US, LLC, | |
|        Intervenor-Defendant, | |
|     and | |
| ERICSSON, INC., | |
|        Intervenor-Defendant. | |

**APPEARANCES:**

DECHERT LLP
By:  Thomas P. Lihan, Esq.
     Robert D. Rhoad, Esq.
902 Carnegie Center
Suite 500
Princeton, NJ 08540-6532
     Counsel for High Point SARL

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Lisa J. Rodriguez, Esq.
Woodland Falls Corporate Park
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165
     Counsel for T-Mobile USA, Inc.

```
DENTONS US LLP
By:  Marc S. Friedman, Esq.
1221 Avenue of the Americas
New York, NY 10020-1089
     Counsel for T-Mobile USA, Inc.

GRAHAM CURTIN, PA
By:  Thomas R. Curtin, Esq.
     George C. Jones, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962-1991
     Counsel for Alcatel-Lucent USA, Inc.

LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, ESQS.
By:  Jonathan A. David, Esq.
     Robert B. Hander, Esq.
     Roy Henry Wepner, Esq.
     William L. Mentlik, Esq.
600 South Avenue West
Westfield, NJ 07090
     Counsel for Ericsson, Inc.

KING & SPALDING LLP
By:  Allison Hoch Altersohn, Esq.
     Chandan Sarkar, Esq.
     Robert F. Perry, Esq.
1185 Avenue of the Americas
New York, NY 10036
     Counsel for Nokia Solutions and Networks US, LLC

CONNELL FOLEY LLP
By:  Liza M. Walsh, Esq.
     Katelyn O'Reilly, Esq.
85 Livingston Avenue
Roseland, NJ 07068
     Counsel for Nokia Solutions and Networks US, LLC
```

A2

**IRENAS,** Senior United States District Judge:

This is a patent infringement suit brought by Plaintiff
High Point SARL[1], which currently owns the four patents-in-suit:
the '090 patent, the '308 patent, the '347 patent, and the '091
patent.[2]  The patents disclose methods for designing and
implementing cellular telephone network infrastructure equipment
used in the receiving and transmitting of voice call traffic.
Defendant T-Mobile bought the networking equipment at issue from
at least three vendors: Intervenor-Defendants (1) Nokia
Solutions and Networks US, LLC ("NSN"), and (2) Ericsson, Inc.;
as well as non-parties (3) Alcatel USA Marketing, Inc. and
Alcatel-Lucent USA, Inc. (collectively "ALU").[3]

Presently before the Court are two Motions for Summary
Judgment on T-Mobile's affirmative defense of patent exhaustion
filed by: (1) Ericsson; and (2) T-Mobile and NSN.

_____

[1]  High Point is a non-practicing patent-assertion entity that
acquired the patents in 2008.  All four patents expired in July,
2011.

[2]  U.S. Patent Numbers 5,195,090; 5,305,308; 5,184,347; and
5,195,091 respectively.

[3]  T-Mobile's Motion to Join ALU was administratively terminated
without prejudice prior to the reassignment of this case to the
undersigned.

3

A3

For the reasons stated herein, both motions will be granted in their entirety.[4]

## I.

All four patents-in-suit were originally held by AT&T.  In 1988, AT&T entered into a cross-licensing agreement with Siemens, whereby AT&T granted to Siemens nonexclusive and nontransferable licenses to "make, have made, use, lease, sell and import" the equipment embodying at least some of the patents-in-suit.  (Lauridsen Decl. Ex. 22).

Several years later, in January, 1996, AT&T entered into another cross-license agreement, this time with Alcatel.  (Lauridsen Decl. Ex. 38)  The Alcatel agreement is substantially similar to the Siemens agreement; AT&T granted to Alcatel nonexclusive and nontransferable licenses to "make, have made, use, lease, offer to sell, sell and import" the equipment embodying at least some of the patents-in-suit.  (Id.)

Not long after the Alcatel agreement was signed, in March, 1996, AT&T spun-off Lucent and assigned to it at least some of

---

[4]  High Point also moves for leave to file a brief in sur-reply to T-Mobile and NSN's reply brief. (Docket # 158)  While the proposed sur-reply is less than five pages in length, the Court does not find the brief particularly helpful.  It cites no new law and no new record evidence.  Rather, it attempts to explain and distinguish a Federal Circuit case, *Rembrandt II*, *see infra*, which was cited and discussed in earlier briefs.  The Court is able to analyze the applicable case law without the assistance of High Point's sur-reply.

the patents-in-suit.  Thereafter, in November, 1996, Lucent entered into a cross-licensing agreement with LME that is also similar to the Siemens and Alcatel agreements.  (David Decl. Ex. 6)  Lucent granted LME nonexclusive and nontransferable licenses to "make, have made, use, lease, sell and import" the equipment embodying at least some of the patents-in-suit. (Id.)

Thus, by 1996 at the latest, it appears that AT&T / Lucent had granted licenses to sell equipment embodying all of the patents-in-suit.[5]

Over the ensuing years, through various corporate combinations and sublicensing agreements which are discussed next, Ericsson, ALU, and NSN came to sell to T-Mobile the equipment practicing the methods of the patents-in-suit.[6]

Ericsson

_____

[5] In September 2000 Lucent assigned the patents-in-suit to Avaya. Plaintiff High Point acquired the patents-in-suit from Avaya in March 2008.

[6] High Point contends that T-Mobile also purchased networking equipment from Nokia in 2006 and 2007, prior to the creation of NSN. However, T-Mobile clearly has moved for summary judgment as to equipment it purchased from only three vendors: Ericsson, NSN, and ALU. See Moving Brief p. 2 ("These three companies-- Ericsson, NSN, and ALU-- sold T-Mobile *nearly all* the equipment that High Point accuses of performing the alleged patented invention, and all three are licensed.")(emphasis added); Reply Brief p. 11 (stating that T-Mobile does not include purchases from Nokia in the present motion).  Therefore, this opinion does not address any equipment that T-Mobile purchased from Nokia.

In 2013-- i.e., after this suit was filed, and after the patents had expired-- Ericsson's parent, LME, granted Ericsson a "nunc pro tunc" sublicense with an "effective date" of January 1, 2002.  The single-page document (excluding signature pages) states in relevant part,

> Effective, *nunc pro tunc*, as of [January 1, 2002], LME hereby grants to [Ericsson] . . . a worldwide, non-exclusive, paid-up, royalty-free sublicense to all of LME's rights relating to [the patents-in-suit] pursuant to . . . the Lucent Agreement.

