**2015-1235**

# United States Court of Appeals
# for the Federal Circuit

HIGH POINT SARL,

*Plaintiff-Appellant,*

*v.*

T-MOBILE USA, INC., ERICSSON INC., AND
NOKIA SOLUTIONS AND NETWORKS US LLC,

*Defendants-Appellees.*

*Appeal from the United States District Court for the District of New Jersey
The Honorable Judge Joseph E. Irenas, Presiding
Case No. 1:12-cv-01453-JEI-AMD*

## BRIEF OF APPELLEES T-MOBILE USA, INC., ERICSSON INC. AND NOKIA SOLUTIONS AND NETWORKS US LLC

ASIM M. BHANSALI
THERESA H. NGUYEN
KEKER & VAN NEST LLP
633 BATTERY STREET
SAN FRANCISCO, CA 94111
TELEPHONE:   415 391 5400
FACSIMILE:   415 397 7188

DAN L. BAGATELL
PERKINS COIE LLP
2901 N. CENTRAL AVE., #2000
PHOENIX, AZ 85012
TELEPHONE:   602 351 8250
FACSIMILE:   602 648 7150

*Counsel for Defendant-Appellee
T-MOBILE USA, INC.*

WILLIAM L. MENTLIK
ROY H. WEPNER
ROBERT B. HANDER
LERNER, DAVID,
LITTENBERG, KRUMHOLZ
& MENTLIK, LLP
600 SOUTH AVENUE WEST
WESTFIELD, NJ 07090
TELEPHONE:   908 654 5000
FACSIMILE:   908 654 7866

*Counsel for Defendant-Appellee
ERICSSON INC.*

DARYL L. JOSEFFER
KING & SPALDING LLP
1700 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20006
TELEPHONE:   202 737 0500
FACSIMILE:   202 626 3737

ROBERT F. PERRY
ALLISON H. ALTERSOHN
CHRISTOPHER C. CARNAVAL
KING & SPALDING LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
TELEPHONE:   212 556 2100
FACSIMILE:   212 556 2222

*Counsel for Defendant-Appellee
NOKIA SOLUTIONS and
NETWORKS US LLC*

Additional Counsel Listed on Inside Cover

Additional Counsel:

RYAN J. MCBRAYER
PERKINS COIE LLP
1201 THIRD AVE, SUITE 4900
SEATTLE, WA 98101
TELEPHONE:   206 359 3073
FACSIMILE:    206 359 4073

*Counsel for Defendant-Appellee*
*T-MOBILE USA, INC.*


ADAM CONRAD
KING & SPALDING LLP
100 N TRYON STREET, SUITE 3900
CHARLOTTE, NC 28202
TELEPHONE:   704 503 2600
FACSIMILE:    704 503 2622

*Counsel for Defendant-Appellee*
*NOKIA SOLUTIONS and NETWORKS US LLC*

## CERTIFICATE OF INTEREST

Counsel for Appellee T-Mobile USA, Inc. certifies the following:

1.  The full name of every party or amicus represented by me is:

T-Mobile USA, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

T-Mobile USA, Inc., a Delaware corporation, is a wholly-owned subsidiary of T-Mobile US, Inc., a Delaware corporation. T-Mobile US, Inc. (NYSE: TMUS) is a publicly-traded company listed on the New York Stock Exchange ("NYSE"). Deutsche Telekom Holding B.V., a limited liability company (*besloten vennootschap met beperkte aansprakelijkheidraies*) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc. DT B.V. is a direct wholly-owned subsidiary of T-Mobile Global Holding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Holding"). Holding, is in turn a direct wholly-owned subsidiary of T-Mobile Global Zwischenholding GmbH, a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany ("Global"). Global is a direct wholly-owned subsidiary of Deutsche Telekom AG, an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom"). The principal trading market for Deutsche Telekom's ordinary shares is the Frankfurt Stock Exchange. Deutsche Telekom's ordinary shares also trade on the Berlin, Düsseldorf, Hamburg, Hannover, München and Stuttgart stock exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share,

trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY").

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

### KEKER & VAN NEST LLP

| | | |
|---|---|---|
| Asim M. Bhansali | Leo L. Lam | Paula L. Blizzard |
| R. Adam Lauridsen | Benjamin Rothstein | (formerly of Keker & Van |
| Theresa H. Nguyen | Justina Sessions | Nest LLP) |

### PERKINS COIE LLP

| | | |
|---|---|---|
| Dan L. Bagatell | Ryan J. McBrayer | Christina J. McCullough |
| Jared W. Crop | Carmen G. Wong | |

### SCHNADER HARRISON SEGAL & LEWIS LLP

Lisa J. Rodriguez

### DENTONS US LLP

Marc S. Friedman
Andrew M. Grodin

Dated: June 23, 2015                    */s/ Asim M. Bhansali*_____
                                        Asim M. Bhansali

## CERTIFICATE OF INTEREST

Counsel for Appellee Ericsson Inc. certifies the following:

1.　　The full name of every party or amicus represented by me is:

Ericsson Inc.

2.　　The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.　　All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

Ericsson Inc. is wholly owned by Ericsson Holding II Inc., which in turn is wholly owned by Telefonaktiebolaget LM Ericsson. Telefonaktiebolaget LM Ericsson is publicly held and trades in the United States through American Depository Receipts under the name LM Ericsson Telephone Company.

4.　　The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**LERNER DAVID LITTENBERG KRUMHOLZ & MENTLIK LLP**

| | | |
|---|---|---|
| William L. Mentlik | Roy H. Wepner | Jonathan A. David |
| Jeffrey S. Dickey | Andrew T. Zidel | Robert B. Hander |
| | Natalie S. Richer | |

Dated: June 23, 2015　　　　　　　　　/s/ William L. Mentlik
　　　　　　　　　　　　　　　　　　William L. Mentlik

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Nokia Solutions and Networks US LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

Nokia Solutions and Networks US LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

Nokia Solutions and Networks US LLC is a wholly-owned subsidiary of Nokia Solutions and Networks Holdings USA Inc., which is a wholly-owned subsidiary of Nokia Solutions and Networks B.V., which is a wholly-owned subsidiary of Nokia Finance International B.V., which is a wholly-owned subsidiary of Nokia Corporation; and there is no publicly held company that owns 10% or more of Nokia Solutions and Networks US LLC's stock.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

### KING & SPALDING LLP

| | | |
|---|---|---|
| Daryl L. Joseffer | Robert F. Perry | Allison H. Altersohn |
| Christopher C. Carnaval | Adam M. Conrad | Anup M. Shah |
| | Chandan Sarkar | |

### CONNELL FOLEY LLP

Liza M. Walsh

Katelyn O'Reilly

Dated: June 23, 2015                    */s/ Daryl L. Joseffer*_____

Daryl L. Joseffer

iv

# **TABLE OF CONTENTS**

CERTIFICATES OF INTEREST ................................................................. i-iv

TABLE OF CONTENTS ........................................................................... v

TABLE OF AUTHORITIES ..................................................................... ix

TABLE OF ABBREVIATIONS ................................................................ xi

STATEMENT OF RELATED CASES ..................................................... xii

INTRODUCTION .................................................................................... 1

STATEMENT OF ISSUES ...................................................................... 4

STATEMENT OF THE CASE .................................................................. 6

I.     High Point accused ALU-, NSN US-, and Ericsson-supplied components of practicing all claim elements except standard communications links. ................................................................. 7

II.    The patents-in-suit claim inventions with purportedly novel features in components at a cellular network's cell and switching-system ends. ........................................................... 11

III.   AT&T and Lucent cross-licensed their patents with companies whose license rights extended to T-Mobile's suppliers ......................... 13

      A.    The AT&T-Alcatel license covered existing products, including switching systems, and future products of the same kind. ................................................................. 15

      B.    The AT&T-Siemens license covered existing products, including wireless-telecommunications infrastructure, and AT&T extended that license in 1995 to permit sublicensing Siemens's future divested businesses ...................... 17

           1.    The "kinds of products" Siemens sold by 1988 included wireless-telecommunications infrastructure. ................................................................. 18

2.  In 1995, AT&T executed a divestment rider that broadly allowed AT&T and Siemens to sublicense future divested businesses. ...............................19

3.  Siemens subsequently divested its wireless-telecommunications infrastructure business to form NSN B.V., and Siemens and NSN B.V. granted the sublicenses needed to extend rights to NSN US under the divestment rider...................................20

4.  NSN B.V. operated as a separate legal entity from Nokia, Siemens, and any other company. ..........................21

C.  The Lucent-LME license allowed both parties to retroactively sublicense subsidiaries; LME retroactively sublicensed Ericsson in 2013........................................................22

IV.  The district court granted summary judgment because ALU, NSN US, and Ericsson sold licensed equipment to T-Mobile, and those licensed sales exhausted High Point's asserted claims. ...................................................................................24

SUMMARY OF ARGUMENT .........................................................28

ARGUMENT ...................................................................................30

I.  The AT&T-Alcatel license covered the MGWs that ALU sold to  T-Mobile. .......................................................................31

A.  AT&T licensed Alcatel to sell any switching systems throughout the license's duration, not just the particular switching-system technologies that Alcatel had been selling in 1996.............................................................32

B.  The AT&T-Alcatel license covered MGWs, which High Point itself contended were switching-system components. ...................................................................34

II.  The 1988 AT&T-Siemens license, as extended by the 1995 divestment rider, covered the Node Bs and RNCs that NSN US sold to T-Mobile........................................................35

A.      NSN B.V. is a "divested business" that remained "separately identifiable" as the 1995 divestment rider required. .........................................................................36

B.      NSN US's rights cover the *kinds* of products that Siemens sold before divestiture, rather than just Siemens's specific product models. .............................................40

C.      NSN B.V. received the right to sublicense its subsidiary NSN US. ....................................................................42

D.      The few Node Bs and RNCs that Nokia sold to T-Mobile prior to the formation of NSN B.V. are not at issue in this appeal. ......................................................43

III.    LME's license covered the Node Bs, RNCs, and MGWs that Ericsson sold to T-Mobile. .......................................................44

A.      LME provided Ericsson a sublicense that was made "effective retroactively," as the Lucent-LME license expressly allows. .............................................................44

B.      Even without a formal sublicense, Lucent authorized Ericsson's sales to T-Mobile, which thus triggered patent exhaustion. .........................................................47

C.      The cases High Point relies on have no relevance to applying an express contract term like the retroactive sublicense right here. .................................................49

IV.     High Point's patent rights against T-Mobile are exhausted because the licensed articles substantially embody all asserted claims. ................................................................................52

A.      High Point's admission that licensed Node Bs substantially embody certain claims of the '090 patent established exhaustion in this case as to all asserted claims of that patent. ....................................................54

B.      In High Point's infringement contentions, licensed Node Bs, RNCs, and/or MGWs substantially embody the remaining claims of the patents-in-suit. .......................57

C.    The combination provisions in the license agreements are irrelevant to the patent exhaustion analysis. ........................... 61

CONCLUSION ................................................................................... 61

CERTIFICATE OF SERVICE ........................................................... 64

CERTIFICATE OF COMPLIANCE ................................................... 65

# TABLE OF AUTHORITIES

**Federal Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*
    625 F.3d 1359 (Fed. Cir. 2010) ........................................................... 50

*Alps South, LLC v. Ohio Willow Wood Co.*
    Nos. 2013-1452, -1488, 2014-1147, -1426, 2015 U.S. App. LEXIS
    9368 (Fed. Cir. June 5, 2015) ............................................................. 50

*Amazon.com v. Barnesandnoble.com*
    239 F.3d 1343 (Fed. Cir. 2001) ........................................................... 34