(David Decl. Ex. 7)

"The Lucent Agreement" is the 1996 Cross-License Agreement between Lucent and LME.  (Id.)  It provides in relevant part,

> 1.03  Scope
>
> (a) The licenses granted herein are licenses to (i) make, have made, use, lease, sell and import LICENSED PRODUCTS, and (ii) convey to any direct or indirect customer of the grantee, with respect to any LICENSED PRODUCT which is sold or leased by such grantee to such customer, rights to use, import, and resell such LICENSED PRODUCT as sold or leased by such grantee (whether or not as part of a larger combination); provided, however, that no rights may be conveyed to customers with respect to any invention which is directed to (1) a combination of such LICENSED PRODUCT (sold or leased) with any other product, (2) a method or process which is other than the inherent use of such LICENSED PRODUCT itself (as sold or leased); or (3) a method or process involving the use of a LICENSED PRODUCT to manufacture (including associated testing) any other product.
>
> (b)  . . .
>
> (c)  The grant of each license hereunder includes the right to grant sublicenses within the scope of

6

A6

> such license to a party's RELATED COMPANIES for so
> long as they remain its RELATED COMPANIES. Any
> such sublicense may be made effective retroactively
> but not prior to the effective date hereof, nor
> prior to the sublicensee's becoming a RELATED
> COMPANY of such party.

(David Decl. Ex. 6).

ALU

Alcatel-Lucent USA, Inc. ("ALU Inc.") is a subsidiary of Alcatel-Lucent.   Alcatel-Lucent was formed by the reverse triangular merger of Alcatel and Lucent in 2006.

It appears undisputed that prior to the merger, ALU Inc.'s predecessor in interest, Alcatel USA Marketing, Inc., a subsidiary of Alcatel, sold the networking equipment to T-Mobile pursuant to the AT&T-Alcatel cross-license agreement, which automatically extended sublicenses to then-existing Alcatel subsidiaries at the time the cross-license agreement was executed.  (Lauridsen Ex. 38, 1.01(c)) ("The present respective [subsidiaries] of the parties are deemed sublicensed, effective as of the effective date of this Agreement.").

After the 2006 merger, Alcatel USA Marketing continued to sell the networking equipment to T-Mobile just as it did prior to the merger.

Then, in 2008, Alcatel USA Marketing merged with another Alcatel-Lucent subsidiary to form ALU Inc.  ALU Inc. sold the

7

A7

networking equipment to T-Mobile purportedly pursuant to the AT&T-Alcatel cross-license agreement which, in addition to automatically extending sublicenses to existing subsidiaries, automatically extends sublicenses to "future respective [subsidiaries] of the parties . . . effective as of the date on which any such company becomes a [subsidiary]." (Lauridsen Ex. 38, 1.01(c))

<u>NSN</u>

In March 2009, Siemens granted Nokia Siemens Networks B.V. "retroactively as of April 1, 2007, a sublicense within the scope of Siemens' own license under [its] License Agreement [with AT&T]" which is "subject to all applicable restrictions, exceptions, obligations, liabilities, termination provisions and other provisions in the License Agreement." (Lauridsen Decl. Ex. 28)  According to T-Mobile and NSN, this sublicense was authorized under a 1995 letter amendment (also referred to as the "Divestment Rider") to the AT&T-Siemens cross-license agreement. (Lauridsen Decl. Ex. 24)

The next year, in 2010, Nokia Siemens Networks B.V. and NSN executed a "Confirmatory License Agreement" (Lauridsen Decl. Ex. 36) wherein, effective April 1, 2007, Nokia Siemens Networks B.V. granted NSN a sublicense under the AT&T-Siemens cross-license agreement.

## II.

The district court "shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  In deciding a motion for summary
judgment, the court must construe all facts and draw all
reasonable inferences in the light most favorable to the
nonmoving party. *See Boyle v. Cnty. of Allegheny*, 139 F.3d 386,
393 (3d Cir. 1998).  The moving party bears the burden of
establishing that no genuine issue of material fact remains. *See
Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact
is material only if it will affect the outcome of a lawsuit
under the applicable law, and a dispute of a material fact is
genuine if the evidence is such that a reasonable fact finder
could return a verdict for the nonmoving party. *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

"The longstanding doctrine of patent exhaustion provides
that the initial authorized sale of a patented item terminates
all patent rights to that item."  *Quanta Computer Inc. v. LG
Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Additionally, with
respect to sales of component parts of a patented system, the

9

A9

parts must "substantially embody the patents in suit" in order to trigger exhaustion. *Id.* at 621.

Each issue is addressed in turn.

### A. "Authorized sale"

With respect to the authorized sale analysis, it is important to correctly state the issue presented. *Quanta* clearly states, "[e]xhaustion is triggered only by a sale *authorized by the patent holder.*" 553 U.S. at 636 (citing *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942))(emphasis added); *see also Tessera, Inc. v. ITC,* 646 F.3d 1357, 1369 (Fed. Cir. 2011) ("At issue here, as in *Quanta*, is *whether the patentee has authorized certain sales* of products embodying the asserted patent.") (emphasis added).

In the simplest case, where only one license agreement exists, the issue of whether the patent holder authorized a sale, and whether the vendor was authorized to sell, are one-in-the-same; the patent exhaustion analysis focuses on the one license agreement running directly between the patent holder and the licensee who is simultaneously the vendor.

Both *Quanta* and *Univis* are such cases. Thus, in *Quanta*, the patent holder, LGE, entered into a cross-licensing agreement with Intel, pursuant to which Intel sold to Quanta the equipment

practicing the patented methods.  553 U.S. at 623-24.  Intel was the direct licensee of the patent holder and simultaneously the vendor.

Likewise in *Univis*, the patent holder, Univis, entered into licensing agreements with finishing retailers, prescription retailers, and wholesalers who then sold the products substantially embodying the patents.  316 U.S. at 244.  Once again, the direct licensee of the patent holder was also the vendor.

The facts of this case, however, are different.  Ericsson, ALU, and NSN are not parties to the AT&T or Lucent cross-license agreements.  Those vendors' purported authority to sell the equipment at issue comes from sublicenses rather than from the original cross-license agreements.  Thus, answering the question of whether the patent holders-- in this case AT&T and Lucent-- authorized sales of the licensed products-- by Ericsson, ALU, and NSN-- is a bit more complicated.