*Cascades Computer Innovation, LLC v. Samsung Electronics Co.*
    Civ. Nos. 11-4574, 11-6235, 2014 U.S. Dist. LEXIS 128300 (N.D.
    Ill. Sept. 14, 2014) ...................................................................... 51, 52

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)............................................................................ 31

*Ethicon, Inc. v. United States Surgical Corp.*
    135 F.3d 1456 (Fed. Cir. 1998) ........................................................... 49

*Evans Cooling Systems, Inc. v. General Motors Corp.*
    125 F.3d 1448 (Fed. Cir. 1997) ........................................................... 61

*Helferich Patent Licensing, LLC v. New York Times Co.*
    778 F.3d 1293 (Fed. Cir. 2015) ............................................. 52, 55, 56

*Honeywell International, Inc. v. United States*
    609 F.3d 1292 (Fed. Cir. 2010) ........................................................... 51

*Innovus Prime, LLC v. Panasonic Corp.*
    No. 5:12-00660, 2013 U.S. Dist. LEXIS 93820 (N.D. Cal. July 2,
    2013) ................................................................................................. 50

*Keurig, Inc. v. Sturm Foods, Inc.*
    732 F.3d 1370 (Fed. Cir. 2013) ................................................... *passim*

*LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*
    734 F.3d 1361 (Fed. Cir. 2013) ................................................... 53, 58

*Quanta Computer, Inc. v. LG Electronics, Inc.*
   553 U.S. 617 (2008) ................................................................... *passim*

*Rembrandt Data Technologies, LP v. AOL, LLC*
   641 F.3d 1331 (Fed. Cir. 2011) ("*Rembrandt II*") ...................... *passim*

*Rembrandt Data Technologies v. AOL, LLC*
   673 F. Supp. 2d 420 (E.D. Va. 2009) ("*Rembrandt I*") ......................... 33, 34, 42

*Sage Products, Inc. v. Devon Industries*
   126 F.3d 1420 (Fed. Cir. 1997) ......................................... 43

*Tessera, Inc. v. International Trade Commission*
   646 F.3d 1357 (Fed. Cir. 2011) ......................................... 48

*Teva Pharmaceutical Industries Ltd. v. Astrazeneca Pharmaceuticals LP*
   661 F.3d 1378 (Fed. Cir. 2011) ......................................... 31

*TransCore, L.P. v. Electronic Transaction Consultants Corp.*
   563 F.3d 1271 (Fed. Cir. 2009) ....................................... 31, 47, 48, 61

**State Cases**

*American Express Bank Ltd. v. Uniroyal, Inc.*
   562 N.Y.S. 2d 613 (N.Y. App. Div. 1990) ......................................... 37

*Hudson-Port Ewen Associates v. Chien Kuo*
   566 N.Y.S. 2d 774 (N.Y. App. Div. 1991) ......................................... 37

**Federal Rules**

Fed. R. Civ. P. 30(b)(6) ........................................................... 45

Fed. R. Civ. P. 56(a) ............................................................... 31

Fed. R. Civ. P. 56(d) ........................................................... 25, 26, 28

## <u>TABLE OF ABBREVIATIONS</u>

| Citation | Reference |
|---|---|
| ALU | Alcatel-Lucent USA Inc. and its predecessor, Alcatel USA Marketing Inc. |
| NSN B.V. | Nokia Siemens Networks B.V. |
| NSN US | Nokia Siemens Networks US LLC |
| LME | Telefonaktiebolaget LM Ericsson |
| RNC | Radio Network Controller |
| MGW | Media Gateway |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 47.5, defendants-appellees T-Mobile USA, Inc.,

Ericsson Inc., and Nokia Solutions and Networks US LLC state that:

(a)     there have been no other previous appeals in this case; and

(b)     High Point SARL's appeal in *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298 (Fed. Cir.), which involves the same patents-in-suit as the instant appeal, is currently pending in this Court. On February 24, 2015, this Court listed these cases as companion cases for oral argument.

# INTRODUCTION

High Point knew from the start of this case that prior owners licensed the relevant T-Mobile suppliers under the patents-in-suit decades earlier. High Point cannot come along now and undo these unambiguous licenses, which T-Mobile's suppliers paid for with both substantial royalties and broad patent cross-licenses. The district court correctly applied basic contract principles to find that each license authorized T-Mobile's supplier under the patents-in-suit. Once it did that, the district court correctly saw this case as a straightforward application of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008). After extensive discovery into T-Mobile's network, High Point maintained infringement contentions that accused licensed equipment for every claim element other than standard communications links. Just as in *Quanta*, exhaustion bars High Point from making T-Mobile pay a second time for rights for which its suppliers already paid once before.

The district court's decision rested on four license agreements that prior patent owners AT&T Bell Labs ("AT&T") or its successor Lucent Technologies ("Lucent") entered into with the corporate parents or predecessors (or both) of T-Mobile's suppliers: a 1996 cross-license between AT&T and Alcatel, SA ("Alcatel"); a 1988 cross-license between AT&T and Siemens AG ("Siemens") and a 1995 divestment rider agreement between AT&T and Siemens permitting

them to extend the 1988 cross-license to their future divested businesses; and a 1996 cross-license between Lucent and Telefonaktiebolaget LM Ericsson ("LME"). AT&T and Lucent received both monetary consideration and cross-license rights to the patent portfolios of those companies. Given the breadth of the cross-licensing parties' product and patent portfolios, the cross-licenses covered a wide range of products. Each license reflected a long-term bargain among major telecommunications companies that chose licensing over patent assertion in exchange for the freedom to operate for themselves and their related companies. The district court's decision upheld AT&T's and Lucent's end of that bargain.

As a patent-assertion entity, Luxembourg-based High Point never had an operating business. It acquired the patents-in-suit in 2008 to assert them against already-adopted 3G wireless standards. In order to avoid the licenses to T-Mobile's suppliers, High Point proposed interpretations of several license terms that conflict with those terms' plain and unambiguous meaning. But High Point has neither argued that any of the disputed terms is ambiguous nor offered any extrinsic evidence supporting any interpretation contrary to a term's plain meaning. The district court thus properly treated license interpretation as a question of law.

The district court then correctly interpreted the unambiguous language of four contract terms. For the first two terms in dispute, High Point made arguments that this Court rejected in *Rembrandt Data Technologies, LP v. AOL, LLC*, 641

2

F.3d 1331, 1338 (Fed. Cir. 2011) ("*Rembrandt II*"), when considering nearly

identical language. For all the terms in dispute, High Point presented **no evidence**

to support its interpretations, even though those interpretations wrote restrictions

into the contract terms that did not exist in the plain language. The district court

properly rejected High Point's arguments.

The district court's exhaustion finding necessarily followed from its finding

that AT&T's and Lucent's prior licenses covered the relevant infrastructure

equipment in T-Mobile's accused 3G wireless voice network. The only unlicensed

equipment High Point accused in its infringement contentions was standard

transmission media that was alleged to practice only communications-link claim

elements that the patents themselves described as well known. Thus, licensed

equipment substantially embodies the asserted claims of the patents-in-suit, and the

district court correctly found exhaustion and granted summary judgment.[1]

---

[1] NSN US intervened in this case on the basis of its interest in defending issues related to products it supplied to T-Mobile, which were identified in High Point's infringement contentions in this case. A451. The district court's order following its grant of summary judgment ruled that it was granting summary judgment as to "T-Mobile's patent exhaustion defense," A33, and final judgment followed that order. Because the summary-judgment order was specific to T-Mobile's patent-exhaustion defense and because NSN US did not assert any counterclaims, NSN US joins this brief only with respect to those sections that relate specifically to license and authorized sale of its products.

## STATEMENT OF ISSUES

1.     A 1996 patent cross-license between AT&T and Alcatel covered Alcatel subsidiaries and Alcatel switching-system products. High Point's infringement contentions described the products that T-Mobile purchased from an Alcatel-related company covered by that 1996 license as switching-system products. Did the district court correctly interpret the 1996 AT&T-Alcatel cross-license to authorize that indisputably covered company to sell those particular products to T-Mobile?

2.     A 1995 divestment rider agreement between Siemens and AT&T permitted them to extend the 1988 patent cross-license between those companies to cover "future divested businesses" as to products and services sold at the time of divestment, so long as the divested business remained "separately identifiable." In 2007, Siemens divested its carrier division to form a joint venture called NSN B.V. with a parallel business that Nokia divested. NSN B.V. had a U.S. subsidiary, NSN US, that sold to T-Mobile products of the same kind that Siemens's carrier division sold before the divestiture. Did the district court correctly interpret the divestment rider as permitting Siemens to extend the 1988 AT&T-Siemens cross-license to NSN B.V. and thus authorize the further sublicense from NSN B.V. to NSN US that covered NSN US's product sales to T-Mobile?

3.     In 1996, LME and Lucent entered into a patent cross-license that gave LME the right to sublicense related companies. The cross-license expressly authorized LME to grant such sublicenses retroactively. In 2013, LME granted its U.S. subsidiary Ericsson Inc. ("Ericsson") a sublicense that covered all of Ericsson's sales to third parties, including sales before the sublicense date. Did the district court correctly interpret the Lucent-LME cross-license as allowing that sublicense and thus authorizing Ericsson's product sales to T-Mobile?

4.     High Point concedes that if NSN US and Ericsson made licensed sales of Node Bs to T-Mobile, those sales would exhaust its rights against T-Mobile to at least three claims in the '090 patent. Did the district court correctly rule, under the facts of this case, that the licenses to NSN US and Ericsson exhausted High Point's rights against T-Mobile for all asserted claims of the '090 patent based on its application of *Keurig, Inc. v. Sturm Foods, Inc.*,732 F.3d 1370, 1374 (Fed. Cir. 2013)?

5.     The patents-in-suit claim purportedly novel inventions that relate to equipment used at a wireless network's cell and switching-system ends. Some asserted claims include, in addition to limitations directed to the purportedly novel claim elements, a limitation directed to standard communications links that connect the cell to the switching system. High Point's infringement contentions specifically accused the components supplied by ALU, NSN US, and Ericsson as meeting

limitations directed to the ends of the wireless network. High Point also generically accused standard transmission media that indisputably existed when the patents-in-suit were filed as meeting the communications-link elements. In view of those infringement contentions, did the district court correctly rule that ALU's, NSN US's, and Ericsson's sales to T-Mobile exhausted High Point's rights against T-Mobile as to all asserted claims?

## STATEMENT OF THE CASE

This case involves U.S. Patent Nos. 5,195,090, 5,305,308, 5,184,347, and 5,195,091. The patents observed that rapidly expanding mobile-phone use—resulting from new technologies for more efficiently using the wireless spectrum—had been creating a problem of increasing traffic across then-existing terrestrial communications links that connected cellular base stations to telephone switching offices. A116-17. One then-known alternative to traditional circuit-switched transmission of communications traffic was packet-switched transmission of statistically multiplexed communications traffic. A3393; A6216 ¶ 43. The patents-in-suit disclosed and claimed purportedly novel techniques deployed at the wireless network's ends, i.e., the base stations and the switching offices, to solve timing and synchronization problems that arose from using packetized transmissions across existing communications links. A117; *compare* A84 (prior art) *with* A85-86 (purportedly inventive system).

High Point acquired the patents-in-suit from Avaya in 2008. A6219 ¶ 54.

High Point does not dispute that it acquired the patents subject to the numerous licenses that predecessor owners Avaya, Lucent, and AT&T had granted. (Avaya received the patents in 2000, when Lucent created Avaya through a divestiture. Lucent had received the patents when AT&T, their original assignee, formed Lucent in 1996 through a major divestiture and restructuring.) High Point brought suit against T-Mobile in 2012. A72. Consistent with the patents' disclosures and claims, High Point accused components in T-Mobile's base stations, i.e., cells, and "switching systems" as practicing all the purportedly novel claim elements. Based on the licenses to the suppliers of those components, the district court found exhaustion and granted the summary-judgment motions brought on that basis.