The inquiry must begin with whether the patent holder authorized sales-- as opposed to whether the vendor was authorized to sell under a separate agreement-- because the doctrine of patent exhaustion serves to limit patent holders' rights.  *See Quanta*, 553 U.S. at 621 ("For over 150 years this Court has applied the doctrine of patent exhaustion to limit

A11

patent rights that survive the initial authorized sale of a
patented item."). As more fully explained in *Univis,*

> the purpose of the patent law is fulfilled with
> respect to any particular article when the patentee
> has received his reward for the use of his
> invention by the sale of the article, and that once
> that purpose is realized the patent law affords no
> basis for restraining the use and enjoyment of the
> thing sold. In construing and applying the patent
> law so as to give effect to the public policy which
> limits the granted monopoly strictly to the terms
> of the statutory grant, the particular form or
> method by which the monopoly is sought to be
> extended is immaterial. The first vending of any
> article manufactured under a patent puts the
> article beyond the reach of the monopoly which that
> patent confers. Whether the licensee sells the
> patented article in its completed form or sells it
> before completion for the purpose of enabling the
> buyer to finish and sell it, he has equally parted
> with the article, and made it the vehicle for
> transferring to the buyer ownership of the
> invention with respect to that article. To that
> extent he has parted with his patent monopoly in
> either case, and has received in the purchase price
> every benefit of that monopoly which the patent law
> secures to him.

316 U.S. at 251-52 (internal citations omitted); *see also*
*Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed.
Cir. 2013) ("The rationale underlying the doctrine rests upon
the theory that an unconditional sale of a patented device
exhausts the patentee's right to control the purchaser's use of

that item because the patentee has bargained for and received
full value for the goods.").[7]

Thus, it logically follows that the patent exhaustion
analysis focuses on the agreement to which the patent holder is
a party. Only that agreement reflects what the patent holder
has bargained for. Only that agreement reflects the relevant
transaction pursuant to which the patent holder contemplated
sales of the patented items, whether through a direct licensee,
or through a subsequent sublicensee. Upon the performance of
the initial contract only, where the patent holder grants an
unconditional license to sell the relevant equipment, does the
law presume that the patent holder received an amount equal to

---

[7] *See generally United States v. Masonite Corp.*, 316 U.S. 265,
277-78 (1942) ("There are strict limitations on the power of the
patentee to attach conditions to the use of the patented
article. As Chief Justice Taney said in *Bloomer v. McQuewan*, 14
How. 539, 549, when the patented product 'passes to the hands of
the purchaser, it is no longer within the limits of the
monopoly. It passes outside of it, and is no longer under the
protection of the act of Congress.' In applying that rule, this
Court has quite consistently refused to allow the form into
which the parties chose to cast the transaction to govern. The
test has been whether or not there has been such a disposition
of the article that it may fairly be said that the patentee has
received his reward for the use of the article."); *Motion
Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502,
516 (1917) ("[T]his court [has] . . . decided that the owner of
a patent is not authorized by either the letter or the purpose
of the law to fix, by notice, the price at which a patented
article must be sold after the first sale of it, declaring that
the right to vend is exhausted by a single, unconditional sale,
the article sold being thereby carried outside the monopoly of
the patent law and rendered free of every restriction which the
vendor may attempt to put upon it.").

the full value of its patent monopoly.[8]  Any subsequent
sublicense is therefore only relevant to the extent the original
license agreement requires a sublicense.

    With this understanding, the Court now turns to the
parties' arguments concerning the licensing agreements between
the patent holders (Lucent and AT&T) and their direct licensees
(LME, Alcatel, and Siemens).


**1.**

    High Point asserts one argument as to all three vendors:
"T-Mobile's assembly and use of its multi-vendor network is an
unauthorized combination excluded from all putative licenses."
(High Point's Opposition to T-Mobile's Motion for Summary
Judgment, p. 28)  It is undisputed that all three licenses at
issue do exclude combinations.  However, the same argument was
considered and rejected as irrelevant by the *Quanta* court:

> LGE argues that there was no authorized sale here
> because the License Agreement does not permit
> Intel to sell its products for use in combination

---

[8]  Indeed, after *Quanta*, some commentators have advised patent
holders to use care in drafting license agreements so as to
avoid "the risk that a license or covenant not to sue will be
interpreted broadly" and therefore trigger patent exhaustion.
*Patent Exhaustion After* Quanta *and* Transcore: *Protecting Your
Right to Sue Third Parties*, Pat. Trademark & Copyright J. (BNA)
No. 1930, at 518-520 (Aug. 21, 2009).  In particular, patent
holders are advised that "if a component manufacturer is
licensed, the agreement should include express language that the
licensee fee is not for the entire patent right."  *Id.* at 520.

with non-Intel products to practice the LGE Patents. It cites *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 58 S. Ct. 849, 82 L. Ed. 1273, 1938 Dec. Comm'r Pat. 831 (1938), and *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 59 S. Ct. 116, 83 L. Ed. 81, 1938 Dec. Comm'r Pat. 841 (1938), in which the manufacturer sold patented amplifiers for commercial use, thereby breaching a license that limited the buyer to selling the amplifiers for private and home use. The Court held that exhaustion did not apply because the manufacturer had no authority to sell the amplifiers for commercial use, and the manufacturer 'could not convey to petitioner what both knew it was not authorized to sell.' 304 U.S., at 181, 58 S. Ct. 849, 82 L. Ed. 1273, 1938 Dec. Comm'r Pat. 831 LGE argues that the same principle applies here: Intel could not convey to Quanta what both knew it was not authorized to sell, i.e., the right to practice the patents with non-Intel parts.

LGE overlooks important aspects of the structure of the Intel-LGE transaction. Nothing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of LGE's patent claims. . . .

LGE points out that the License Agreement specifically disclaimed any license to third parties to practice the patents by combining licensed products with other components. . . . But the question whether third parties received implied licenses is irrelevant because Quanta asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on Intel's own license to sell products practicing the LGE Patents.

*Quanta*, 553 U.S. at 636-37.

15

A15

High Point makes no attempt to distinguish this case from
*Quanta*, and this Court discerns no material distinction.  High
Point's combination argument fails.

### 2.

As to Ericsson only, High Point expressly states in its
opposition brief that the 1996 Lucent-LME Cross-License
Agreement authorized the sale of the equipment at issue.
Moreover, the undisputed record evidence demonstrates that
Lucent authorized those sales when it granted LME the right "to
make, have made, use, lease, sell and import LICENSED PRODUCTS."
(David Decl. Ex. 6)

It is also undisputed that: (1) the Lucent-LME Cross-
License Agreement authorized LME to grant sublicenses-- and
particularly relevant to this case, authorized *retroactive*
sublicenses-- to LME's "related companies" as that term is
defined in the agreement (David Decl. Ex. 6); (2) that Ericsson
was a "related company"[9]; and (3) LME did, in fact, grant
Ericsson a retroactive sublicense.