## I.    High Point accused ALU-, NSN US-, and Ericsson-supplied components of practicing all claim elements except standard communications links.

High Point's infringement contentions focused on (a) the "Node B" (base station) at the cell and (b) components at the central office, i.e., the radio network controller ("RNC") and the media gateway ("MGW"). These central-office components, either separately and/or in combination depending on the claim, allegedly practiced the asserted claims' "switching system" elements. A conceptual map of T-Mobile's accused 3G wireless voice network shows each component's logical placement in the network:



*Figure 6    Illustration of the Iu Interface and the connected CN domains.*

A2733; *see also* A5851.

**Node Bs** send and receive radio signals at the network's edge. They are the entry and exit point for signals to and from mobile devices. As High Point puts it (at 12), Node Bs "are used to convey digital traffic 'over the air' to and from mobile users in a geographic area near the Node B." T-Mobile purchased the accused Node Bs from Ericsson and NSN US. A5995-98.

**MGWs** connect the cellular voice network to the conventional Public Switched Telephone Network. MGWs usually communicate with a number of Node Bs through one or more RNCs. A6298; A6074. T-Mobile purchased the accused MGWs from ALU and Ericsson. A5995-98.

**RNCs** perform control functions for one or more Node Bs. For example, an RNC passes voice call traffic to and from the Node Bs and to and from MGWs to which the RNC is connected. A6298; A6074. T-Mobile purchased the accused RNCs from Ericsson and NSN US. A5995-98.

**Standard communications links**, such as copper wire or optical fiber, link Node Bs and RNCs. Standard routers and packet switches may interconnect the communications links. A6057, A6274-75.

High Point never asserted that the communications-link element included in some asserted claims was novel. And High Point has not accused anything other than Node Bs, RNCs, or MGWs of practicing any purportedly inventive claim element. To the contrary, High Point's counsel confirmed in a declaration that according to High Point's infringement contentions, "each Node B, RNC or MGW…encompasses critical inventive features and/or carries out critical inventive functions required by the claim[s]." A6284 ¶ 24; *see* A6282-84. The declaration included no such assertion with regard to communications links.

High Point's infringement contentions can be divided into three categories, based on how High Point mapped the asserted patent claim elements to the equipment in T-Mobile's network:

First, High Point contended that Node Bs satisfied every limitation of claims 28, 29, and 31 of the '090 patent (the cell-only claims). *See* A5901-03, A5905-07; *see also* A6262-63 ¶¶ 160-62.

9

Second, High Point contended that combinations of Node Bs and RNCs and/or MGWs satisfied all limitations of certain other asserted claims, namely '090 patent claims 39, 40, 42, 47, 53, and 54; '308 patent claims 4, 13, 17, and 28; and '347 patent claims 24, 26, 29, 31, and 32.[2] *See* A5910-30, A5933-35, A5937-40, A5951-52, A5957-68; *see also* A6087-96.

Third, High Point contended that combinations of Node Bs and RNCs and/or MGWs satisfied all ***novel*** limitations of the remaining claims at issue on appeal, '090 patent claims 6, 8, 10, 11, 12, 15, 18, and 22, and '091 patent claims 22, 24, and 25. *See* A5869-71, A5874-84, A5887-96, A5972-75; *see also* A6078-87, A6096-98. High Point also identified standard "physical transmission media" as meeting generic "communications medium" or "communications link" elements of those claims. *See id.* But High Point's infringement contentions described the communications links and communication media in T-Mobile's accused network only generically, A5857-58:

> The communications links are the physical transmission media that carry voice call traffic and interconnects [sic] the Node B/RBSs and the RNCs (including without limitation the transmission media that carry the logical Iub interface), and may be comprised of, for example T1 spans, microwave antennas, Ethernet cables, and/or optical fiber. These links may be comprised of multiple link segments connected

---

[2] High Point incorrectly states (at 52 n.10) that these claims all "includ[e] the transmission media and interconnect equipment" that connect Node Bs with RNCs and/or MGWs. In fact, none of those claims includes a communications-link element.

via one or more transport nodes or other components such as ATM switches, Routing Switch Platforms, Access Integration Platforms, Local Exchange Carriers, and/or Cisco 7609 Routers.

## II. The patents-in-suit claim inventions with purportedly novel features in components at a cellular network's cell and switching-system ends.

The written descriptions and prosecution histories of all four patents-in-suit confirm that the patents' purported novelty existed at the network's cell and switching system ends.

To start, the '090 and '308 patents' summary of invention states that these patents relate to "a new system architecture for wireless-access (such as cellular radio-telephone) systems which uses packet-switching techniques to transport communications between the base stations (cells) and the radio-telephone call-processing and switching equipment." A117, 3:17-22; A196, 3:21-26. It then confirms that the inventive system would "***make use of conventional telephony trunks***," A117, 3:56-57 (emphasis added), making clear that the communications links (i.e., trunks) were "conventional" rather than inventive. Furthermore, the system would eliminate "processing of packet protocols at all nodes of the system ***other than at the transfer endpoints***," such that the purportedly novel packet-protocol processing would occur only at the system endpoints and thus not in the links between them. A117, 3:50-53 (emphasis added).

Thus, while some asserted '090 patent claims include a generic communications-link element, the AT&T inventors never suggested that those

11

communications links were a novel element of the claims. A3448, A3468-69 (AT&T inventors' remarks); A3393 (PTO examiner remarks). As for the '308 patent, the asserted claims at issue do not even include any communications-link elements.

The '347 patent addresses timing problems caused by drift (asynchrony) between the clocks in the switching system and the cell. A6296 ¶ 27. It describes ways of addressing asynchrony in a system comprising a first operating unit for transmitting incoming and/or outgoing communications, a second operating unit for receiving incoming and/or outgoing communications, and a third operating unit for interfacing communications between the first and second units. *See*, *e.g.*, A286, 50:37-60; A6095. The '347 patent specification describes each of these first, second, and third units as part of the cell or switching system. None of the asserted '347 patent claims includes any element directed towards communications links. A6096.

The '091 patent addresses timing problems caused by variable transmission delays resulting from variations in the amount of call traffic or changes in the call traffic's path length. A6296 ¶ 27. It describes ways of addressing variable transmission delays in a system comprising a first unit for transmitting, a second unit for receiving, and a third unit for interfacing. *See, e.g.,* A350, 50:32-36. The '091 patent specification describes each of these first, second, and third units as

part of the cell or switching system. A327, 3:46-68. Although the asserted '091 patent claims recite "a communications medium having a fluctuating delay and connecting the first [or second] unit with the third unit," this element was well known in the art. A6097. Indeed, the communications medium was not part of any novel solution; rather, its fluctuations created the transmission delay and a resulting timing problem that the '091 patent aimed to address. A3798; A6097.

## III. AT&T and Lucent cross-licensed their patents with companies whose license rights extended to T-Mobile's suppliers.

While AT&T and Lucent owned the patents-in-suit, they entered into broad patent-portfolio cross-licenses with various competitors including the Alcatel, Siemens, and LME corporate families. AT&T and Lucent received substantial money and valuable cross-license rights as consideration for those licenses. These licenses reached the U.S. operating entities that supplied T-Mobile as shown below:



These entities (or their successors) supplied the equipment accused in High Point's

infringement contentions in the configurations shown below:



**A.    The AT&T-Alcatel license covered existing products, including switching systems, and future products of the same kind.**

T-Mobile purchased MGWs from Alcatel-Lucent USA Inc. and its

predecessor, Alcatel USA Marketing Inc. (collectively "ALU"). ALU is a

subsidiary of Alcatel-Lucent, SA, a company formed when Alcatel and Lucent

combined in 2006. In 1996, AT&T and Alcatel entered into a cross-license

agreement under which Alcatel paid AT&T substantial monetary consideration and

granted AT&T a cross-license to Alcatel's patents. A5395 § 1.01(b), A5397-99 § 2.01; A5413-20; *see also* A6242 ¶¶ 115-16. High Point now argues that the district court erred in interpreting this license to have covered MGWs. High Point does not contest the district court's findings that the license covered ALU as an entity and included the patents-in-suit.

As such, the only contract term relevant to the appeal is the one granting Alcatel the right to make, use, and sell "products and services of the ***kinds*** which are furnished or used by ALCATEL...in the operation of the business in which ALCATEL...[wa]s engaged on the effective date of th[e] Agreement," i.e., January 1, 1996. A5395 § 1.01(a) (emphasis added). Alcatel's 1996 Annual Report described the kinds of products and services that Alcatel had furnished at that time as having included "complete telecommunications systems," public-switching networks, mobile-communications infrastructure, and business networking. A5433-37. The report highlighted Alcatel's position as a leader in "public switching," A5433, and specifically stated that Alcatel's mobile communications division sold switching systems for wireless networking that used the then-current cellular communications standards such as GSM and CDMA. A5428; A5436-37. Alcatel thus had sold switching systems as of the license's effective date. High Point itself contended that the MGWs in T-Mobile's network were switching-system components. *See, e.g.,* A5859-61.

**B.     The AT&T-Siemens license covered existing products, including wireless-telecommunications infrastructure, and AT&T extended that license in 1995 to permit sublicensing Siemens's future divested businesses.**

T-Mobile purchased Node Bs and RNCs from Nokia Siemens Networks US LLC ("NSN US").[3] NSN US was a subsidiary of Nokia Siemens Networks B.V. ("NSN B.V."), a company that Nokia and Siemens formed in 2007 to carry on the telecommunications carrier equipment businesses that Nokia and Siemens were each divesting. In 1988, Siemens and AT&T entered into a patent cross-license under which Siemens paid substantial monetary consideration and also granted AT&T a license to Siemens patents. A4866-67 §§ 1.01, 2.01. In 1995, AT&T sought and obtained a divestment rider agreement with Siemens that modified the 1988 cross-license to allow for sublicensing future divested businesses. A4881-82. High Point does not dispute that AT&T licensed Siemens to the patents-in-suit.

Instead, High Point contends that Siemens's rights did not flow to NSN US and did not cover the products that NSN US sold to T-Mobile. Specifically, High Point contends that (1) T-Mobile did not buy from NSN US the same kinds of products that Siemens had sold in 1988; (2) the 1995 divestment rider did not allow a sublicense to NSN B.V. because the carrier division that Siemens divested into NSN B.V. did not remain "separately identifiable" within NSN B.V.; (3) NSN

---

[3] On August 7, 2013, NSN US changed its name to Nokia Solutions and Networks US LLC. That change is irrelevant to the case.

US did not sell T-Mobile the same product models that Siemens sold before the 2007 divestiture; and (4) NSN US was not entitled to a sublicense because it was never a controlled subsidiary of Siemens. The contract terms and undisputed facts relevant to this appeal are as follows:

### 1. The "kinds of products" Siemens sold by 1988 included wireless-telecommunications infrastructure.

The 1988 AT&T-Siemens license granted Siemens the right under AT&T's patents to make, use, and sell "products and services of the *kinds* which are furnished or used by [Siemens] or any of its present RELATED COMPANIES…in the operation of the business in which it [wa]s engaged on th[e] effective date of this Agreement," i.e., January 1, 1988. A4866 (emphasis added). AT&T and Siemens also agreed in writing that the "kinds of products and services" described in the 1988 AT&T-Siemens license included "new products and services…which normally evolve" from existing kinds of products and services. A4878. The agreement specifically contemplated covering switching systems as they evolved over time: "AT&T's 5ESS Switching Machine…is the same kind of product as AT&T's No. 5 Crossbar Switching Machine." *Id*.