------

[9]  At oral argument on the instant motions, counsel for Ericsson
stated that LME has always been a holding company only, and
therefore it may be inferred that when Lucent entered into a
cross-license agreement with LME, Lucent contemplated that sales
would be accomplished through a sublicensee.

16

A16

Thus, Ericsson and T-Mobile argue, Ericsson's sales to T-Mobile were authorized because every requirement of the Lucent-LME Cross-License Agreement was satisfied.

High Point, however, argues that the retroactive sublicense had no legal effect because it was executed in 2013, i.e., after the cross-license agreement expired in 2011.  According to High Point, LME's authority to grant retroactive sublicenses expired upon the expiration of the cross-license agreement's term, which was coextensive with the patents' terms.  But High Point offers no authority for why this should be so, nor any authority for why it should matter in the patent exhaustion analysis.

The Cross-License Agreement places no limits on when retroactive sublicenses may be granted, therefore the Court holds that Lucent authorized the retroactive sublicense that LME granted to Ericsson, and therefore authorized the sales Ericsson made to T-Mobile.

### 3.

As to ALU, T-Mobile's argument in support of its Motion for Summary Judgment is relatively simple:  Paragraph 1.01(c) of the AT&T-Alcatel Cross-License Agreement (Lauridsen Ex. 38) automatically grants sublicenses to sell the equipment practicing the patented methods to all present and future subsidiaries, which Alcatel USA Marketing, Inc. and Alcatel-

17

A17

Lucent USA, Inc. (collectively "ALU") undisputedly are.  Thus, T-Mobile concludes, the sales of equipment from ALU to T-Mobile are authorized for patent exhaustion purposes.

High Point attacks T-Mobile's position on three fronts, arguing: (1) the patents-in-suit are not "licensed patents" as that term is defined in the AT&T-Alcatel Cross-License Agreement; (2) that issues of material fact exist as to whether the specific equipment ALU sold T-Mobile-- the "media gateways" ("MGWs")[10]-- were covered by the cross-license agreement; and (3) the cross-license agreement "ceased to exist" following the Alcatel/Lucent mergers in 2006 and 2008.  All three arguments fail.

As to the first issue, the cross-license defines "LICENSED PATENTS" as patents "for which a first application was filed . . . prior to the termination of the THREE YEAR PERIOD" ending December 31, 2006.  (Lauridsen Ex. 38)  High Point argues that because the three year period is defined as "the period commencing on January 1, 1994 and ending on December 31, 1996," (Id.) "only patents with a first filing date within" the three year period are covered by the license.

---

[10]  Unlike Ericsson and NSN, who sold T-Mobile more than one type of equipment (Erisson sold MGWs, RNCs, and Node Bs; NSN sold Node Bs and RNCs), ALU only sold MGWs to T-Mobile.  (See T-Mobile's Moving Brief, p. 10)

It is undisputed that the relevant filing date for all patents-in-suit is July 9, 1991, therefore, according to High Point, the patents-in-suit are not licensed.

The Court agrees with T-Mobile that High Point's proposed interpretation of the cross-license conflicts with the plain language of the agreement which only requires that an application be filed prior to the end of the three year period, i.e., prior to December 31, 1996. High Point's proffered interpretation would change "prior to the termination of" the three year period to "during" the three year period.

It is undisputed that the relevant filing date for the patents-in-suit is prior to December 31, 1996, therefore the patents-in-suit are covered by the cross-license agreement.

As to the second issue, the cross-license agreement grants a license to sell "any or all products and services of the kinds which are furnished or used by ALCATEL or any of its present RELATED COMPANIES . . . on the effective date of this Agreement." (Lauridsen Ex. 38) The effective date of the agreement is January 1, 1996. (Id.)

High Point relies on record evidence from which, it asserts, a reasonable factfinder could conclude that Alcatel was not furnishing or using MGWs as of 1996. High Point correctly notes that the only evidence in the record concerning ALU's sales of the MGWs at issue is an agreement dated 2004.

19

(Lauridsen Ex. 46)  Further, High Point argues that a factfinder
could reasonably infer that ALU was not selling MGWs prior to
2004 because the record demonstrates that in 2004 ALU acquired
the company that sold the MGWs (Spatial Communications
Technologies) to fill a hole in ALU's product line.  (Edwards
Decl. Ex. G)  Thus, High Point reasons, a reasonable factfinder
could find that Alcatel was not furnishing or using the MGWs in
1996, and therefore could further conclude that ALU had no
license to sell the MGWs to T-Mobile.

High Point's argument, however, misses the relevant legal
inquiry.  As T-Mobile observes, there can be no dispute that
Alcatel was not furnishing or using MGWs in 1996 because MGWs
did not exist in 1996.  Thus, the question cannot possibly be
whether, in 1996, AT&T granted Alcatel a license to sell MGWs.
Rather, the relevant question is whether Alcatel or any of its
related companies were furnishing or using "any . . . products .
. . of [a] kind" like MGWs in 1996.  (Lauridsen Ex. 38)

T-Mobile argues, and the Court agrees, that *Rembrandt Data
Technologies, LP v. AOL, LLC et al.,* 641 F.3d 1331 (Fed. Cir.
2011)("*Rembrandt II*") informs this analysis.  In *Rembrandt II*
the Federal Circuit affirmed the district court's interpretation
of a license agreement with language similar to the language at
issue here.  The agreement provided that sublicences could be
granted to divested businesses, but only as "to products and

20

A20

services sold by the future divested business prior to its
divestiture." *Id.* at 1338.

The Federal Circuit observed that the relevant agreements
"specif[ied] product types using general, functional terms," and
therefore concluded that a "broad interpretation of 'products',"
rather than a narrow interpretation which would limit the
license agreement to specific product models, was warranted.
*Rembrandt II*, 641 F.3d at 1338.  Since the relevant agreements
defined "'licensed products'" as "'data communication station
systems'" and "'digital transmission systems,'" the Federal
Circuit agreed with the district court that "the term 'products'
covers 'modems generally, not the specific types of modems in
production at the time of the sublicense and/or divestiture.'"
*Id.*

Here, the language of the AT&T-Alcatel License Agreement is
even broader than the relevant language in *Rembrandt II*.  The
title page of the AT&T-Alcatel agreement reads, "Patent License
Agreement between [AT&T] and [Alcatel], effective as of January
1, 1996, *Relating to the Products and Services of the Businesses
of the Parties*."  (Lauridsen Ex. 38) (emphasis added).  Rather
than limiting licensed products to certain kinds of
communication and transmission systems, as the agreements in
*Rembrandt II* did, the agreement here does not define a class of
licensed products.  It broadly states,

21

> AT&T . . . grants to ALCATEL, . . . nonexclusive
> and nontransferable licenses to make, have made,
> use, lease, offer to sell, sell and import any or
> all products and services of the kinds which are
> furnished or used by ALCATEL or any of its
> present RELATED COMPANIES in the operation of the
> business in which ALCATEL or any such RELATED
> COMPANY is engaged on the effective date of this
> Agreement.