As of 1988, Siemens had manufactured and sold switching systems for communications. *See* A2798 n.108. Siemens also had sold wireless-infrastructure products by 1988. A6407. By that time, it had already marketed and sold a mobile

telephony infrastructure product called DNET, a first-generation wireless system.

A7394-95.

### 2. In 1995, AT&T executed a divestment rider that broadly allowed AT&T and Siemens to sublicense future divested businesses.

In 1995, AT&T announced a major corporate restructuring into three separate companies. A4881. AT&T wanted to ensure that the license rights it had acquired from Siemens would extend both to the new companies it was forming and to any businesses those new companies divested in the future. *Id.* AT&T thus prepared a divestment rider that allowed for extending license rights to AT&T's soon-to-be divested companies and any future businesses divested from those new companies.[4] Because the license in question was a cross-license, AT&T offered reciprocity to Siemens. The AT&T-drafted divestment rider thus provided, A4881:

> It is possible that either SIEMENS or any of these three entities [AT&T's divested companies] may at some time in the future wish to divest all or part of its business….

> [I]n the future, if SIEMENS or any of the three [AT&T-divested] entities divests a portion of its present business, the licenses and rights granted in the subject agreement may be sublicensed to the divested business by the divesting company. Such sublicenses may be granted and retained only while the future divested business operates as a separately identifiable business and only to the extent applicable to products and services sold by the future divested business prior to its divestiture.

---

[4] Unlike the divestment rider, the original 1988 cross-license did not expressly include a right to sublicense divested businesses. Instead, it allowed sublicensing only "RELATED COMPANIES," which included only those subsidiaries for which the licensee owned a majority of the shares entitled to vote in electing the board of directors. A4866, A4873-74.

Under this provision, a divested business could practice covered patents so long as it remained a "separately identifiable business." The divested business's license would cover the "products and services" it had sold "prior to its divestiture." The letter agreement contained no other restrictions on such sublicenses. Because sublicensed divested businesses had the same rights as their predecessors, those businesses could sublicense their own subsidiaries and "RELATED COMPANIES" under the original 1988 cross-license's terms. A4866, A4873-74.

3. **Siemens subsequently divested its wireless-telecommunications infrastructure business to form NSN B.V., and Siemens and NSN B.V. granted the sublicenses needed to extend rights to NSN US under the divestment rider.**

On April 1, 2007, Siemens divested its carrier division, which included its telecommunications carrier-related operations for fixed and mobile networks, to form a new joint venture entity. A6231 ¶ 92, A6235 ¶ 99. That joint venture, to which Nokia also contributed a divested networks business, was called NSN B.V. In 2009, Siemens granted NSN B.V. a sublicense to AT&T's patents, including the patents-in-suit, that was retroactive to April 1, 2007. A5308. In 2011, NSN B.V. granted a further retroactive sublicense to the patents-in-suit to its subsidiary, NSN US. A5356-59.

The divestment rider allowed Siemens to grant NSN B.V. the same sublicensing rights that Siemens had under the 1988 AT&T-Siemens cross-license,

including the right to grant sublicenses to "RELATED COMPANIES." Thus, NSN B.V. could sublicense any entity for which it had majority control of the voting capital. A4873-74; A5307. During the relevant timeframe, NSN B.V. always owned or controlled at least 50% of NSN US's shares. A5292; A5356, A5359.

### 4. NSN B.V. operated as a separate legal entity from Nokia, Siemens, and any other company.

During the entire relevant period (from 2007 to 2011), NSN B.V. was a legal entity separate from Nokia and Siemens. NSN B.V. had its own corporate organization and board of directors. It began "independent operations" on April 1, 2007 and maintained "autonomy to carry on its business independently of its shareholders," Nokia and Siemens. A6235 ¶ 99. NSN B.V. carried forward the wireless-telecommunications-infrastructure businesses it received in divestitures from Nokia and Siemens. A6231 ¶ 92; A5333 ("Today's announcement…will culminate in a portfolio plan that fully taps the mobile communications strength of Nokia and Siemens with Siemens' fixed networks expertise."). NSN US's corporate witness confirmed that, as the name Nokia Siemens Networks suggests, NSN B.V. carried forward Nokia's and Siemens's divested businesses in a new venture. A "joint team" comprising both predecessor entities performed research and development work. A6398-99. Although the legacy Nokia and Siemens product lines were combined "over time," the new products were backwards compatible with the legacy Siemens product line, and NSN B.V. continued to sell legacy Siemens products for certain standards used in China. A6398-6400.

High Point did not dispute the factual evidence regarding NSN B.V.'s

operations, and it did not cite any evidence that would support its statement (at 17)

that the Siemens-contributed business was "shut down" in favor of the Nokia-

contributed business. High Point also did not controvert the record evidence that

the Siemens carrier division sold 3G wireless network infrastructure equipment,

including Node Bs and RNCs, before its divestiture. A6398-99; A5342, A5346.

## C.    The Lucent-LME license allowed both parties to retroactively sublicense subsidiaries; LME retroactively sublicensed Ericsson in 2013.

T-Mobile purchased Node Bs, RNCs, and MGWs from Ericsson Inc.

("Ericsson"). Ericsson was and is a subsidiary of LME. In 1996, Lucent and LME

entered into a cross-license under which LME gave Lucent substantial monetary

consideration plus a cross-license to LME's patents. A1777-95; A1780 § 1.01(a),

A1793, A1783-84 § 2.01. That license covered the patents-in-suit, and it granted

rights to make, use, and sell, among other things, "Switching System Products,"

"Transmission System Products," and "Wireless System Products." A1780;

A1538-47 Nos. 23-26, 29. LME was and is a holding company. A6982, A7009-12.

Not surprisingly, Lucent and LME received the right to grant sublicenses to their

related companies, including subsidiaries. A1781 § 1.03(c).

High Point does not dispute that the products T-Mobile bought from

Ericsson qualified as covered products under the Lucent-LME license. High Point

also does not dispute that Ericsson was at all relevant times a LME

"SUBSIDIARY" and thus a "RELATED COMPANY." High Point argues only that LME did not validly convey a sublicense to Ericsson.

The following contract terms are relevant to the dispute: The Lucent-LME license expressly provided both Lucent and LME the right to sublicense "RELATED COMPANIES for so long as they remain its RELATED COMPANIES." A1781 §1.03(c). As defined in the agreement, "RELATED COMPANIES" include "SUBSIDIARIES." A1793-94. A licensed party's sublicense to a related company "may be made effective retroactively, but not prior to the effective date hereof, nor prior to the sublicensee's becoming a RELATED COMPANY of such party." A1781 §1.03(c).

In January 2013, LME granted Ericsson a sublicense to the patents-in-suit retroactive to January 1, 2002. A1796-99. The sublicense did not cover any period before the January 1, 1996 effective date of the Lucent-LME license. And Ericsson had been a wholly owned indirect subsidiary of LME and thus a related company since at least January 1, 2002. A6795-96 ¶ 28.

The Lucent-LME license did not have a termination date. No provision in the Lucent-LME license prohibited either party from granting a retroactive license after any particular covered patent expired. The license also did not include any restriction on providing a sublicense retroactively during the six years after any covered patent expired, i.e., the time during which a patentee could still sue on an

expired patent. Other than the requirement that sublicenses not predate the January 1, 1996 license effective date, and that the sublicensee be a RELATED COMPANY at all pertinent times, the agreement had no timing restriction whatsoever with respect to granting retroactive sublicenses.[5]

## IV. The district court granted summary judgment because ALU, NSN US, and Ericsson sold licensed equipment to T-Mobile, and those licensed sales exhausted High Point's asserted claims.

High Point filed this lawsuit on March 8, 2012, contending that T-Mobile's 3G wireless voice service infringed the four patents-in-suit. A72. In May 2013, the district court permitted Ericsson and NSN US to intervene as defendants. A451-56. T-Mobile asserted license and exhaustion as defenses in its answer. A362. The parties agreed to complete summary-judgment briefing regarding those issues approximately twenty-two months after fact discovery began and to complete discovery on exhaustion by the time the opening brief was due. A980; A1098-99. The district court entered an agreed scheduling order requiring both sides to file summary-judgment motions regarding license and exhaustion by February 24, 2014, with briefing to close on April 22, 2014. A1098-99. The parties agreed to

---

[5] High Point erroneously states (at 18) that "[i]t is undisputed that during th[e] time period [between 2006 and July 2011], Ericsson-US had no license to the patents-in-suit…." In fact, although Ericsson did not move for summary judgment on this basis, Ericsson was prepared to prove, if necessary, that it had an unwritten sublicense from LME at all relevant times. A7530.

take all discovery needed for the motion practice regarding license and exhaustion issues before February 24, 2014. A1098 n.1.

On the ordered date, T-Mobile and NSN US filed a combined motion for summary judgment based on licenses to Alcatel, Siemens, and LME that covered all accused network configurations except a *de minimis* portion. A2720. Ericsson also filed a separate motion that principally addressed configurations that involved Ericsson products alone, or in combination with standard parts, but also joined in the arguments set forth in T-Mobile's and NSN US's motion. A1176. High Point opted not to file any motion. On March 21, 2014, the district court granted High Point's unopposed request for a one-month extension on its opposition to the summary-judgment motions. A63, No. 135. High Point took additional discovery related to the already-filed motions during that month.

On May 1, 2014, High Point filed oppositions to both summary-judgment motions. Despite having agreed to the summary judgment and related discovery schedule and despite having received a further one-month extension to conduct more discovery, High Point sought to further postpone the summary-judgment ruling under Rule 56(d) pending additional discovery. A6198 n.15. By that time, High Point had approximately twenty-one months of fact discovery, including two months *after* defendants had filed their motions. High Point thus received the full agreed and allotted time for discovery on these issues—and then some. And it used

25

that time: High Point took fact depositions of each defendant, a deposition of T-Mobile's expert, and a fact deposition of ALU in a related suit. High Point never moved to amend its original infringement contentions.

The district court granted both summary-judgment motions. A3-33. The court concluded that the Alcatel, Siemens, and LME licenses covered ALU, NSN US, and Ericsson, and thus, authorized their product sales to T-Mobile. The court further found that those authorized sales exhausted High Point's patent rights against T-Mobile. The district court did not grant High Point's Rule 56(d) request.

As to ALU, the court rejected High Point's arguments that the 1996 AT&T-Alcatel license did not cover the patents-in-suit and that it did not extend to ALU, the entity from which T-Mobile purchased products.[6] The court further concluded that MGWs were covered as "products or services of the kinds furnished or used by ALCATEL" as of January 1, 1996 because Alcatel sold switching systems at that time, and High Point accused ALU's MGWs of being switching systems. A19-22.

As to NSN US, the district court concluded that the 1995 divestment rider permitted Siemens to sublicense NSN B.V. under the 1988 AT&T-Siemens cross-license. The court rejected High Point's argument that a divested business could not include a joint venture, noting that the agreement merely required that the

---

[6] High Point has abandoned these arguments on appeal.

divested sublicensee be "separately identifiable" from Siemens, which NSN B.V. was. A24-25. The court also ruled that NSN B.V. properly sublicensed NSN US. The court rejected High Point's claim that NSN B.V.'s license extended only to the particular product models that Siemens had sold before the divestment. A25-27.

As to Ericsson, the court concluded that LME validly sublicensed its subsidiary, Ericsson Inc., because LME had an express contract right to do so retroactively. The court found no support for High Point's argument that LME's authority to grant retroactive sublicenses expired when the patents-in-suit expired. A16-17.