(Id.)[11]  Indeed, it is difficult to hypothesize a broader grant

of a license.

Thus, in order to prevail on the authorization issue, T-

Mobile must only produce evidence supporting a conclusion that

MGWs are of the kind of products that either Alcatel or one of

its related companies were furnishing or using in the operation

of their businesses on January 1, 1996.  It has satisfied its

burden in this regard because High Point does not dispute that

Alcatel sold "switching systems" in 1996, and that MGWs are a

type of switching system.  (See High Point's Response to T-

Mobile / NSN's Statement of Undisputed Facts ¶ 124; High Point's

Opposition Brief, p. 33, 35-38).

Accordingly, a reasonable factfinder could only conclude

that AT&T authorized the sale of the MGWs that T-Mobile

purchased from ALU.

---

[11]  The Agreement expressly states that "no rights are granted to
ALCATEL for TELECOMMUNICATIONS SERVICES, SEMICONDUCTOR
APPARATUS, and DATA PROCESSING APPARATUS," however, High Point
does not argue that MGWs or similar kinds of products fall
within this exception.

22

A22

As to the third and last issue, High Point's argument that the mergers occurring in 2006 and 2008 terminated the cross-license agreement is incorrect as a matter of law. High Point argues that the mergers triggered the non-assignability clause in the cross-license agreement because the mergers resulted in an unauthorized transfer of the license.

"[A] reverse triangular merger generally is not an assignment by operation of law." *Meso Scale Diagnostics, LLC v. Rocher Diagnostics GMBH*, 62 A.3d 62, 86 (Del. Ch. Ct. 2013);[12] *see generally* Revised Model Business Corporation Act § 11.07 ("A merger is not a conveyance, transfer or assignment. It does not give rise to claims for reverter or impairment of title based on a prohibited conveyance, transfer, or assignment. It does not give rise to a claim that a contract with a party to the merger is no longer in effect on the ground of nonassignability, unless the contract specifically provides that it does not survive a merger."). The mergers did not terminate the cross-license agreement.

In summary, as to ALU's sales to T-Mobile, all of High Point's arguments fail. The Court holds that AT&T authorized the sales.

**4.**

_____

[12] It is undisputed that Delaware law governs this issue.

23

A23

Lastly, as to NSN, T-Mobile and NSN argue that AT&T authorized NSN's sales of equipment to T-Mobile under the 1995 "Divestment Rider" to the AT&T-Siemens License (Lauridsen Ex. 24). The relevant portion of the Rider provides,

> [I]n the future, if SIEMENS . . . divests a portion of its present business, the licenses and rights granted in the subject agreement may be sublicensed to the divested business by the divesting company. Such sublicenses may be granted and retained *[a] only while the future divested business operates as a separately identifiable business and [b] only to the extent applicable to products and services sold by the future divested business prior to its divestiture.*

(Lauridsen Decl. Ex. 24)(emphasis added)

It is undisputed that Siemens granted a sublicense to NSN B.V., which later granted NSN an undisputedly valid retroactive sublicense, pursuant to which NSN sold to T-Mobile the equipment at issue.

However, High Point argues that the sublicense from Siemens to NSN B.V. was not authorized by AT&T because neither condition [a] nor [b] were satisfied. The Court disagrees.

High Point's arguments implicitly turn on the fact that Siemens' "divested business"-- a term not defined by either the rider or the cross-license agreement-- is a joint venture. It is undisputed that NSN B.V. was created by combining Siemens' carrier division with Nokia's infrastructure business. Thus, High Point argues, the divested Siemens carrier division did not

24

operate as a "separately identifiable business" because it undisputedly operated as one half of a joint venture. According to High Point, the Siemens carrier division "never operated the divested Siemens business as a separately identifiable business *within* NSN B.V." because the whole point of the joint venture was to integrate the Siemens carrier division with Nokia's infrastructure business. (Opposition Brief, p. 16) (emphasis added).

This argument rests on an unsupported interpretation of the term "separately identifiable." The plain language of the rider indicates that the divested business need only operate separately *from Siemens*. The entire rider addresses what happens in the event that Siemens "divests a portion of its business." (Lauridsen Decl. Ex. 24) It is undisputed that: (1) Siemens did divest its carrier division, and (2) after the joint venture transaction closed, the carrier division was no longer part of Siemens, but rather, part of a new and separate entity, NSN B.V. Thus, Siemens' carrier division did operate separately from Siemens after the formation of the joint venture.

High Point's argument as to rider condition [b] fails for similar reasons. According to High Point's argument, only some equipment coming from NSN B.V. was licensed (i.e., equipment that originated with Siemens prior to the joint venture) while

other equipment-- indeed, even the same *type* of equipment[13]-- was not, simply because it originated with Nokia prior to the joint venture.

Not only does High Point's argument make little practical sense, it conflicts with the language of the rider, which speaks of granting sublicenses "to the divested business." (Lauridsen Decl. Ex. 24)  Indeed, Siemens granted a sublicense to NSN B.V., not to its carrier division. (See Lauridsen Decl. Ex. 28 – sublicense agreement between Siemens and NSN B.V.)

The Court agrees with T-Mobile and NSN's observation that "High Point's position boils down to saying 'separately identifiable business' includes an unwritten, unstated prohibition on joint ventures." (T-Mobile / NSN's reply brief,

---

[13]  T-Mobile and NSN have introduced evidence that Siemens was selling wireless infrastructure equipment (of which RNCs and Node Bs are a later generation type) long before the divestment of Siemens' carrier division, and even before AT&T and Siemens entered into the original cross-license agreement.  (Zott Dep. p. 155-157)  Thus, contrary to High Point's position, it does not matter that, according to High Point, the specific NSN models T-Mobile purchased were Nokia's pre-joint venture infrastructure models.  So long as the equipment coming from NSN was wireless infrastructure equipment, it does not matter whether it originated with Siemens or Nokia.