Having found that prior licenses authorized all relevant equipment sales to T-Mobile, the district court ruled that these authorized sales exhausted High Point's asserted patent rights against T-Mobile. High Point had conceded that the Node Bs "substantially embody" three claims of the '090 patent. Relying on this Court's *Keurig* decision, as applied to the facts of this case, the district court ruled that the authorized Node B sales to T-Mobile also exhausted the other asserted claims of that patent. A27-28. The court also recognized that High Point's own infringement contentions "implicitly" conceded that the accused Node Bs, RNCs, and/or MGWs substantially embody asserted claims in each of the other three patents. The court ultimately found that "the equipment at issue [i.e., Node Bs, RNCs, and MGWs] substantially embodies all four patents-in-suit." A28-29. The

court rejected High Point's argument that exhaustion could apply only if licensed components from a single authorized vendor substantially embody each claim of each patent. *Id*.

The summary-judgment ruling did not dispose of the entire case because the defendants' motions did not cover a *de minimis* portion of T-Mobile's network. A30 n.14. However, High Point chose to waive those claims so that it could appeal the summary-judgment order without having to litigate the *de minimis* claims further. *See* A35-37 ¶¶ 5, 9. High Point thus stipulated to entry of a final judgment, A34-38, from which it now appeals.

## SUMMARY OF ARGUMENT

High Point raises several contract-based arguments on appeal, but the contract language confirms the district court's rulings on each argument. Once the district court correctly construed the license agreements at issue to cover the equipment that T-Mobile purchased from ALU, NSN US, and Ericsson, summary judgment on T-Mobile's exhaustion defense necessarily followed due to the way High Point's own contentions accused the licensed network infrastructure of practicing the claims.

First, High Point argues that both the AT&T-Alcatel and AT&T-Siemens licenses limit the covered products to particular models and product lines, rather than broadly covering "kinds" of products, e.g., cells and switching systems, and

future generations of those kinds of products. But in *Rembrandt II*, this Court construed nearly identical language used in another AT&T license from the same era and rejected the narrow interpretation that High Point proposes. The district court properly followed this Court's precedent.

Second, High Point argues that because NSN B.V. was a joint venture formed from the divested network-infrastructure businesses of both Siemens and Nokia, Siemens could not sublicense NSN B.V. or NSN B.V.'s subsidiary, NSN US. But the 1995 divestment rider permitted Siemens to sublicense NSN B.V. as a divested company so long as NSN B.V. remained "separately identifiable." High Point does not dispute any *facts* regarding NSN B.V.'s operations and separateness from Nokia and Siemens. Instead, High Point reads the divestment rider's use of the term "separately identifiable" to mean that the divested business could not take the joint-venture form. But the 1995 divestment rider includes no such limitation. AT&T drafted the rider when planning for its own broad divestiture in 1995; AT&T did not suggest that its successors would lose their license rights if they acquired businesses or entered into joint ventures.

Third, High Point argues that LME's license does not cover LME's U.S. operating subsidiary, Ericsson, because LME had not yet executed a written sublicense to Ericsson when Ericsson sold system components to T-Mobile. But the license expressly authorizes LME to sublicense subsidiaries *retroactively*, and

LME admittedly executed a written, retroactive sublicense to Ericsson in 2013. High Point argues that the sublicense was ineffective because LME executed it after the patents-in-suit expired, but the license agreement places no such limitation on when retroactive licenses could be granted. Moreover, High Point's argument would contradict the parties' express agreement, which allows the parties' subsidiaries to practice the licensed patents free from suit, whether or not their parent company has yet executed a written sublicense.

Considering High Point's infringement contentions, patent exhaustion necessarily followed from T-Mobile's suppliers being licensed under the patents-in-suit. High Point never disputed that the inventive features of each patent were practiced at the ends of the network. The district court concluded that, under this Court's *Keurig* decision as applied to the facts of this case, the authorized Node B sales to T-Mobile exhausted all asserted claims of the '090 patent. Moreover, T-Mobile showed that under High Point's infringement theory, licensed equipment was alleged to practice each purportedly novel element of every claim at issue in this appeal. *Quanta* allows for no result other than patent exhaustion.

## ARGUMENT

Because High Point did not present any relevant disputes of material fact to the district court—and does not present any on appeal—summary judgment was appropriate. Summary judgment is appropriate when, drawing all reasonable

inferences in favor of the non-moving party, there is no genuine dispute of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). When a motion for summary judgment is properly supported by evidence,

the non-moving party "may not rest upon mere allegations or denials," but rather

"must present significant probative evidence to establish a genuine issue of

material fact." *Rembrandt II*, 641 F.3d at 1336 (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 327 (1986)).

This Court reviews a Third Circuit district court's grant of summary

judgment de novo. *Teva Pharm. Indus. Ltd. v. Astrazeneca Pharms. LP*, 661 F.3d

1378, 1381 (Fed. Cir. 2011). This Court has previously affirmed summary

judgment of patent exhaustion where no genuine dispute of material fact existed.

*See, e.g.*, *Keurig*, 732 F.3d at 1374; *TransCore, L.P. v. Elec. Transaction*

*Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009).

## I.    The AT&T-Alcatel license covered the MGWs that ALU sold to T-Mobile.

High Point does not dispute that the AT&T-Alcatel license covers ALU

products in general. Instead, on appeal, it argues (at 38-43) that although the

AT&T-Alcatel license covered the "kinds of products" Alcatel sold at the license's

inception, it did not cover MGWs because Alcatel did not sell MGWs at that time

and MGWs did not exist then. But the patents-in-suit did not claim MGWs as their

invention. They claimed ***switching systems***, and Alcatel indisputably sold

switching-system products at the relevant time. High Point's own infringement

contentions characterized MGWs as "switching system" components. On that

basis, the district court correctly found that the MGWs—as switching-system

components—were a product of the "kind" that Alcatel sold in 1996, and thus

licensed.

**A.   AT&T licensed Alcatel to sell any switching systems throughout the license's duration, not just the particular switching-system technologies that Alcatel had been selling in 1996.**

High Point does not dispute that Alcatel sold switching systems when

Alcatel entered into the license with AT&T in 1996. Nonetheless, High Point

argues (at 38-40) that Alcatel's license covers only then-current switching systems.

High Point argues (at 40) that the contract term defining the covered products—

"products…of the kinds" sold at the time of the license—limited the license to the

particular products that Alcatel sold in 1996. But High Point's argument fails under

*Rembrandt II*, where this Court read a similar but narrower license term to cover

both *future* and then-current products.

*Rembrandt II* involved a 1995 rider to an earlier AT&T license with

Rockwell. (That rider was essentially identical to the 1995 divestment rider

between AT&T and Siemens.) The agreement in *Rembrandt II* permitted

sublicensing future divested businesses "only to the extent applicable to products

and services sold by the future divested business prior to its divestiture." 641 F.3d

at 1338. Like High Point, Rembrandt argued that the divestment rider covered only the particular product models that the divested business sold at the time of divestiture. But this Court affirmed the district court's ruling that the 1995 AT&T-Rockwell rider applied more broadly because "the[ ] agreements specify product types using general, functional terms." *Id.* Rather than being limited to the particular products sold at the license's inception, "the term 'products' covers 'modems generally, not specifically the exact types of modems in production at the time of the sublicense and/or divestiture.'" *Id.* (quoting *Rembrandt Data Techs. v. AOL, LLC.*, 673 F. Supp. 2d 420, 437 (E.D. Va. 2009) ("*Rembrandt I*")).

*Rembrandt II* controls here. The 1996 AT&T-Alcatel license has even more specific language confirming that the covered "products" included types defined by "general, functional terms": it actually used the phrase "***kinds of*** products" to define the scope of coverage rather than just the word "products." A5395 § 1.01(a) (emphasis added). Thus, Alcatel's license necessarily covered generic categories rather than specific models.

As in *Rembrandt II*, Alcatel's license extended for many years, so the only sensible interpretation would have covered functional product types. A5396 § 1.01(d). As the district court observed in *Rembrandt I*:

> It would be nonsensical to think that savvy parties involved in an agreement of this magnitude would be so shortsighted as to limit the agreement presumably intended to stretch some time into the future to

technology being manufactured at that time with no consideration of relevant future developments.

673 F. Supp. 2d at 437.

**B.    The AT&T-Alcatel license covered MGWs, which High Point itself contended were switching-system components.**

High Point specifically contended that MGWs supplied by ALU constituted switching-system components. *See*, *e.g.,* A5859-61. High Point thus cannot and does not dispute that for purposes of its own infringement theory, ALU MGWs constitute switching-system components.

Nonetheless, High Point contends (at 39-40) that the license did not apply to MGWs because Alcatel did not sell MGWs in 1996. But, as explained above, Alcatel's license was not limited to any specific product design or name; it covered all products of the "kinds" that Alcatel sold in 1996, which included switching systems. *Rembrandt II*, 641 F.3d at 1338. In fact, the patents-in-suit did not use the term "MGW" in any claim. They refer to "switching systems," a term that High Point itself reads to cover MGWs. High Point is not entitled to twist the term "switching systems" like a nose of wax, to cover MGWs for purposes of infringement but not for purposes of T-Mobile's exhaustion defense.[7]

---

[7] *See, e.g., Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." (citations omitted)), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

High Point tries to distinguish *Rembrandt II* by arguing that all the products there involved "modems" whereas MGWs are distinct from "switching systems." But again, High Point itself contends that MGWs are part of a "switching system," and the license indisputably covers switching systems and their component parts because that was a kind of product that Alcatel sold in 1996. Under *Rembrandt II*, High Point cannot read the license language to exclude future switching systems such as the ones at issue here.

*Rembrandt II* also disposes of High Point's remaining argument: that Alcatel's sales were unauthorized, because Alcatel purchased the MGW product line from another company, Spatial. High Point has never disputed that the AT&T-Alcatel license covered products sold by businesses that Alcatel or AT&T acquired, so long as the license otherwise covered those products. High Point also does not dispute that T-Mobile bought all the MGWs at issue from ALU after Alcatel acquired Spatial. So the fact that the MGWs at issue came to ALU because ALU acquired Spatial is irrelevant. All that matters is whether the license covers MGWs. And it does.

## II.    The 1988 AT&T-Siemens license, as extended by the 1995 divestment rider, covered the Node Bs and RNCs that NSN US sold to T-Mobile.

NSN US holds a license to the patents-in-suit as a successor to Siemens's rights under the 1988 AT&T-Siemens license and the 1995 divestment rider

agreement. As the district court explained, "Siemens granted a sublicense to NSN B.V., which later granted an undisputedly valid retroactive sublicense" to NSN US. A24. NSN US is therefore an authorized provider of the equipment at issue, and all the Node Bs and RNCs that T-Mobile purchased from NSN US are licensed.

## A.     NSN B.V. is a "divested business" that remained "separately identifiable" as the 1995 divestment rider required.

The relevant facts are not in dispute. The 1995 divestment rider authorized Siemens to grant a sublicense to a "divested business" so long as the divested business remained "separately identifiable." A4881. Siemens divested its carrier division as part of a joint venture to which Nokia also divested its infrastructure business, and Siemens then granted a sublicense to the newly formed company, NSN B.V. *See* A6231 ¶¶ 92-93, A6232 ¶ 94. Legally, NSN B.V. operated as an entity separate from any other company, including its owners, Siemens and Nokia. NSN B.V. had its own board of directors, governance, and organization, and it had the "autonomy to carry on its business independently of its shareholders." A6235 ¶ 99. Nothing further was required to satisfy the divestment rider. *See* A24-25.

High Point argues (at 30) that Siemens could not grant a sublicense to NSN B.V. because NSN B.V. "is not the 'divested business.'" But NSN B.V. was created as a consequence of divesting Siemens's carrier division; as such, it is the only entity to which Siemens **could** have granted any rights.