The equipment was covered by the cross-license agreement, as products "of the kinds which [were] furnished or used by [Siemens] or any RELATED COMPANY . . . on the effective date of" the cross-license agreement (Lauridsen Ex. 22)-- including new products and services that "normally evolve from the existing products and services (Lauridsen Ex. 23)-- which were also products sold by Siemens prior to the divestment of its carrier division into the joint venture.  (Lauridsen Ex. 24)  *See Rembrandt II,* 641 F.3d at 1338.

p. 10)  High Point points to nothing in the record supporting an inference that such result was intended by AT&T when it entered into the Divestment Rider with Siemens.

High Point has failed raise a disputed issue of material fact as to whether AT&T authorized Siemens' sublicense to NSN B.V.  The Court holds that the sublicense was authorized under the Divestment Rider; and therefore concludes that AT&T authorized NSN's sale of equipment to T-Mobile.

### B.  "Substantial embodiment"

As to the '090 patent, High Point concedes that if the sales of Node Bs were authorized, claims 28, 29, and 31 are exhausted: "[T]he accused Node Bs substantially embody the claimed inventions of those claims, such that the licensed sale of a Node B would exhaust High Point's rights with respect to those patent claims[.]"  (High Point's Opposition to T-Mobile / NSN's Motion for Summary Judgment, p. 33 n.14)

The parties dispute, however, the implications of this concession.  High Point argues that exhaustion applies only to claims 28, 29, and 31; "with respect to all of High Point's other asserted claims, High Point's rights are not exhausted." (High Point's Opposition to T-Mobile / NSN's Motion for Summary Judgment, p. 33 n.14)  T-Mobile takes the opposite position:

27

"High Point's concession means that all claims of the '090 Patent are exhausted." (Reply brief, p. 12)

*Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370 (Fed. Cir. 2013), conclusively forecloses High Point's argument. In that case the Federal Circuit expressly rejected the patent holder's "argument that patent exhaustion must be adjudicated on a claim-by-claim basis." *Id.* at 1374. The Court explained,

> The [Supreme] Court's patent exhaustion jurisprudence has focused on the exhaustion of the patents at issue in their entirety, rather than the exhaustion of the claims at issue on an individual basis. . . . To permit a patentee to reserve specific claims from exhaustion would frustrate the purposes of the doctrine, one of which is to provide an efficient framework for determining when a patent right has been exhausted.

*Id.* (internal citations to *Quanta* and *Univis* omitted).

Accordingly, High Point's claim for infringement of the '090 patent is barred by the doctrine of patent exhaustion.

Likewise, High Point's substantial embodiment argument as to the '308, '347 and '091 patents also fails. In an apparent attempt to avoid its own infringement contentions, which implicitly concede that the Node Bs, RNCs, and MGWs substantially embody at least one claim of the patents, High Point argues that exhaustion does not apply to combinations of the Node Bs, RNCs, and MGWs that were purchased from different vendors. According to High Point, exhaustion only applies if

28

A28

each "individual component" of T-Mobile's accused network substantially embodies each patent claim at issue. (Opposition brief, p. 33-35)

T-Mobile correctly notes however, that High Point cites no legal authority for its position, and that High Point's position would severely undercut, if not eviscerate, the doctrine of patent exhaustion.

To accept High Point's argument would be to rule that T-Mobile could not use the equipment it purchased in an authorized sale in the manner in which it chooses to use it-- for example, that T-Mobile could not combine MGWs it purchased from ALU with Node Bs and RNCs it purchased from NSN. Once an authorized sale of the equipment at issue had taken place, however, the patent holder (i.e., High Point, as successor-in-interest to AT&T and Lucent) lost all rights to control the purchaser's (i.e., T-Mobile's) post-sale use of that equipment. Such is the fundamental operation of the patent exhaustion doctrine. *See Keurig,* 732 F.3d at 1373 ("The rationale underlying the doctrine rests upon the theory that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of that item.").

Accordingly, the Court holds that the equipment at issue substantially embodies all four patents-in-suit.

29

**IV.**

For the above-stated reasons, the Court holds that the patent holders (AT&T and Lucent) authorized all three vendors' (Ericsson, ALU, and NSN) sales of the equipment substantially embodying the patents-in-suit, and therefore the doctrine of patent exhaustion bars High Point's infringement claims. Accordingly, the Motions for Summary Judgment will be granted in their entirety.[14]

An appropriate Order accompanies this Opinion.


Date:  October 15, 2014


__s/ Joseph E. Irenas_____
JOSEPH E. IRENAS, S.U.S.D.J.

---

[14]  The Court notes that this Opinion and accompanying Order do not dispose of the entire case; T-Mobile's counterclaims for non-infringement and invalidity remain, as well as Ericsson's numerous counterclaims.  Apparently, the issue regarding T-Mobile's use of Nokia equipment, *see* fn. 6 *supra*, also remains.

30

A30

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HIGH POINT SARL,<br><br>        Plaintiff,<br><br>    v.<br><br>T-MOBILE USA, INC.,<br><br>        Defendant,<br><br>    and<br><br>NOKIA SOLUTIONS AND NETWORKS US, LLC,<br><br>        Intervenor-Defendant,<br><br>    and<br><br>ERICSSON, INC.,<br><br>        Intervenor-Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>Civil No. 12-1453 (JEI/AMD)<br><br>**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (Docket #s 125, 129)** |

**APPEARANCES:**

DECHERT LLP
By:  Thomas P. Lihan, Esq.
     Robert D. Rhoad, Esq.
902 Carnegie Center
Suite 500
Princeton, NJ 08540-6532
     Counsel for High Point SARL

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Lisa J. Rodriguez, Esq.
Woodland Falls Corporate Park
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165
     Counsel for T-Mobile USA, Inc.