36

Citing no evidence, High Point posits (at 28) that the purpose of the "separately identifiable" limitation was to prevent "integrating the divested business into a similar, unlicensed business operated by another" and that Siemens violated this limitation when its carrier division became part of NSN B.V. But nothing in the divestment rider expressly or implicitly precludes joint ventures from receiving rights as a divested business. Rather, the agreement uses broad, flexible language, because it sought to *facilitate* AT&T's complex restructuring into separate companies and to *permit* future divestments by either AT&T or Siemens—not to *stifle* such changes. So long as a divested business remains "separately identifiable," the rider places no restrictions on its structure or form, no limits on who could own or control it, and no limits on its future business combinations. *Id*. There is certainly no reason to believe that the agreement uses the term "divested business" in a way that would exclude such a common corporate form as joint ventures. High Point neither offers factual evidence to the contrary nor contends that the term "separately identifiable" is ambiguous. Because "separately identifiable" is admittedly unambiguous and on its face does not exclude joint ventures, the Court can dispose of High Point's argument on that basis alone under controlling New York law. *See Am. Express Bank Ltd. v. Uniroyal, Inc*., 562 N.Y.S. 2d 613, 614 (N.Y. App. Div. 1990); *see also Hudson-Port Ewen Assocs. v. Chien Kuo*, 566 N.Y.S. 2d 774, 776 (N.Y. App. Div. 1991).

A further example shows why High Point's position does not make sense. Even under High Point's unsupported interpretation, Siemens could have divested its carrier division as a standalone business and granted that business a sublicense. In that scenario, nothing in the divestment rider or the license suggests that the divested company would have lost its sublicense rights if it later purchased Nokia's carrier division and renamed itself NSN B.V. High Point offers no basis to construe that divestment rider to preclude Siemens from sublicensing NSN B.V. simply because the two carrier divisions were combined at the outset, instead of sequentially.

Moreover, High Point misleads in arguing (at 3) that the district court "ruled that *Nokia's* phone business obtained a license to the patents-in-suit when it formed a joint venture with Siemens." Rather, NSN B.V. obtained a license, operating independently from Nokia and Siemens with its own board of directors. *See* A6235 ¶ 99. Without any supporting evidence, High Point also contends (at 29) that the Siemens carrier division was "'fully integrated' into the corresponding business of *Nokia*" (emphasis added). In reality, the undisputed facts show that the Siemens carrier division combined with a Nokia divested business to form a new company that operated independently. A6235 ¶ 99. Thus, even under High Point's unsupported interpretation, Siemens's sublicense to NSN B.V. was authorized by AT&T as a matter of law, because NSN B.V. remained separately identifiable.

38

Once it is established that NSN B.V. is the relevant divested business, High Point's other arguments fall apart. High Point argues (at 29) that the Siemens carrier division "was never operated or identified separately by NSN." But that is irrelevant. All that matters is that NSN B.V. remained "separately identifiable." It did remain so, as the undisputed facts described earlier show. *See* pp. 21-22, *supra*. High Point is wrong when it claims that NSN US's witness agreed with its position. The question posed during the deposition was whether "the Siemens legacy business operated separately identifiably *within NSN B.V.*," A6419:18-19 (emphasis added), which is irrelevant and distinct from the proper question, i.e., whether NSN B.V. itself maintained a separate identity.

Finally, High Point argues (at 28-29) that NSN B.V. could not have received a sublicense because it was not a "related company" of Siemens. But that argument depends on a mischaracterization of T-Mobile's and NSN's argument. Although section 4.03 of the original 1988 AT&T-Siemens cross-license limits sublicenses to "RELATED COMPANIES," T-Mobile and NSN US are not relying on that provision. Instead, T-Mobile and NSN US are relying on the *divestment rider*, which modified the 1988 cross-license to authorize coverage for future divested businesses. The original license's provision for related companies does not affect whether Siemens could sublicense NSN B.V. as a divested business under the divestment rider.

**B.    NSN US's rights cover the *kinds* of products that Siemens sold before divestiture, rather than just Siemens's specific product models.**

The divestment rider authorized Siemens to grant a sublicense "to the extent applicable to products and services sold by the future divested business prior to its divestiture." A4881. That language unambiguously covers the NSN US Node Bs and RNCs at issue in this case because Siemens sold wireless-infrastructure products—including Node Bs and RNCs—as of 2007, when it divested the carrier division. A6398-99, A5342, A5346; *see* A25-26 & n.13.

High Point nonetheless contends (at 30) that any rights obtained by NSN US were limited to the particular models that Siemens sold in 2007. That is essentially the same argument High Point makes as to the AT&T-Alcatel license, and it fails for the same reason: this Court expressly rejected it in *Rembrandt II*. *See* pp. 32-33, *supra*. *Rembrandt II* held that AT&T did ***not*** narrowly limit its 1995 license extensions to particular models sold at the time of divestiture, but instead covered broader "***product types*** using general, functional terms." 641 F.3d at 1338. So too here. The language in the divestment rider is virtually identical to the language at issue in *Rembrandt II* and resulted from the same historical context (AT&T's corporate reorganization). *Compare* A4881 *with* 641 F.3d at 1338.

It is true, as High Point asserts, that *Rembrandt II* dealt with modems rather than wireless infrastructure, but that is a distinction without a difference: the divestment rider between AT&T and Siemens authorizes coverage for the Node Bs

and RNCs that NSN US sold to T-Mobile because they are the same "product types" as those which the Siemens carrier division sold in 2007. It does not matter whether T-Mobile purchased NSN US products that originated from the legacy Nokia product line rather than the legacy Siemens product line. NSN US was licensed to sell T-Mobile the kinds of products that Siemens sold prior to the divestiture, and that is exactly what it did.

High Point also argues (at 31-32) that the 1988 AT&T-Siemens license does not cover the Node Bs and RNCs sold by NSN US because those products are "significantly more complex" than the "first-generation analog product" that Siemens sold in 1988. But again, *Rembrandt II* is squarely on point, and it rejected any argument that would limit the license to a particular generation of products. *See* 641 F.3d at 1337-38. Indeed, High Point's argument makes even less sense than the patentee's argument in *Rembrandt II*. A July 14, 1988 letter agreement between Siemens and AT&T confirmed that their cross-license would include "new products and services which normally evolve from the existing products and services" of the parties. A4878. Even apart from that clarification, the license's duration undercuts High Point's argument. The 1988 AT&T-Siemens license had a five-year capture period and provided rights for the full term of the captured patents. A4866 §1.01(c), A4873. The 1995 divestment rider extended the capture period to nine years, but that extension would have been illusory for many 1995-

41

era products under High Point's view that the cross-license applies only to first-generation mobile products sold in 1988. As the district court observed in *Rembrandt I*, it would make no sense to construe the 1988 AT&T-Siemens license to exclude the right to make and sell future product generations.

The AT&T-Siemens license's coverage of evolving generations of wireless infrastructure is dispositive because High Point concedes the relevant facts (at 31). In the mid-1980s, Siemens was deploying a first-generation cellular network in Germany and developing future generation products. A6406-07, A7394-95. Node Bs and RNCs and similar later-generation infrastructure equipment represent the normal evolution of those first-generation systems. *See* A7394-95. The covered products under both the 1988 cross-license and the divestment rider therefore include the Node Bs and RNCs sold by NSN US.

## C.    NSN B.V. received the right to sublicense its subsidiary NSN US.

High Point further argues (at 31-32) that NSN US is "unlicensed" because it was not a Siemens subsidiary or Siemens "divested business." But the 1995 divestment rider does not require NSN US to have a familial relationship with *Siemens* to obtain rights via a sublicense. Instead, NSN US obtained its sublicense as a subsidiary of *NSN B.V.*, and as the district court explained, the sublicense from NSN B.V. to NSN US is "undisputedly valid." A24. Any contrary argument

is "raised for the first time on appeal" and thus waived. *Sage Prods., Inc. v. Devon Indus.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

In any event, NSN B.V. had the right to grant a sublicense to NSN US. The divestment rider permitted Siemens to grant to future divested businesses "the licenses and rights granted in the [1988 AT&T-Siemens license]." A4881. The rights in the 1988 AT&T-Siemens license include the right to sublicense "RELATED COMPANIES." A4866 § 1.01(b). A "RELATED COMPAN[Y]" includes any subsidiary, defined as "a corporation or other legal entity the majority of whose shares or other securities entitled to vote for election of directors…is now or hereafter controlled by such company either directly or indirectly." A4873-74. When Siemens granted to NSN B.V. all rights as a licensee under the 1988 license, *see* A5308, this included NSN B.V.'s right to sublicense a subsidiary. High Point concedes that, at all relevant times, NSN B.V. owned or controlled at least 50% of NSN US. A5356, A5359, A5292. Thus, NSN US was a subsidiary of NSN B.V., and NSN B.V. had the right to sublicense NSN US.

**D.    The few Node Bs and RNCs that Nokia sold to T-Mobile prior to the formation of NSN B.V. are not at issue in this appeal.**

Finally, High Point notes (at 14-15, 27) that Nokia sold a few Node Bs and RNCs to T-Mobile prior to the formation of NSN B.V. But High Point fails to tell this Court that it gave up any claim regarding that Nokia equipment to permit this

appeal. A36-37. Those sales are not at issue, and they have nothing to do with the district court's summary-judgment ruling. A30 n.14.

### III.    LME's license covered the Node Bs, RNCs, and MGWs that Ericsson sold to T-Mobile.

The district court correctly held that the 1996 Lucent-LME license covered the Node Bs, RNCs, and MGWs that Ericsson sold to T-Mobile. A17. On appeal, High Point concedes all the district court's findings as to the Ericsson products except one: it argues that LME could not have validly sublicensed Ericsson in 2013 because the patents-in-suit had expired by that time. But the district court relied on the plain language of Section 1.03(c) of the Lucent-LME license, which expressly allows retroactive sublicenses and has no such time restriction. High Point offers no basis for disregarding that unambiguous contract term. Moreover, even without a formal sublicense, the Lucent-LME license authorized Ericsson to sell products to T-Mobile, which was enough to trigger exhaustion.

### A.    LME provided Ericsson a sublicense that was made "effective retroactively," as the Lucent-LME license expressly allows.

Section 1.03(c) of the Lucent-LME license granted both parties the right to sublicense related companies and also provided that "*[a]ny such sublicense may be made effective retroactively*." A1781 (emphasis added). The retroactive sublicense provision reflects the fact that the Lucent-LME license authorizes related companies to practice covered patents and treats the execution of a

sublicense as a ministerial act to memorialize a substantive right already granted. The retroactive license provision also reflects the fact that a license, which ultimately grants freedom from suit, has value past a patent's expiration because patentees may sue after expiration for pre-expiration infringement. The broad ability to sublicense retroactively made particular sense for LME, a holding company, which could only achieve freedom from suit if that freedom extended to related companies.[8]

The license agreement did limit the sublicense right, but only in three specific ways that indisputably do not apply here. First, a retroactive license could not immunize infringement before the license effective date, January 1, 1996. Second, a retroactive license could not immunize infringement that occurred before the sublicensee became a "RELATED COMPANY." Third, all sublicenses to "RELATED COMPANIES," including retroactive ones, must terminate when the sublicensee ceases to be a "RELATED COMPANY." A1781. Notably, High Point does not contend that the 2013 LME-Ericsson sublicense violated any of these three express limitations.

---

[8] Contrary to High Point's suggestion (at 36-37), the record testimony of Ericsson's Rule 30(b)(6) designee fully supports defense counsel's statement at oral argument that "LME has always been a holding company only." *See* A7009, A7010-12; *see also* A6982.