1

A31

```
DENTONS US LLP
By:  Marc S. Friedman, Esq.
1221 Avenue of the Americas
New York, NY 10020-1089
     Counsel for T-Mobile USA, Inc.

GRAHAM CURTIN, PA
By:  Thomas R. Curtin, Esq.
     George C. Jones, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962-1991
     Counsel for Alcatel-Lucent USA, Inc.

LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, ESQS.
By:  Jonathan A. David, Esq.
     Robert B. Hander, Esq.
     Roy Henry Wepner, Esq.
     William L. Mentlik, Esq.
600 South Avenue West
Westfield, NJ 07090
     Counsel for Ericsson, Inc.

KING & SPALDING LLP
By:  Allison Hoch Altersohn, Esq.
     Chandan Sarkar, Esq.
     Robert F. Perry, Esq.
1185 Avenue of the Americas
New York, NY 10036
     Counsel for Nokia Solutions and Networks US, LLC

CONNELL FOLEY LLP
By:  Liza M. Walsh, Esq.
     Katelyn O'Reilly, Esq.
85 Livingston Avenue
Roseland, NJ 07068
     Counsel for Nokia Solutions and Networks US, LLC
```

A32

**IRENAS,** Senior United States District Judge:

This matter having appeared before the Court upon the Motions for Summary Judgment filed by (1) Intervenor-Defendant Ericsson, Inc. (Docket #125) and (2) Defendant T-Mobile USA, Inc., and Intervenor-Defendant Nokia Solutions and Networks US, LLC (Docket #129), oral argument on the motions having been held on September 19, 2014, and for the reasons set forth in the accompanying Opinion issued on even date herewith,

**IT IS** on this 15th day of October, 2014,

**ORDERED THAT:**

The Motions for Summary Judgment as to T-Mobile's patent exhaustion defense are hereby **GRANTED.**


                                    ___s/ Joseph E. Irenas_____
                                    Joseph E. Irenas, S.U.S.D.J.

A33

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| HIGH POINT SARL, | : | |
| | : | |
| *Plaintiff,* | : | Civil No. 12-cv-1453-JEI-AMD |
| | : | |
| v. | : | |
| | : | |
| T-MOBILE USA INC., | : | |
| | : | |
| *Defendant,* | : | |
| and | : | |
| | : | |
| NOKIA SOLUTIONS AND NETWORKS US | : | |
| LLC, and ERICSSON INC., | : | |
| | : | |
| *Intervenors.* | : | |

### STIPULATED ORDER AND FINAL JUDGMENT

The Parties stipulate to entry of the following order and judgment:

1.      In this patent infringement action, plaintiff High Point SARL ("High Point") asserts claims for infringement of U.S. Patent Nos. 5,195,090; 5,305,308; 5,184,347; and 5,195,091 ("patents-in-suit") against defendant T-Mobile USA, Inc. ("T-Mobile").   Nokia Solutions and Networks US LLC ("NSN USA") and Ericsson Inc. ("Ericsson") (collectively with NSN USA, "Intervenors") intervened.

2.      In their respective pleadings, the parties assert the following claims, counterclaims, and defenses:

(a)      In its Complaint (ECF No. 1, March 8, 2012), High Point asserts claims for four counts of patent infringement (Counts I – IV), one for each of the patents-in-suit;

(b)      In its Amended Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial, T-Mobile asserts counterclaims for declaratory relief of non-infringement and invalidity (ECF No. 76, filed June 13, 2013);

A34

Case: 15-1235    Document: 41    Page: 98    Filed: 03/23/2015

Case 1:12-cv-01453-JEI-AMD    Document 192    Filed 12/10/14    Page 2 of 5 PageID: 12861
Case 1:12-cv-01453-JEI-AMD    Document 191-1    Filed 12/08/14    Page 2 of 5 PageID: 12856

(c)    In its Amended Answer, Affirmative Defenses, Counterclaims in Intervention, and Demand for Trial by Jury (ECF No. 57, filed May 28, 2013), Ericsson asserted counterclaims for declaratory relief of non-infringement, invalidity, license and exhaustion, estoppel, and breach of contract; and

(d)    In its Amended Answer and Defenses (ECF No. 59, filed May 29, 2013), NSN USA asserted numerous defenses, including non-infringement, invalidity, estoppel, license and patent exhaustion, and breach of contract.

3.    On February 24, 2014, T-Mobile and NSN USA filed Defendant T-Mobile USA Inc.'s and Intervenor Nokia Solutions and Networks US LLC's Motion for Partial Summary Judgment of Patent Exhaustion, and Ericsson filed Ericsson, Inc.'s Motion for Partial Summary Judgment on Defenses of License and Exhaustion.

4.    On October 15, 2014, after briefing and oral argument, the Court granted T-Mobile's and Intervenors' respective motions for summary judgment on T-Mobile's affirmative defense of patent exhaustion ("Summary Judgment Ruling") (*see* ECF Nos. 181 (Opinion), 182 (Order)).

5.    This decision, however, did not dispose of all of the claims or counterclaims asserted in the case.  (*See,e.g.*, Opinion, ECF No. 181, at 30 nn. 6 & 14.)   In particular, the decision did not address High Point's claims of infringement against T-Mobile arising out of T-Mobile's use of equipment purchased from Nokia Inc. prior to the formation of Nokia Siemens Networks US LLC (n/k/a Nokia Solutions and Networks US LLC) ("Nokia Claims") or purchased from ip.access ("ip.access Claims"), and did not fully dispose of either (i) T-Mobile's counterclaims of non-infringement and invalidity; or (ii) certain of Ericsson's counterclaims.

Case: 15-1235    Document: 41    Page: 99    Filed: 03/23/2015

Case 1:12-cv-01453-JEI-AMD    Document 192    Filed 12/10/14    Page 3 of 5 PageID: 12862
Case 1:12-cv-01453-JEI-AMD    Document 191-1    Filed 12/08/14    Page 3 of 5 PageID: 12857

6.    Nevertheless, the Parties have informed the Court that, in view of the Court's Summary Judgment Ruling, the Parties stipulate to final resolution of all pending claims, counterclaims, and defenses as set out in Paragraphs 7-11 of this Order.

7.    Accordingly, it is hereby ORDERED that final judgment is entered as follows:

(a) Judgment is entered against High Point on Counts I through IV of its complaint against T-Mobile and on T-Mobile's First, Third, Fifth and Seventh Counterclaims and on Ericsson's First and Fourth Counterclaims (for the avoidance of doubt, with respect to Ericsson's First Counterclaim, the only justiciable controversy between High Point and Ericsson related to T-Mobile's use of Ericsson equipment, and judgment is entered as to that Counterclaim solely with respect to that justiciable controversy and solely for the reasons set forth in the Court's Summary Judgment Ruling); and

(b) T-Mobile's and Intervenors' remaining counterclaims and defenses are dismissed without prejudice, subject to T-Mobile's and Intervenors' right to revive such counterclaims and defenses in the event of a remand from the Court of Appeals for the Federal Circuit.

8.    This Order is without prejudice to the Parties' rights to appeal the Summary Judgment Ruling, this Stipulated Order, or any other judgment or order of this Court entered in this matter.