Rather, High Point argues (at 32-33) that LME was not entitled to grant a retroactive license to Ericsson because the patents-in-suit had expired by 2013. High Point relies on Section 1.02, which provides that "[a]ll licenses granted herein under any patent shall, notwithstanding the expiration of the LIMITED PERIOD, continue for the entire unexpired term of such patent." A1781. The "capture period" of the license was based upon the "LIMITED PERIOD." *See* A1780, A1793. Section 1.02 thus provides that even after the license's capture period ends, the licenses to the patents captured by the agreement will remain in effect for the licensed patents' full term. A1781. Section 1.02 places no limit on the period during which a party may retroactively sublicense a subsidiary; it does not mention retroactive license rights or refer to Section 1.03(c) at all.

High Point's reading would turn Section 1.02 on its head: it would take a provision designed to ***extend*** license rights beyond the capture period and use it to ***curtail*** license rights discussed elsewhere. Moreover, nothing within Section 1.03(c) (or elsewhere in the Lucent-LME license) suggests that a post-expiration retroactive sublicense would be improper. Indeed, such a sublicense does nothing more than memorialize the rights that both parties had permitted the other's subsidiaries to enjoy during a time when the patents were still in force.

High Point's interpretation also would lead to illogical and anomalous results. Under High Point's interpretation, although LME had the right to sublicense Ericsson to the patents-in-suit both prospectively and retroactively until the day the patents-in-suit expired (July 8, 2011), LME lost all rights to retroactively sublicense those patents the very next day, despite the fact that LME's subsidiaries and their customers still faced six more years of potential infringement claims. That interpretation would have the perverse effect of encouraging delay in filing suit and providing more compensation after patent expiration than before.

## B.    Even without a formal sublicense, Lucent authorized Ericsson's sales to T-Mobile, which thus triggered patent exhaustion.

This Court has held that patent exhaustion is triggered by *authorization*, and that a formal license is unnecessary. *TransCore,* 563 F.3d at 1274-75. In that regard, this Court has explained that "authorization" turns not on how an agreement characterizes the rights it provides to a seller, but, rather, on whether the agreement ultimately provides the seller with protection from an infringement claim. *Id.* at 1276. In view of these principles, Ericsson was at all times authorized to sell the accused equipment to T-Mobile, because when those sales took place, neither Lucent nor any of its successors-in-interest could have sustained an infringement claim against Ericsson. Had they tried, LME could have immediately granted Ericsson a retroactive and prospective sublicense under Section 1.03(c) of the Lucent-LME license.

*Tessera, Inc. v. International Trade Commission*, 646 F.3d 1357 (Fed. Cir. 2011), reinforces this point, and renders moot High Point's various arguments regarding the timing and effect of the LME-Ericsson sublicense. In *Tessera*, each of the seller's license agreements expressly stated that the seller was not licensed unless and until it had paid a royalty. *Id.* at 1363. Notwithstanding that fact, this Court held that the actual payment of royalties was irrelevant because the agreement ***authorized*** the seller to make the sales in question:

> These agreements expressly authorize licensees to sell the licensed products and to pay up at the end of the reporting period....That some licensees subsequently renege or fall behind on their royalty payments does not convert a once authorized sale into a non-authorized sale.

*Id.* at 1369-70. The same reasoning applies here. Section 1.03(c) of the Lucent-LME license expressly authorized LME to make sales through its subsidiaries, and to retroactively sublicense those subsidiaries after the fact. A1781. Thus, just as this Court rejected Tessera's argument that a sale could be "initially unauthorized until [Tessera] receive[d] the royalty payment," it is equally unavailing for High Point to argue that Ericsson's sales were somehow initially unauthorized until a sublicense was actually executed. *Tessera*, 646 F.3d at 1370. Accordingly, although LME and Ericsson later executed a written retroactive sublicense as Section 1.03(c) expressly permitted, they did not need to do so for exhaustion purposes. Section 1.03(c)'s mere existence ***always*** provided Ericsson with "freedom from suit," and thus "authorization" to make the sales in question. *TransCore*, 563 F.3d at 1275.

**C.    The cases High Point relies on have no relevance to applying an express contract term like the retroactive sublicense right here.**

Unable to counter the plain language of the Lucent-LME license, High Point instead tries to rely on case law to nullify it. But none of the four cases High Point cites concerns an express contractual term allowing retroactive sublicensing and a patent owner who took ownership subject to that contractual term. Accordingly, each of High Point's cases is readily distinguishable, as set forth below.

High Point cites *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998), for the proposition that a patent license may only operate prospectively. But *Ethicon* holds only that a ***co-owner*** may not grant ***a release of another co-owner's right to accrued damages***. It says nothing about a sole owner's ability to authorize a licensee to grant retroactive sublicenses. *Ethicon* thus has no bearing on this case, where the sole patent owner, Lucent, granted LME the right to sublicense its subsidiaries retroactively, and High Point subsequently took title to the asserted patents subject to those rights.

Indeed, were *Ethicon* to stand for the proposition High Point now urges (i.e., that the entire retroactive sublicense clause should be void), it would undo an express contract provision and undercut Lucent's right—as the patentee at the time—to freely convey its interest in the patent. It also would offend the settled and common-sense principle that "[p]atent owners cannot transfer an interest greater than what they possess, so assignees 'take[ ] a patent subject to the legal

encumbrances thereon.'" *Innovus Prime, LLC v. Panasonic Corp.*, No. 5:12-00660, 2013 U.S. Dist. LEXIS 93820, at *15 (N.D. Cal. July 2, 2013) (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008)).[9]

High Point tries this same argument using *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359 (Fed. Cir. 2010). However, *Abraxis* was focused on the entirely distinct legal issue of whether a plaintiff could retroactively acquire standing to sue for infringement through a *nunc pro tunc* assignment. Even then, this Court suggested that the assignment in question **could** have conferred standing had the original patent owner expressly assigned the intermediate owner (which granted the *nunc pro tunc* assignment to plaintiff) the right to sue for past damages. *Id.* at 1367. Thus, to whatever limited extent *Abraxis* may be analogized to the present case, it actually supports the proposition that Lucent could likewise grant LME the right to convey freedom from suit to Ericsson as to past sales.[10]

---

[9] High Point incorrectly claims (at 37) that "Ericsson-US specifically recognized in its brief the 'potential unfairness that may arise from an assignee not being on notice of a prior…license.'" Ericsson actually asserted the opposite: "Here, holding High Point to the terms of the Lucent license would not be at all unfair." A1193. The quotation High Point relied upon came from Ericsson's summary of *Innovus,* which, as stated, holds that assignees (such as High Point) always take title subject to prior encumbrances (such as the Lucent-LME license, including its provision authorizing retroactive sublicenses to related companies). *Innovus*, 2013 U.S. Dist. LEXIS 93820, at *15.

[10] *Alps South, LLC v. Ohio Willow Wood Co.*, Nos. 2013-1452, -1488, 2014-1147, -1426, 2015 U.S. App. LEXIS 9368 at *13 (Fed. Cir. June 5, 2015), which cites *Abraxis*, considered a similar question of standing with respect to a retroactive

High Point also relies on *Honeywell International, Inc. v. United States*, 609 F.3d 1292 (Fed. Cir. 2010), for the related proposition that exhaustion cannot apply retroactively. However, unlike the present case, *Honeywell* did not concern a mutually agreed-upon, two-way retroactive licensing clause, but rather, the issue of whether a ***merger*** between the seller (Honeywell, Inc.) and the patent owner (AlliedSignal) had the legal effect of retroactively authorizing the seller's ***premerger sales*** (to the government). *Id.* at 1304. Although this Court held that the merger did not retroactively authorize the prior sales, it did so because Honeywell had ***no rights*** in the AlliedSignal patents when it made those sales. *Id.* In contrast, when Ericsson sold the accused products to T-Mobile, Lucent had already granted LME the right to sublicense subsidiaries such as Ericsson retroactively. Thus, while AlliedSignal unquestionably could have sued Honeywell when Honeywell made its sales to the government, Lucent had already relinquished the right to claim infringement by any LME subsidiary at the time Ericsson made its sales to T-Mobile.

Finally, High Point also cites *Cascades Computer Innovation, LLC v. Samsung Electronics Co.*, Civ. Nos. 11-4574, 11-6235, 2014 U.S. Dist. LEXIS 128300 (N.D. Ill. Sept. 14, 2014) for the proposition that exhaustion cannot apply

---

***exclusive license***. Nevertheless, like *Abraxis*, *Alps* neither considered issues relating to patent exhaustion, nor facts similar to the present case, in which a prior written agreement expressly authorized the execution of the retroactive agreement in question.

retroactively. However, *Cascades* involved a litigation settlement agreement that included a "release" and related "covenant not to sue" for past infringement by Google, which was not unconditional. It expressly did not extend to defendants in other actions, such as the defendants in *Cascades*. Consequently, the district court held that the settlement agreement could not provide authorization for the past activities of downstream users such as the defendants. By contrast, the Lucent-LME license was struck in the ordinary course of business, was in place ***years*** before the sales at issue in this case, and expressly authorized LME to make those sales through Ericsson and execute a retroactive sublicense after the fact. Thus, the fact-specific holding in *Cascades* has no application to the present case.[11]

## IV.   High Point's patent rights against T-Mobile are exhausted because the licensed articles substantially embody all asserted claims.

High Point does not challenge the exhaustion principles the district court applied. Under *Quanta*, "the initial authorized sale of a patented item terminates all rights to that item." 553 U.S. at 625. This rule prevents a patent holder from repeatedly exacting royalties by attacking multiple points along the chain of distribution; it also "confers on the purchaser, or any subsequent owner, the right to use or sell the thing as he sees fit." *Helferich Patent Licensing, LLC v. New York*

---

[11] High Point asserts (at 36) that Section 1.03(c) "does not permit LME to grant…releases to third parties such as T-Mobile." But ***release*** is a red herring on this appeal. The district court based its ruling on ***exhaustion***, which requires only that Ericsson have been authorized to make the sales in question to T-Mobile, which it was.

*Times Co.*, 778 F.3d 1293, 1301 (Fed. Cir. 2015) (internal quotations and citation omitted). "The basic principle underlying the Supreme Court's exhaustion cases is that the authorized transfer of ownership in a product embodying a patent carries with it the right to engage in that product's contemplated use." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1373 (Fed. Cir. 2013).

Under *Quanta*, authorized products that ***substantially embody*** asserted claims exhaust those patent rights. Substantial embodiment arises when authorized products embody an asserted claim, even when other, non-authorized products satisfy the non-inventive elements of that claim. *Quanta*, 553 U.S. at 631-32; *LifeScan*, 734 F.3d at 1368. "What is 'inventive' about patent claims in the patent exhaustion context is what distinguishes them from the prior art." *LifeScan*, 734 F.3d at 1369. Thus, as one example, licensed products will substantially embody a claim when "the only step necessary to practice the patent is the application of common processes or the addition of standard parts." *Quanta*, 553 U.S. at 633. However, even a non-standard part is irrelevant to substantial embodiment analysis if the element it practices is a non-inventive one, i.e., one that does not distinguish the claim over the prior art. *LifeScan*, 734 F.3d at 1372.

Applying those principles, High Point's own infringement contentions established exhaustion, once the district court found that ALU, NSN US, and Ericsson sold licensed components to T-Mobile. As to the '090 patent, High Point

admitted that NSN US and Ericsson Node Bs substantially embody three asserted claims. Thus, as the district court first found, under *Keurig*, as applied to the facts of this case, the authorized Node B sales to T-Mobile exhausted all asserted claims of the '090 patent. Furthermore, as to all claims at issue in this appeal, the only unlicensed component High Point accused in its infringement contentions was standard physical-transmission media practicing non-novel communications-link elements that appeared in some claims. Accordingly, authorized components practiced all the novel claim elements, and thus substantially embody all asserted claims under *Quanta*.