9.    In the event that, following any appeal of the Summary Judgment Ruling, this Stipulated Order and Final Judgment, or any other judgment or order of this Court, this case is remanded back to this Court, in whole or in part, with respect to any of High Point's claims of infringement against T-Mobile, then on remand, High Point may also reassert the Nokia Claims and ip.access Claims, and T-Mobile and the Intervenors' may also reassert any

A36

Case: 15-1235    Document: 41    Page: 100    Filed: 03/23/2015

Case 1:12-cv-01453-JEI-AMD    Document 192    Filed 12/10/14    Page 4 of 5 PageID: 12863
Case 1:12-cv-01453-JEI-AMD    Document 191-1    Filed 12/08/14    Page 4 of 5 PageID: 12858

counterclaims or defenses dismissed pursuant to paragraph 7(b) above.   This Order shall not otherwise alter the procedures following remand, if any.

10.    T-Mobile, Ericsson and NSN USA are declared the prevailing parties.   The time in which T-Mobile, Ericsson and NSN USA may file any bill of costs and motion to tax same, and any motion for attorney fees (including but not limited to an exceptional case determination pursuant to 35 U.S.C. § 285 or other bases for the award of attorneys' fees and/or costs), is hereby enlarged to (a) 60 days from entry of this order if no appeal from this Order and Final Judgment is timely noticed, or (b) 30 days from the issuance of the mandate of the court of appeals if an appeal is taken.

11.    The above entry of final judgment resolves all claims and counterclaims asserted in this matter by any party.   This is a final, appealable judgment.    *The Clerk of Court is hereby directed to CLOSE THIS FILE.*

SO ORDERED this 10th day of _DECEMBER_, 2014:

_____
U.S. District Judge Joseph E. Irenas

So Stipulated:

Dated:   December 8, 2014        By:   /s/ Robert D. Rhoad
                                          Robert D. Rhoad
                                          DECHERT LLP
                                          A Pennsylvania Limited Liability Partnership
                                          902 Carnegie Center, Suite 500
                                          Princeton, NJ 08540-6531
                                          Telephone: (609) 995-3200
                                          Email:  robert.rhoad@dechert.com

                                          *Attorneys for Plaintiff High Point SARL*

                                  By:   /s/ Lisa J. Rodriguez
                                          Lisa J. Rodriguez
                                          SCHNADER HARRISON SEGAL & LEWIS LLP
                                          Woodland Falls Corporate Park
                                          220 Lake Drive East, Suite 200
                                          Cherry Hill, NJ 08002-1165

A37

Case: 15-1235    Document: 41    Page: 101    Filed: 03/23/2015

Case 1:12-cv-01453-JEI-AMD    Document 192    Filed 12/10/14    Page 5 of 5 PageID: 12864
Case 1:12-cv-01453-JEI-AMD    Document 191-1    Filed 12/08/14    Page 5 of 5 PageID: 12859

Telephone: (856) 482-5222
Email: jrodriguez@schnader.com

*Attorneys for Defendant T-Mobile USA, Inc.*

By:    /s/ Liza M. Walsh
      Liza M. Walsh
      CONNELL FOLEY LLP
      85 Livingston Avenue
      Roseland, NJ 07068
      Telephone: (973) 535-0500
      Email:  lwalsh@connellfoley.com

      *Attorneys for Intervenor Nokia Solutions and*
      *Networks US LLC*

By:    /s/ William L. Mentlik
      William L. Mentlik
      LERNER, DAVID, LITTENBURG,
      KRUMHOLZ & MENTLIK, LLP
      600 South Avenue West
      Westfield, NJ 07090-1497
      Telephone: (908) 654-5000
      Email:  wmentlik@ldlkm.com

      *Attorneys for Intervenor Ericsson, Inc.*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*High Point SARL v. T-Mobile USA, Inc.,* 2015-1235

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DECHERT LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **March 23, 2015,** counsel has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

| | |
|---|---|
| Asim M. Bhansali  (Principal Counsel) (abhansali@kvn.com) KEKER & VAN NEST LLP 633 Battery Street San Francisco, CA 94111-1809 Telephone: (415) 676-2235 Fax: (415) 397-7188 | *Counsel for Defendant-Appellee T-Mobile USA, Inc.* |
| Ryan J. McBrayer (RMcBrayer@perkinscoie.com) Christina J. McCullough (CMcCullough@perkinscoie.com) PERKINS COIE LLP 1201 Third Avenue, Suite 4800 Seattle, Washington 98101-3099 Telephone: (206) 359-8000 Fax: (206) 359-9000 | *Counsel for Defendant-Appellee T-Mobile USA, Inc.* |

Dan L. Bagatell                          *Counsel for Defendant-Appellee*
(DBagatell@perkinscoie.com)              *T-Mobile USA, Inc.*
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8250
Fax: (602) 648-7150

William L. Mentlik (Principal Counsel)   *Counsel for Defendant-Appellee*
(WMentlik@ldlkm.com)                     *Ericsson, Inc.*
Jonathan A. David
(JDavid@ldlkm.com)
Roy H. Wepner
(RWepner@ldlkm.com)
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
Telephone: 908.654.5000
Fax: 908.654.7866

Daryl L. Joseffer  (Principal Counsel)   *Counsel for Appellee Nokia*
(djoseffer@klsaw.com)                    *Solutions and Networks US LLC*
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-737-0500
Fax: 202-626-3737

Adam M. Conrad                           *Counsel for Appellee Nokia*
(aconrad@klsaw.com)                      *Solutions and Networks US LLC*
KING & SPALDING LLP
100 N. Tryon St., Suite 3900
Charlotte, NC 28202
Telephone: 704-503-2600
Fax: 704-503-2622

Allison H. Altersohn                    *Counsel for Appellee Nokia*
(aaltersohn@kslaw.com)                  *Solutions and Networks US LLC*
Christopher Carnaval
(ccarnaval@kslaw.com)
Robert F. Perry
(rperry@kslaw.com)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone: 212-556-2100
Fax: 212-556-2222


Additionally, on this date confidential copies will also be served via emailed to the

above counsel and confidential paper copies will be mailed to the above principal.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court within the time provided in the Court's rules.

March 23, 2015                          /s/ Robyn Cocho
                                        Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains <u>11,906</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013 </u>in a <u>14</u> point <u>Times New Roman</u> font or

_____ The brief has been prepared in a monospaced typeface using_____ _____in a ___ characters per inch_____ font.

Date: March 23, 2015

<u>/s/ Martin J. Black</u>
Martin J. Black
DECHERT LLP
*Counsel for Plaintiff-Appellant, High Point SARL*