## A.    High Point's admission that licensed Node Bs substantially embody certain claims of the '090 patent established exhaustion in this case as to all asserted claims of that patent.

High Point admitted that "the accused Node Bs substantially embody the claimed inventions of [claims 28, 29, and 31 of the '090 patent], such that the licensed sale of a Node B would exhaust High Point's rights with respect to those patent claims…." A6194 n.14. Based on that admission, the district court correctly concluded as to the facts of this case that the remaining asserted claims of the '090 Patent were also exhausted under the reasoning of *Keurig*. A28-29.

Though High Point attempts to avoid this result by invoking this Court's more recent opinion in *Helferich*, its reliance thereon is misplaced. The Helferich patents involved two sets of claims: "content" claims that read on the provision of

content and that were not practiced by the handset (present in all seven patents at issue) and "handset" claims on viewing of the content that were practiced by the handset (present in only two of the patents at issue). *Helferich*, 778 F.3d at 1295. Helferich did not dispute that its licenses exhausted the patent claims as to handset use by downstream owners or possessors of the handsets ("authorized acquirers"). *Id.* at 1296-97. And, Helferich did not sue any authorized acquirer of a handset. Rather, it sued third-party content providers *for infringement of the content claims*. *Id.* at 1297-98. On those facts, the panel held that exhaustion of the handset claims against the licensed handset manufacturers and their customers did not necessarily exhaust Helferich's right to assert the content claims against unlicensed, unauthorized content providers. *Id.* at 1301-03, 1311. The panel saw "no sound basis for expanding exhaustion doctrine to hold that authorized sales to persons practicing the handset claims exhaust the patentee's rights to enforce the asserted content claims against different persons." *Id.* at 1311. It reasoned that the exhaustion doctrine's protection against infringement allegations has "always remained within a limit that reflects the core notion that exhaustion lifts legal restrictions on an *authorized acquirer*." *Id.* at 1301-02 (emphasis added). The panel cautioned, however, that its ruling did not foreclose an exhaustion defense premised on "the presence of essentially the same inventive features in paired

handset-content claims" or "the necessity that someone practice a handset claim for an asserted content claim to be practiced." *Id.* at 1311.

Unlike the defendants in *Helferich*, T-Mobile purchased the accused equipment from **authorized** suppliers. Accordingly, *Keurig* applies and *Helferich* does not.

Moreover, unlike *Helferich*, this is not a case where the patent has claims directed to distinct subject matters requiring different articles to practice them. In *Helferich*, the content claims were directed to delivering content and did not require using a licensed handset. Conversely, the handset claims were directed to using the handset and practicing them did not also require practicing the content claims. Here, however, all the asserted claims of the '090 patent are clearly related: they either claim just a cell (i.e., claims 28, 29, and 31), or they claim the uses of that cell in telecommunication networks. In both instances, High Point reads the cell element on Node Bs. Accordingly, the reasoning of *Helferich* does not apply to the asserted claims of the '090 patent, and the district court was correct to find each of the asserted claims of the '090 patent to be exhausted under *Keurig*.

In addition, on the facts of this case, High Point's arguments (at 46-47) that it can continue to assert other claims from the '090 patent, even if licensed Node Bs did substantially embody three claims in the '090 patent, directly contradicts *Keurig*. In view of High Point's infringement contentions and the claims at issue,

the district court properly applied *Keurig* to evaluate exhaustion on a patent-by-patent basis. Any other holding on these particular facts would have allowed High Point "to reserve specific claims from exhaustion" in a way that "would frustrate the purposes of the [exhaustion] doctrine, one of which is to provide an efficient framework for determining when a patent right has been exhausted." *Keurig*, 732 F.3d at 1374-75.

The district court thus correctly ruled that NSN US's and Ericsson's licensed Node B sales to T-Mobile exhausted all asserted claims of the '090 patent. A28.

**B.    In High Point's infringement contentions, licensed Node Bs, RNCs, and/or MGWs substantially embody the remaining claims of the patents-in-suit.**

The record also demonstrated substantial embodiment and exhaustion on a claim-by-claim analysis for all four patents-in-suit. *See, e.g.,* A1193-212, A1230-39, A2730-36, A2752-67, A2771-82, A2807-14, A1800-1941, A6042-6147, A7409-20. Moreover, the record left no room for any dispute of material fact on substantial embodiment or exhaustion, because both followed from High Point's own infringement contentions, which accused components that the district court found to be licensed as practicing every novel feature of the asserted claims.

High Point has not accused any component other than a Node B, RNC, and/or MGW as performing any inventive feature of any asserted claim at issue in this appeal. In fact, the only unlicensed components identified in High Point's

57

contentions are standard physical-transmission media, and even then only for some claims. But High Point accused those transmission media of practicing only the admittedly non-novel communications-link and communications-medium elements. Thus, High Point's infringement contentions effectively concede that Node Bs, RNCs, and/or MGWs embody every inventive feature in the asserted claims.

Under *Quanta* and *LifeScan*, the concession in High Point's infringement contentions means that authorized sales of those products exhausted High Point's asserted claims. For the majority of the asserted claims, which do not include communications-link or communications-medium elements, High Point does not challenge the district court's conclusion that combinations of licensed equipment meeting all claim elements would substantially embody the claim and thus exhaust High Point's patent rights.[12] Indeed, High Point has not even suggested that the licensed equipment has any alternative use, much less that the alternative use is "'reasonable and *intended*' by the patentee or its authorized licensee" as *Lifescan* would require to avoid exhaustion. 734 F.3d at 1369 (emphasis added).

---

[12] Apart from configurations that combine equipment from multiple licensees, there is a significant portion of the accused network that uses only Ericsson products (Node Bs, RNCs, and MGWs) for all the novel claim elements. *See supra* p. 15.

Instead, High Point (at 51-53) challenges substantial embodiment and exhaustion only as to those claims where it contends that T-Mobile infringes by combining licensed and unlicensed equipment, i.e., combining Node Bs, RNCs, and/or MGWs with an unlicensed physical-transmission medium that constitutes a "communications link" or "communications medium." But exhaustion still applies to those claims despite the combination with unlicensed physical-transmission media. The AT&T inventors stated in the specifications and during patent prosecution that the communications links and communications media were well-known technologies at the time of the patents-in-suit. *See, e.g.,* A117, 3:50-58, A1231-39, A3448, A3468-69. High Point has not contended otherwise in this case. The accused combinations of supposedly novel but licensed Node Bs, RNCs, and/or MGWs with unlicensed but ordinary, off-the-shelf communications links and media thus present a scenario on all fours with *Quanta*, where the Supreme Court held that exhaustion applied.

As to certain claims of the '090 patent only, High Point argues (at 50) that additional discovery ***might*** reveal that unlicensed routers ***might*** statistically multiplex voice call traffic, and thereby perform a purportedly inventive function. High Point's speculation about what additional discovery might have revealed is irrelevant to this appeal. High Point points to no ***actual*** evidence that would suggest that routers in T-Mobile's network perform anything more than standard

functions. Despite ample time to take discovery, High Point did not come up with any actual evidence to support its speculation.

Even if discovery had shown that routers performed packet-switching or statistical multiplexing features, which is the most High Point says it might possibly have shown, such evidence would not affect the substantial embodiment analysis. The AT&T inventors never claimed packet-switching and statistical multiplexing functions to be a novel feature of the '090 patent. Rather, they identified the novel features as *managing the time instants* of transmission for packet-based, statistically multiplexed traffic, at the cell and switching system. A3468-69. In fact, High Point has conceded that packet-switching and statistical multiplexing were known in the art at the time of the inventions. A6211-14.

Moreover, neither Mr. Chandler nor High Point has ever suggested that they have found any reason to question the accuracy of High Point's *current* infringement contentions, which state that the accused Node Bs, RNCs, and/or MGWs can nevertheless perform every "statistical multiplexing" function in the asserted claims without the help of any additional routers. Accordingly, Mr. Chandler's musings are, at best, the beginnings of *additional* potential infringement theories, but do nothing to diminish the effect of High Point's standing concession in its infringement contentions that the accused Node Bs, RNCs, and/or MGWs can substantially embody every asserted claim. Accordingly,

the district court properly ruled based on High Point's ***existing*** infringement contentions, as this Court has confirmed it was entitled to do. *See Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997).

As a matter of law, the licensed components substantially embody all the asserted claimed inventions, resulting in exhaustion.

## C.    The combination provisions in the license agreements are irrelevant to the patent exhaustion analysis.

Finally, High Point argues (at 53-54) that by virtue of restrictions in the license agreements, a ***license*** defense would not apply "to the combination of licensed and unlicensed products in the network." As this Court explained in *TransCore*: "The parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis." 563 F.3d at 1275 (citing *Quanta*, 533 U.S. at 637). Accordingly, under *Quanta* and *TransCore*, the anti-combination provisions in the license agreements are irrelevant to analyzing exhaustion.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

DATED: June 23, 2015

*Asim M. Bhansali*
Asim M. Bhansali
Theresa H. Nguyen
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   (415) 391-5400
Facsimile:    (415) 397-7188

Dan L. Bagatell
PERKINS COIE LLP
2901 N. Central Ave., #2000
Phoenix, AZ 85012
Telephone:  (602) 351-8250
Facsimile:   (602) 6488-7150

Ryan J. McBrayer
PERKINS COIE LLP
1201 Third Ave, Suite 4900
Seattle, WA 98101
Telephone:  (206) 359-3073
Facsimile:   (206) 359.4073

*Counsel for Defendant-Appellee*
*T-MOBILE USA, INC.*

DATED: June 23, 2015          *William L. Mentlik*
                              William L. Mentlik
                              Roy H. Wepner
                              Robert B. Hander
                              LERNER, DAVID, LITTENBERG,
                              KRUMHOLZ & MENTLIK LLP
                              600 South Avenue West
                              Westfield, NJ 07090
                              Telephone:  (908) 654-5000
                              Facsimile:   (908) 654-7866

                              *Counsel for Defendant-Appellee*
                              *ERICSSON INC.*

DATED: June 23, 2015          *Daryl L. Joseffer*
                              Daryl L. Joseffer
                              KING & SPALDING LLP
                              1700 Pennsylvania Ave., NW
                              Washington, DC 20006
                              Telephone:  (202) 737-0500
                              Facsimile:   (202) 626-3737

Robert F. Perry
Allison H. Altersohn
Christopher C. Carnaval
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone:   (212) 556-2100
Facsimile:    (212) 556-2222

Adam M. Conrad
KING & SPALDING LLP
100 N. Tryon Street, Suite 3900
Charlotte, NC 28202 10036
Telephone:   (704) 503-2600
Facsimile:    (704) 503-2622

*Counsel for Defendant-Appellee*
*NOKIA SOLUTIONS and*
*NETWORKS US LLC*

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

*High Point SARL v. T-Mobile USA, Inc., Ericsson Inc., and Nokia
Solutions and Networks US LLC,* 15-1235

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KEKER & VAN NEST LLP, Attorneys for Defendants-Appellees, to print this document. I am an employee of Counsel Press.

On June 23, 2015, Counsel for Appellee has authorized me to electronically file the foregoing **BRIEF OF APPELLEES T-MOBILE USA, INC., ERICSSON INC. AND NOKIA SOLUTIONS AND NETWORKS US LLC** with the Clerk of the Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Martin J. Black (martin.black@dechert.com)
Robert D. Rhoad (robert.rhoad@dechert.com)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: 215 994 4000
*Counsel for Plaintiffs-Appellants*

Additionally, paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

June 23, 2015                                     /s/ Robyn Cocho
                                                  Counsel Press

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(C) because it is proportionally spaced, has a Times New Roman typeface of 14 points or more and contains 13,573 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*Asim M. Bhansali*
Asim M. Bhansali